CITY OF DETROIT v DETROIT POLICE OFFICERS ASSOCIATION

Docket No. 63929. Argued January 10, 1980 (Calendar No. 16).— Decided June 6, 1980. Rehearing denied 409 Mich 1101.

A panel of arbitrators, proceeding under the statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments, resolved the issues remaining between the City of Detroit and the Detroit Police Officers Association during the formation of a new collective bargaining agreement in 1977. The award essentially accepted the city's last offer of settlement on most of the disputed economic issues but accepted the police officers' offers to preserve the existing cost of living allowance (COLA) agreement with a lower increase in wages than that proposed by the city (with a limited COLA agreement) over the next three years.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5, 20, 21, 23-25, 27, 31-33, 35, 36] 5 Am Jur 2d, Arbitration and Award § 9.

16 Am Jur 2d, Constitutional Law §§ 335, 339.

48A Am Jur 2d, Labor and Labor Relations §§ 1772, 1773.

Constitutionality of arbitration statutes. 55 ALR2d 432.

Validity and construction of statutes or ordinances providing for arbitration of labor disputes involving public employees. 68 ALR3d 885.

[3, 26, 28] 1 Am Jur 2d, Administrative Law § 102 et seq.

16 Am Jur 2d, Constitutional Law §§ 335, 339.

[4, 7, 8, 10, 12, 13] 48 A Am Jur 2d, Labor and Labor Relations §§ 1772, 1773.

Validity and construction of statutes or ordinances providing for arbitration of labor disputes involving public employees. 68 ALR3d 885.

[6, 9, 11, 13, 20] 5 Am Jur 2d, Arbitration and Award § 145.

[14] 48A Am Jur 2d, Labor and Labor Relations § 1999.

[15] 5 Am Jur 2d, Arbitration and Award § 143.

[16] 48A Am Jur 2d, Labor and Labor Relations §§ 1771, 1773.

[17] 16A Am Jur 2d, Constitutional Law § 384.

[18] 16 Am Jur 2d, Constitutional Law §§ 752, 753.

[19] 16 Am Jur 2d, Constitutional Law § 158.

[22] 16 Am Jur 2d, Constitutional Law §§ 150, 158.

[29] 16A Jur 2d, Constitutional Law § 735 et seq.

[30, 31, 34-36] 73 Am Jur 2d, Statutes §§ 38-41, 43.

Most of the non-economic issues were settled or withdrawn or remanded to the parties and the order provided for consideration by the panel of a hardship exemption from the existing contractual requirement that the police officers reside in the city, unless the parties were able to resolve the residency issue by further negotiation within 30 days of the award. The City of Detroit brought an action seeking review of the arbitrators' award and challenging the constitutionality of the statute which provides for compulsory arbitration. Defendant Detroit Police Officers Association and intervening defendant Detroit Fire Fighters Association brought counterclaims seeking enforcement of the arbitration award and payment of interest on its economic portions from the time of its issuance. The Wayne Circuit Court, Victor J. Baum, J., granted a judgment enforcing the award, and later enforced a supplemental award concerning the hardship exemption from the existing residency requirement and the use of grievance arbitration to resolve individual claims of hardship. The plaintiff appeals prior to decision of the Court of Appeals. In opinions by Justices Williams, Blair Moody, Jr., and Fitzgerald, and a dissenting opinion by Justice Levin, the Supreme Court *held* that the compulsory arbitration statute is constitutional.

Justice Williams, joined by Justices Ryan and Moody, wrote:

The statute, as amended in 1976, is a constitutional delegation of legislative power because it provides standards for guidance of the arbitrators as reasonably precise as the subject matter requires or permits, and, as a practical matter, the statutory scheme provides adequate political accountability. The arbitration award, with the exception of the hardship exemption from the city's residency requirement, complies with the requisite statutory standards and is supported by competent, material and substantial evidence on the whole record. However, there is no statutory provision under which to grant interest on the economic portion of the award. The other claims the plaintiff raises, that the statutory scheme impermissibly usurps the powers of a home rule city and violates the Equal Protection Clause by denying the right to cast an effective ballot in a municipal election, have been previously rejected by the Court.

1. The Legislature may delegate its power, provided that the standards prescribed for guidance of the body to which it is delegated are as reasonably precise as the subject matter requires or permits. The statute at issue specifically states its guiding purpose, defines the parties to whom it applies, estab-

lishes specific time limits for initiation and resolution of arbitration, provides a detailed procedure for the appointment and removal of persons appointed to the Michigan Employment Relations Commission Panel of Arbitrators and for the selection of the arbitration panel's representative delegates and public chairperson, formulates procedural guidelines for the arbitration hearing and remand, narrows the scope of the arbitrators' authority to eight specific considerations ("factors") for their decision of economic and non-economic issues, and details the effect of an arbitral decision subject to the availability of judicial review. The eight factors in the act provide standards which are at least as reasonably precise as the subject matter requires or permits in effectuating the purpose of the act to afford a procedure for the resolution of contract-formation ("interest") disputes. The statutory requirement that the arbitration panel adopt the last offer of settlement which it finds more nearly complies with the applicable statutory factors shows the sufficiency of these standards more clearly. Neither the presence nor absence of the last-best-offer provision is necessary to the act's constitutionality and the dictates of the delegation doctrine.

2. The City of Detroit argues that political, or public, accountability of the arbitrators is necessary, in addition to proper delegation, to sustain the constitutionality of the statute. The Supreme Court has previously recognized the inherent tension between the objectives of affording the arbitrators a high degree of independence and requiring public accountability and responsibility. In 1976 the Legislature significantly modified the scheme of the act as to the tenure of the impartial chairpersons of the arbitration panels and as to the method of their selection. These modifications have greatly increased the accountability of the persons available to serve as chairpersons of arbitration panels, tend to eliminate "hit-and-run" arbitrators, and lead to the establishment of a class of arbitrators with tenure and responsibility compatible with the notion of political or public accountability. Should the actions of the appointed arbitrators invite unfavorable comment, the voters may express their dissatisfaction by directing complaints to the Governor as well as to the gubernatorially appointed MERC commissioners.

3. The MERC commissioners and panel members need not be directly accountable to the people of the specific community over which arbitral authority is exercised. Interruptions of work by police and fire departments, although primarily local in their settings, were deemed by the Legislature to pose a threat to the state's public health, safety and welfare. Should

the people be dissatisfied with the accountability of the state's statutory scheme, the burden is upon the state's voters, including those locally affected, to exercise their political will upon the Legislature. The inherent tensions between the objectives of affording arbitrators sufficient independence in making decisions on complex disputes and maintaining their accountability to the public have been adequately balanced in view of the statutory provision of standards, the extremely public atmosphere in which the arbitration operates, and the statutory provision for judicial review. The statutory standards check the unfettered exercise of the arbitrators' authority and provide them with guides which the Legislature deemed to be significant in resolving those issues which have been negotiated and sharpened by the parties, yet remain unresolved. Therefore, as a practical matter, the scheme exhibits adequate political or public accountability.

4. The statute provides the Court with a license neither to consider the wisdom of an arbitration award nor to subject it to *de novo* review, but specifically confines the scope of review to awards without or exceeding the panel's jurisdiction, or unsupported by competent, material and substantial evidence on the whole record, or procured by unlawful means. The award must be based upon competent, material, and substantial evidence relating to the applicable factors prescribed by the statute in the case of non-economic issues, or to the last offer which "more nearly complies with" the factors in the case of economic issues. That is, the arbitration panel's award must reflect the applicable statutory factors and they must be established by competent, material and substantial evidence on the whole record. However, the fact that a majority of the arbitrators may not have been persuaded by a party's evidence and argument as to certain issues does not mean that they have failed to give the statutory factors that separate consideration required by law. The Legislature has evinced no intention that each factor be accorded equal weight; it is the arbitration panel that must decide which particular factors are more important in resolving a certain contested issue, although all applicable factors must be considered.

5. The Court's review of the award must be undertaken with considerable sensitivity in order to accord due deference to the arbitrators' expertise and not displace their choice between two reasonably differing views. On the economic issues of the cost of living allowance (COLA) and wages, because the City of Detroit advocated the abolition or severe diminution of the existing COLA agreement, its wage proposal was considerably higher

than the one the police officers requested in conjunction with a continuation of the COLA provision. Therefore, the arbitrators discussed the two issues together in considering the statutory factors and reached a finding as to each one. There was uncontradicted evidence that the City of Detroit was at the legal limit of its taxing power, but the arbitrators did not consider this fact to be conclusive as to the economic issues. The city asserted that its ability to pay was "limited" but because the city did not introduce its budget the arbitrators were unable to determine what other needs of the city were met by the city's previous spending compared with the importance of and amounts necessary for funding the police officers' last offers on the wage and COLA issues. The panel considered it to be of major importance that, in another recent arbitration proceeding, the Detroit Police Lieutenants and Sergeants Association had obtained a continuation of a similar COLA agreement. Because the two police associations had enjoyed a strong historic relationship, the panel decided that a denial of the COLA to the police officers would imperil police morale and the effective performance of their services to the public. The panel also found that the more apt and persuasive comparisons of salaries and fringe benefits to be with the Detroit police lieutenants and sergeants and with other police officers working in the Detroit metropolitan area, rather than with other City of Detroit employees, out-of-state police officers, or private security employees. The panel also decided that it should maintain the historic relation between the compensation of police officers below the rank of sergeant and of those above. The panel concluded that the maintenance of high police morale could more effectively be insured by preserving the previous COLA arrangements, which were inextricably related to the resolution of the wage issue. The award of the defendant's last offer as to these economic issues, *i.e.,* the lower wage proposals with the continued COLA agreement, was supported by competent, material and substantial evidence on the whole record.

6. The City of Detroit argues that the economic award should be vacated because of refusal to admit into evidence the city's Exhibit 30, which purported to show the financial effect that the award would have on the city because of the DPOA's relationship with the Detroit Fire Fighters Association and the police lieutenants and sergeants. The city had already agreed, with respect to certain economic benefits, that there would be a parity between fire fighters and police officers, and the previous and proposed contracts with the police lieutenants and ser-

geants had provided that their pay would be computed upon that of a police officer. Thus the city argued that any economic award in this case would be reflected in the total cost to the city in the total budget, and its ability to pay. The chairman of the arbitration panel excluded Exhibit 30 from evidence on the ground that the statutory arbitration with the other two unions had not been completed at that time. Review of that decision is limited to whether the exclusion was so egregious as to cause the award on the contested economic issues to be unsupported by competent, material and substantial evidence on the whole record. In the light of remarks by the chairman of the panel to the effect that they were aware of the historic relations among the three bargaining units and the city, the exclusion from evidence of Exhibit 30 cannot be said to have caused the economic award to be unsupported by competent, material and substantial evidence on the whole record.

7. The panel of arbitrators, in considering the issue of the city's residency requirement, erroneously failed to compare this condition of employment with residency requirements for public and private employees performing similar services. The omission by the parties of evidence on this statutory factor does not excuse the arbitrators' inattention to it. Therefore, the award of a hardship exemption from the residency requirement is not supported on this record and it remains up to the parties to either introduce evidence on the applicable factors before the arbitrators or to return to collective bargaining on the issue. The arbitrators did not make an award concerning the 1978 Detroit ordinance defining "residence" and therefore a reviewing court cannot fill this void by *de novo* amending the contract to include it. The parties should also resolve the issue of the inclusion of the ordinance by collective bargaining and arbitration.

8. The question of interest on the award is purely statutory. The arbitration panel is not a court, and the concept of a money judgment is totally alien to the concept of the arbitration of labor disputes in critical public services. Therefore, the provision of the Revised Judicature Act concerning interest on a "money judgment recovered in a civil action" does not apply to the arbitrators' economic award. Neither is this an award "founded" on contract because the very purpose of the statutory arbitration is to form a contract and the award which results has not been executed to the extent that an amount upon which interest may be granted has been liquidated or ascertained. In sum, there is no statutory provision under

which to grant interest on the economic portion of the arbitrators' award.

Justice Moody, joined by Justice Ryan, concurring with Justice Williams, wrote separately to respond to Justice Levin's opinion:

1. The result offered by the dissenting opinion of redetermination of the economic awards without the last-best-offer restriction, although it presents an attractive compromise solution to the economic problem, would require an ex post facto change of the rules of the contest. It would cause the parties to debate again what has been resolved in accordance with reasonable standards.

2. The conclusion that the last-best-offer system yields results which are unconstitutionally arbitrary does not necessarily follow in fact or law. No section of the Michigan or United States Constitution is cited to support the conclusion. Furthermore, it is conceded that there is a sound rationale for the adoption of the system: the promotion of private settlements by penalizing those who did not try hard enough to settle.

3. The Court must determine whether there is a rational basis for the Legislature's judgment, but it is not the role of the Court to decide whether the Legislature acted wisely or unwisely in enacting this statute. The proper test for judging the constitutionality of the statute, enacted pursuant to the police power, under the Due Process Clause is whether the legislation bears a reasonable relation to a permissible legislative objective. The test to determine whether it comports with the Equal Protection Clause is essentially the same. The legislative classification must be sustained if it is rationally related to a legitimate government interest. The Court does not have the power to arbitrarily declare certain legislation to be unconstitutional.

Justice Fitzgerald agreed that the compulsory arbitration act is constitutional, but for different reasons from those advanced by Justice Williams. He also agreed with Justice Williams' analysis of the other issues in the case. He wrote:

1. The degree of "political accountability" of the arbitration panel is not the crucial test for determining the act's constitutionality. There is "accountability" in that the act specifically provides that any award must be based on certain legislatively prescribed criteria, and thus the arbitration panel is not free to issue an award premised on its unique view of what the criteria ought to be; more importantly, fidelity to the criteria will be examined by the judiciary if review is sought. But it stretches credulity to contend that the arbitrators, including the chairperson, are "politically accountable" in some fashion to the

electorate. Debate on the question of political accountability is misplaced emphasis.

2. What has been ignored is that a "politically accountable" entity, the Legislature, has enacted this mechanism for the peaceful resolution of labor disputes, and another "politically accountable" entity, the local unit of government which constitutes "management" has been charged with the responsibility of putting on the bargaining table its offer to settle the dispute. The arbitrators themselves need not also be directly politically accountable; such a system, while it might make for politically expedient awards, would hardly be consonant with the spirit of having an impartial forum for binding arbitration.

3. Much of the language in the dissent is an examination of the wisdom of the legislation rather than of its constitutionality. If the act is simply bad legislation, the electorate should call to account those who were responsible for its promulgation.

Affirmed, except as to the hardship exemption from the city's residency requirement.

Justice Levin, joined by Chief Justice Coleman and Justice Kavanagh, dissenting, would hold the statute unconstitutional on the ground that it delegates the power to prescribe policy (law) to the chairman of the arbitration panel without adequate safeguards circumscribing the exercise of that power, and the last-best-offer provision exacerbates rather than cures the statute's deficiencies so that entirely apart from its constitutionality otherwise, it is unconstitutional with that provision. The holding should be given prospective effect, and this case and the Lieutenants and Sergeants Association case remanded for redetermination of the economic awards unrestrained by the last-best-offer limitation. Because the merits in this case depend in part on the merits of the city's appeal in the Lieutenants and Sergeants Association case, for which application for leave to appeal is now being held in abeyance, there can be no final decision in this case until the city's application in the Lieutenants and Sergeants case is decided.

1. Implicit in the Legislature's constitutionally conferred power to enact laws for the resolution of disputes concerning public employees is the power to delegate the resolving authority. The delegation doctrine and other constitutional principles seek to protect against excessive delegation or misuse and abuse of delegated lawmaking power. The doctrine is rooted, at least in part, in the constitutional provision vesting the "legislative power" in the Senate and House of Representatives, and reflects the fundamental democratic premise that the law should be made by representatives chosen by the people. It

attempts to reconcile that precept with the complexity of the governing process. The statutory "standards" test has proved ineffectual in assuring legislative responsibility for fundamental policy decisions and in structuring the exercise of delegated power. The more appropriate inquiry is whether the totality of standards and safeguards surrounding the delegation of legislative power sufficiently protects against unnecessary and uncontrolled discretionary power. A court should review a challenged delegation of legislative power to examine whether adequate checks have been provided against arbitrary or uncontrolled official action. Such an inquiry, however, cannot supplant the basic inquiry whether the legislatively devised framework for official action—considered in its application—secures the fundamental goal of the delegation doctrine: preserving legislative responsibility for the determination of public policy.

2. Accountability requires a structure which does not inhibit the emergence of intelligible principles and coherent policies to guide the resolution of individual cases because the possibility of constructive political response presupposes that the electorate and the Legislature can determine the policy being applied. The statute violates the delegation doctrine because it insulates the decision-making process and the results from accountability within the political process. It is novel in that the policy-making power is dispersed among ad hoc arbitrators, which prevents the emergence of visible and intelligible principles. Therefore, safeguards which are generally regarded as adequate in such a delegation of lawmaking power do not assure accountability in this context. The chairman of the panel of arbitrators decides the public policy which will govern a particular case and have the effect of law. Such a delegation of legislative power is generally made only to full-time public officers or administrative agencies. This provides a structure for the development of policy in a uniform and politically responsive manner. The delegation doctrine developed in the context of the safeguards implicit in centralization and continuing exercise of policy-making power and therefore few precedents recognize the mischief resulting from the unsupervised dispersal of policy-making power.

3. The decisions of the arbitrators involve questions of policy, principally the allocation of public funds. The statutory standards are sufficiently amorphous to allow a panel confronted with a given set of evidence to reach (and justify) a result in favor of either party on virtually any issue. The absence of principled decision-making inherent in the ad hoc structure of the statute inhibits the emergence of a coherent body of law

and precludes any meaningful accountability. When sensitive judgments of this sort are not based upon *any* known principles they cannot be said to be based upon questions of policy decided by the Legislature in the first instance. Therefore, the decisions once made must be accessible to legislative scrutiny. The absence of discernible principles also prevents the public from scrutinizing what is being decided in its interest.

4. The lack of uniformity in the process which is invited by the dispersal of policy-making power is in itself an evil. It is not consonant with a constitutional democracy for those who exercise the powers of government to apply different policies in the same situations. Inherent in the diffusion of state power among ad hoc arbitrators is potential non-uniformity in policy-making. Even if the chairman in one case fully explained his reasoning, there would be no assurance that the rule would be applied by him or by others in other cases. A related vice flowing from the absence of principles is that the Legislature is accomplishing indirectly that which it cannot do directly: the creation of what are, in practical effect, local laws.

5. It cannot be said that the issues presented in arbitration are not capable of resolution by principles, which may of necessity be complex in many cases. It is important that there be a continuing body responsible for the development of coherent principles and duty-bound to explain the bases for distinction when a result different from that of past cases is reached. The Legislature may adopt a mandatory procedure for resolving collective bargaining disputes, but the authority should be vested in a governmental officer or agency with continuing responsibility to the electorate through the appointing authority for the exercise of that power.

6. Although they may pass traditional standards-oriented inquiry, the "factors" provided by the Legislature as guides for decision-making by the arbitrators do not adequately protect against excessive delegation or unnecessary and uncontrolled discretionary power. The statement of public policy in the statute is no more than a general directive that the arbitrators shall go forth and settle disputes. Nor do the statutory standards supply the coalescing element of policy. In most cases, particularly in last-offer arbitration of economic issues, any reasonable decision can be justified by one or more of the statutory criteria. As a practical matter, the Legislature has offered the arbitrators little direction as to what they should consider or how they should reach a decision, and still less assurance to the electorate that arbitration awards will be

fashioned through a principled, consistent, or fathomable process.

7. The inadequacy of the standards is shown in this case by the fact that the chairman of the arbitration panel suggested that a city's claim of inability to pay the union's wage demands will not receive serious consideration unless the asserted inability is absolute, which effectively eliminates the factor of financial ability of the city from consideration. In applying the "comparable" factor in the Lieutenants and Sergeants Association case, the chairman of the arbitrators indicated considerable reliance on the parties' stipulations as to "comparable" communities in reaching the first decision only to dismiss the evidence in a later opinion because no testimony established that the functions of police lieutenants and sergeants in cities that the parties had agreed to were comparable. This change of position demonstrates the failure of the statute to give meaningful guidance or to insure a measure of consistency in reasoning even of the same arbitrator.

8. The judicial review provided by the statute is not a safeguard against the improper exercise of delegated policy-making power. Requiring that the award reflect consideration of all applicable statutory factors provides no assurance that the decisions will show consistent use of intelligible principles of broader application than the particular case. The standards are so general that any reasonable decision can be justified. Affirmance of the award is assured unless the chairman of the panel has considered evidence outside the record or employed decisional criteria not contemplated by the statute. Arbitrariness cannot even be detected if the rules of decision-making are unknown. The awards are not required to be published, nor are the arbitrators required to make their decisions of policy separate from their findings of fact. But, in any event, a court confronted with non-uniformity of policy could not resolve the conflict. Furthermore, requiring the panels to solicit evidence from the parties on applicable factors concerning the noneconomic issue but permitting the chairman of the panel discretion to ignore properly admitted evidence as to the economic issue shows a practical, if not a logical, inconsistency in the judicial review of the evidence which supports the award.

9. The last-offer provision requires that the arbitrators choose one party's proposal on each economic issue, but forbids them to fashion their own award. The requirement in effect forces adoption of a policy which may not be uniform with the policy applied to similar communities, and the lack of uniformity is exacerbated by the last-best-offer feature. The vitality of any

policy that the chairman might develop is in the parties' hand: they can fashion their offers in accordance with it, they can reject it because certain the other side will, or if there is no discernible policy, the parties have inadequate information to guide them in fashioning their bargaining strategy or devising an acceptable last offer except what they can discern of the individual chairman's personal preferences. In sum, there can be no principled development to govern in all cases because each one is shaped and determined by the parties' last offer. Last-offer arbitration further reduces the political accountability of the chairman of the panel who is no longer required to announce the result which he thinks most in accord with the statutory factors declared by the Legislature or the particular policy implicit in the decision he makes. The chairman, as he did in this case, can dissociate himself from the result he announces by indicating that if he were not restrained by the last best offer he would reach a different result, presumably lying between the last best offers. Responsibility for the terms of the award now has moved even further from the Legislature and falls somewhere between the parties and the chairman of the panel. The last-best-offer arbitration eliminates the most appropriate result as an option, and it is a question of some moment whether the Legislature can deprive itself, or its delegate, of the authority to make the best public policy. The Legislature may encourage collective bargaining, but peaceful resolution of collective bargaining disputes is not a mandatory constitutional principle. The efficacy of binding arbitration as a method of resolving collective bargaining disputes does not depend on the last-offer procedure, and the last-offer system yields results which are unconstitutionally arbitrary because it is apt to impose a costly and arbitrary penalty on the party who, although proceeding in good faith, did not more nearly satisfy the statutory criteria. The chairman of the panel in this case indicated that he might have made an economic award substantially less costly to the city had he not been required to select the last best offer of one of the parties. The Legislature cannot constitutionally provide for so arbitrary a solution and penalty.

10. The 1976 amendments to the process of selecting a chairman have not provided any significant measure of political accountability in the arbitral process. While the set of persons eligible to become chairman may in theory have been narrowed and the likelihood that some arbitrators will be chairmen of a number of panels has been correspondingly increased, it remains impossible to assign meaningful responsibility to any

public official or authority for the manner in which a chairman exercises delegated power. Arbitrators continue to be selected to determine the terms of contracts on a case-by-case basis, and their tenures as decision-makers are only as long as the disputes remain unresolved by agreement or award. It is entirely conjectural whether the new method of selection motivates arbitrators to conduct themselves so as to enhance their chances of continued employment in such arbitrations. Even if the chairman's sensitivity to the effect of his decisions is heightened by his awareness of the personal consequences to him, that provides no safeguard against non-uniformity of policy and lack of political responsiveness. The connection between the chairmen of the arbitration panels and the Governor is too attenuated to provide any measure of political accountability for the arbitrators' decisions. The Legislature is undoubtedly within its prerogative in creating a system which allocates to a group composed largely of persons with grievance arbitration experience the power to resolve public policy concerning the terms and conditions of public employment, but the persons chosen to make those decisions for the state may not be isolated from the political process.

11. It is contended that, because it was the intention of the Constitutional Convention of 1961 to leave the choice of procedures for resolving disputes concerning public employees to future Legislatures, the Legislature and not the Court is the appropriate body to determine whether the delegation of power is an appropriate allocation of authority in a representative democracy. The power to determine whether acts of the Legislature comport with constitutional principles is confided to the judicial branch. Even if the delegates to the 1961 Constitutional Convention specifically intended to authorize compulsory interest arbitration, there is no indication that they intended to approve any particular method of arbitration or to permit the adoption of such measures without regard to other constitutional precepts. The entire framework of the Civil Service Commission, for a contrasting example, is constitutional because it is embodied in the Constitution; moreover, certain provisions of its constitutional charter endow the Civil Service Commission with a measure of political accountability and subject its policy-making powers to limited legislative review. The constitutional authorization for the statute in this case simply permits the Legislature to enact laws providing for the resolution of disputes concerning public employees except those in state civil service. Finally, the 1978 amendment to the Constitution authorizing collective bargaining for Michigan

State Police officers and binding arbitration "the same as now provided by law for public police and fire departments" does not amount to a ratification by constitution of the statutory binding arbitration scheme. It concerns only the State Police. The Legislature remains free to modify or repeal the binding arbitration statute for local police and fire departments, and its constitutionality must be decided without regard to the constitutional amendment.

12. The award in this case cannot properly be approved without deciding the merits of the city's appeal in the Detroit Police Lieutenants and Sergeants Association case. The chairman of the arbitrators in this case declared that the cost-of-living allowance in the award rendered by another panel in the Lieutenants and Sergeants case is the central issue in this dispute. He emphasized that acceptance of the DPOA cost-of-living-allowance offer was virtually mandated by the award of an identical provision in the Lieutenants and Sergeants arbitration. The merits of this appeal thus depend in part on the merits of the city's appeal in the Lieutenants and Sergeants case and therefore this appeal cannot finally be decided before decision of the city's application for leave to appeal.

DECISION OF THE COURT

1. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — MUNICIPAL CORPORATIONS — CONSTITUTIONAL LAW.
   The statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments, as amended in 1976, is a constitutional delegation of legislative power (MCL 423.231 et seq.; MSA 17.455[31] et seq.).

OPINION BY WILLIAMS, J.

2. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — MUNICIPAL CORPORATIONS — CONSTITUTIONAL LAW.
   *The statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments, as amended in 1976, is a constitutional delegation of legislative power because it provides standards for guidance of the arbitrators as reasonably precise as the subject matter requires or permits and, as a practical matter, the statutory scheme exhibits adequate political or public accountability of the arbitrators (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

3. ADMINISTRATIVE LAW — CONSTITUTIONAL LAW — DELEGATION OF POWERS.
   *The Legislature may not abdicate its lawmaking powers; how-*

*ever, a subordinate body or official may be delegated the power to apply the laws provided that the statutory standards prescribed for guidance of the body or official to which the power is delegated are as reasonably precise as the subject matter requires or permits.*

4. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — MUNICIPAL CORPORATIONS — PUBLIC POLICY.

*Interruptions of work by police and fire departments were deemed by the Legislature to pose a threat to the state's public health, safety and welfare; the appointment by the Employment Relations Commission from its permanent panel of arbitrators of the chairpersons of panels arbitrating disputes concerning contract formation in police and fire departments serves to effectuate the state's labor policy, as established by the Legislature, although such disputes are primarily local in their settings (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

5. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — STATUTES — ADMINISTRATIVE LAW — DELEGATION OF POWERS.

*The inherent tensions between the legislative objectives of affording arbitrators sufficient independence in deciding complex disputes concerning contract formation in police and fire departments and maintaining the arbitrators' accountability to the public have been adequately balanced by the Legislature in view of the statutory provision of standards ("factors") to be considered in making the award, the extremely public atmosphere in which the statutory arbitration operates, and the provision for judicial review; the statutory standards check the unfettered exercise of the arbitrators' authority and provide them with guides for their consideration which the Legislature deemed to be significant in resolving those issues which have been negotiated and sharpened by the parties, yet remain unresolved (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

6. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — APPEAL.

The statute providing for compulsory arbitration of disputes concerning contract formation in police and fire departments provides a reviewing court with a license neither to consider the wisdom of an arbitration award nor to subject it to *de novo* review; rather, the statute specifically confines the scope of review to awards exceeding jurisdiction, unsupported by competent, material and substantial evidence on the whole record, or

procured by unlawful means (Const 1963, art 6, § 28; MCL 423.242; MSA 17.455[42]).

7. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
   MENTS — APPEAL.

   The award of an arbitration panel on any issue, whether eco-
   nomic or non-economic, in disputes concerning contract forma-
   tion in police and fire departments must emanate from a
   consideration of the eight specific statutory "factors" as they
   are applicable to the issue, and the factors must be established
   by competent, material and substantial evidence on the whole
   record (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

8. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
   MENTS — APPEAL. '

   The Legislature has evinced no intention that each "factor" in
   the statute providing for compulsory arbitration of disputes
   concerning contract formation in police and fire departments be
   accorded equal weight; it is the arbitration panel that must
   decide which particular factors are more important in resolving
   a certain contested issue and the fact that the arbitrators have
   not been persuaded by a party's evidence and argument as to
   certain issues does not mean that they have failed to give each
   of the eight statutory factors that separate consideration re-
   quired by law (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

9. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
   MENTS — APPEAL.

   Review of an arbitration award under the statute providing for
   compulsory arbitration of disputes concerning contract forma-
   tion in police and fire departments must be undertaken by
   courts with considerable sensitivity in order to accord due
   deference to the arbitrators' expertise and not to displace their
   choice between two reasonably differing views (Const 1963, art
   6, § 28; MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

10. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
    MENTS — ECONOMIC ISSUES — MUNICIPAL CORPORATIONS —
    TAXATION.

    An arbitration award on the economic issues in a contract-forma-
    tion dispute in the Detroit Police Department which accepted
    the police officers' offer of the existing cost-of-living allowance
    agreement in conjunction with a lower increase in wages over
    the next three years rather than a higher wage increase but
    reduced cost-of-living allowance offered by the city complies
    with the applicable statute where it is established, by compe-

tent, material and substantial evidence on the whole record, that the arbitrators considered certain circumstances to be of greater importance than the fact that the city's budget was at the legal limit of its taxing power (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

11. ARBITRATION — EVIDENCE — ADMISSIBILITY — LABOR RELATIONS — POLICE AND FIRE DEPARTMENTS — APPEAL.

The statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments explicitly accords a wide discretion to the arbitrators in deciding evidentiary questions; the arbitration panel "may" receive into evidence any testimony, document or other data which it deems relevant, and review of the arbitrators' discretion is generally limited to whether the evidentiary decision caused the award on the contested issues to be unsupported by competent, material and substantial evidence on the whole record (Const 1963, art 6, § 28; MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

12. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — RESIDENCY REQUIREMENT.

Arbitrators considering the issue of a contractual requirement by the City of Detroit that its police officers reside in the city erred reversibly in failing to compare this condition of employment with residency requirements for other public and private employees performing similar services; the omission by the parties of evidence on this statutory "factor" of comparison does not excuse the arbitrators' inattention to it (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

13. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — RESIDENCY REQUIREMENT.

A reviewing court cannot amend an arbitration award in a contract-formation dispute between the City of Detroit and its police officers over a requirement that the police officers reside in the city to include the language of a new city ordinance defining the term "residence" where the arbitrators did not make specific findings of fact and an award on the issue under the applicable statute; the courts may not act as *de novo* arbitrators in the matter but the parties should resolve it by collective bargaining and further arbitration under the statute (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

14. ARBITRATION — LABOR RELATIONS — ECONOMIC ISSUES — INTEREST ON AWARD.

Interest on the economic portion of an arbitration award in a contract-formation dispute of a police department may not be

granted, because there is no statutory provision for it (MCL 423.231 *et seq.*, 438.7; MSA 17.455[31] *et seq.*, 19.4).

CONCURRING OPINION BY BLAIR MOODY, JR., J.

15. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — APPEAL — LAST BEST OFFER.

*Requiring redetermination of economic awards without the statutory last-best-offer restriction in an arbitration of a dispute concerning contract formation in police and fire departments, would be changing ex post facto the rules of the contest because it would be requiring the parties to debate again what has been resolved in accordance with reasonable standards (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

16. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — LAST BEST OFFER — STATUTORY PURPOSE.

*The promotion of private settlements of disputes concerning contract formation in police and fire departments by penalizing those who did not try hard enough to settle them is a sound rationale for the adoption of statutory last-best-offer limitation on arbitrators making the economic award in such cases (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

17. CONSTITUTIONAL LAW — DUE PROCESS — POLICE POWER.

*The test to determine the constitutionality of a statute enacted pursuant to the police power, under the Due Process Clause, is whether the legislation bears a reasonable relation to a permissible legislative objective (US Const, Am XIV; Const 1963, art 1, § 17).*

18. CONSTITUTIONAL LAW — EQUAL PROTECTION.

*The test to determine the constitutionality of a statute enacted pursuant to the police power, under the Equal Protection Clause, is that the legislative classification must be sustained if it is rationally related to a legitimate government interest (US Const, Am XIV; Const 1963, art 1, § 2).*

19. CONSTITUTIONAL LAW — STATUTES — COURTS — SEPARATION OF POWERS.

*The Supreme Court does not have the power, upon judicial whim, to arbitrarily declare that certain legislation is unconstitutional; it is not the role of the Court to decide whether the Legislature acted wisely or unwisely in enacting social and economic legislation, or to substitute its own social and economic beliefs for those of the Legislature (Const 1963, art 3, § 2).*

Opinion Concurring in Result by Fitzgerald, J.

See headnotes 7-14.

20. Labor Relations — Arbitration — Police and Fire Depart-
    ments — Statutes — Administrative Law — Delegation of
    Powers.

    *There is constitutionally required "accountability" in the statute
    which provides for compulsory arbitration of disputes concern-
    ing contract formation in police and fire departments in that
    the statute specifically provides that any award must be based
    upon certain legislatively prescribed criteria, and thus the
    arbitration panel is not free to issue an award premised on the
    panel's unique view of what the criteria ought to be; more
    importantly, the arbitration panel's fidelity to the application
    of the criteria, and the evidentiary support for the award, will
    be examined by the judiciary if review of the award is sought
    (Const 1963, art 6, § 28; MCL 423.231 et seq.; MSA 17.455[31] et
    seq.).*

21. Labor Relations — Arbitration — Police and Fire Depart-
    ments — Statutes — Administrative Law — Delegation of
    Powers.

    *The degree of "political accountability" of the arbitration panel is
    not the crucial test for determining the constitutionality of the
    statute which provides for compulsory arbitration of disputes
    concerning contract formation in police and fire departments
    because the Legislature has enacted the mechanism for the
    peaceful resolution of labor disputes, and the local unit of
    government which constitutes "management" has been charged
    with making its offer to settle the dispute; the arbitrators
    themselves need not also be politically accountable (MCL
    423.231 et seq.; MSA 17.455[31] et seq.).*

22. Constitutional Law — Statutes — Courts — Separation of
    Powers.

    *Courts cannot declare legislation to be unconstitutional because
    they think it unwise; if an act is simply bad legislation, the
    electorate should call to account those who were responsible for
    its promulgation (Const 1963, art 3, § 2).*

Dissenting Opinion by Levin, J.

23. Labor Relations — Arbitration — Police and Fire Depart-
    ments — Constitutional Law — Delegation of Powers.

    *The statute which provides for compulsory arbitration of disputes
    concerning contract formation in police and fire departments is
    unconstitutional because it delegates the power to prescribe*

*policy (law) to the chairman of the arbitration panel without
adequate safeguards circumscribing the exercise of the power
(MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

24. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
    MENTS — CONSTITUTIONAL LAW — LAST BEST OFFER.

*The last-best-offer requirement concerning economic issues, which
was added in 1976 to the statute providing for compulsory
arbitration of disputes concerning contract formation in police
and fire departments, exacerbates rather than cures the stat-
ute's deficiencies so that, entirely apart from its constitutional-
ity otherwise, it is unconstitutional with that provision (MCL
423.231 et seq.; MSA 17.455[31] et seq.).*

25. LABOR RELATIONS — PUBLIC EMPLOYEES — CONSTITUTIONAL LAW
    — DELEGATION OF POWERS.

*Implicit in the Legislature's constitutionally conferred power to
enact laws for the resolution of disputes concerning public
employees is the power to delegate the resolving authority
(Const 1963, art 4, § 48).*

26. CONSTITUTIONAL LAW — ADMINISTRATIVE LAW — DELEGATION OF
    POWERS.

*A court should review a challenged delegation of legislative
power to examine whether adequate checks have been provided
against arbitrary or uncontrolled official action; such an in-
quiry, however, cannot supplant the basic inquiry whether the
legislatively devised framework for official action—considered
in its application—preserves legislative responsibility for the
determination of public policy (Const 1963, art 4, § 1).*

27. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
    MENTS — CONSTITUTIONAL LAW — DELEGATION OF POWERS.

*The statute which provides for compulsory arbitration of disputes
concerning contract formation in police and fire departments
violates the constitutional doctrines concerning the delegation
of legislative power because it insulates the decision-making
process and the results from accountability within the political
process; it is novel in that the policy-making power is dispersed
among ad hoc arbitrators, preventing the emergence of visible
and intelligible principles and coherent policies, and therefore,
safeguards which are generally regarded as adequate in a
delegation of lawmaking power do not assure accountability in
this context (Const 1963, art 4, § 48; MCL 423.231 et seq.; MSA
17.455[31] et seq.).*

28. CONSTITUTIONAL LAW — ADMINISTRATIVE LAW — DELEGATION OF POWERS.

*A delegation of legislative power to decide the public policy which will govern a particular case and have the effect of law is generally made only to full-time public officers or administrative agencies; this provides a structure for the development of policy in a uniform and politically responsive manner with the safeguards implicit in centralization and continuing exercise of policy-making power (Const 1963, art 4, § 1).*

29. CONSTITUTIONAL LAW — DELEGATION OF POWERS.

*It is not consonant with a constitutional democracy for those who exercise the powers of government to apply different policies in the same situations; the lack of uniformity in the governmental process which is invited by the dispersal of policy-making power is in itself an evil.*

30. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — CONSTITUTIONAL LAW — LOCAL LEGISLATION.

*The absence of principled decision-making inherent in the ad hoc structure of the statute which provides for compulsory arbitration of disputes concerning contract formation in police and fire departments permits the Legislature to accomplish indirectly that which it cannot do directly: the creation of what are, in practical effect, local laws (Const 1963, art 4, § 29; MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

31. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — CONSTITUTIONAL LAW — ADMINISTRATIVE LAW.

*The Legislature may adopt a mandatory procedure for resolving collective bargaining disputes in police and fire departments but the authority should be vested in a governmental officer or agency with continuing responsibility to the electorate through the appointing authority for the exercise of that power (Const 1963, art 4, § 48).*

32. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — CONSTITUTIONAL LAW — DELEGATION OF POWERS.

*The "factors" provided by the Legislature as guides for decision-making by the arbitrators in resolving collective bargaining disputes in police and fire departments do not adequately protect against excessive delegation of lawmaking power, or unnecessary and uncontrolled discretionary power; in most cases, particularly in last-offer arbitration of economic issues, any reasonable decision can be justified by one or more of the statutory criteria, which offers the arbitrators little direction as*

*to what they should consider or how they should reach a decision, and still less assurance to the electorate that arbitration awards will be fashioned through a principled, consistent, or fathomable process (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

33. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — CONSTITUTIONAL LAW — LAST BEST OFFER.

*The last-best-offer system for arbitration of economic issues concerning contract formation in police and fire departments yields results which are unconstitutionally arbitrary because it is apt to impose a costly and arbitrary penalty on the party who, although proceeding in good faith, did not more nearly satisfy the statutory criteria; the Legislature cannot constitutionally provide for so arbitrary a solution and penalty in resolving a collective bargaining dispute (Const 1963, art 4, § 48; MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

34. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — CONSTITUTIONAL LAW — DELEGATION OF POWERS.

*The connection between the chairmen of the arbitration panels for disputes concerning contract formation in police and fire departments and the Governor is too attenuated to provide any measure of political accountability for the arbitrators' decisions; the Legislature is undoubtedly within its prerogative in creating a system which allocates to a group composed largely of persons with grievance arbitration experience the power to resolve public policy concerning the terms and conditions of public employment, but the persons chosen to make those decisions for the state may not be isolated from the political process (MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

35. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPARTMENTS — CONSTITUTIONAL LAW.

*The constitutional authorization for the statute concerning arbitration of disputes concerning contract formation in police and fire departments simply permits the Legislature to enact laws providing for the resolution of disputes concerning public employees except those in state civil service; even if the delegates to the 1961 Constitutional Convention specifically intended to authorize compulsory interest arbitration, there is no indication that they intended to approve any particular method of arbitration or to permit the adoption of such measures without regard to other constitutional precepts (Const 1963, art 4, § 48; MCL 423.231 et seq.; MSA 17.455[31] et seq.).*

36. LABOR RELATIONS — ARBITRATION — POLICE AND FIRE DEPART-
MENTS — STATE POLICE — CONSTITUTIONAL LAW.

*The 1978 amendment to the Constitution authorizing collective
bargaining for Michigan State Police officers and binding arbi-
tration "the same as now provided by law for public police and
fire departments" does not amount to a ratification by constitu-
tion of the statutory binding arbitration scheme because it
concerns only the State Police; the Legislature remains free to
modify or repeal the binding arbitration statute for local police
and fire departments, and the constitutionality of that statute
must be decided without regard to the constitutional amend-
ment (Const 1963, art 4, § 48; art 11, § 5; MCL 423.231 et seq.,
423.271 et seq.; MSA 17.455[31] et seq., 17.455[81] et seq.).*

*George G. Matish,* Acting Corporation Counsel
(by *Bernard J. Fieger, William M. Saxton* and
*Michael A. Hurvitz,* Special Assistants Corporation
Counsel), for plaintiff.

*Gregory, Van Lopik, Korney & Moore* for defen-
dant Detroit Police Officers Association.

*Marston, Sachs, Nunn, Kates, Kadushin &
O'Hare* for intervening defendant Detroit Fire
Fighters Association.

WILLIAMS, J. *(for affirmance).* In 1969, the Michi-
gan Legislature enacted 1969 PA 312, an act to
provide for the compulsory interest arbitration of
municipal police and fire department disputes.
MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.* The
purpose and intent of the act is described in § 1:

"It is the public policy of this state that in public
police and fire departments, where the right of employ-
ees to strike is by law prohibited, it is requisite to the
high morale of such employees and the efficient opera-
tion of such departments to afford an alternate, expedi-
tious, effective and binding procedure for the resolution
of disputes, and to that end the provisions of this act,

providing for compulsory arbitration, shall be liberally
construed." MCL 423.231; MSA 17.455(31).

This case involves two major issues: (1) whether
1969 PA 312, as amended, includes an unconstitu-
tional delegation of "legislative and political re-
sponsibility to politically unaccountable arbitra-
tors", to use the words of the plaintiff City of
Detroit; and (2) whether the arbitration panel's
award was supported by "competent, material and
substantial evidence on the whole record" as re-
quired by § 12 of Act 312, MCL 423.242; MSA
17.455(42), as well as Const 1963, art 6, § 28.

The first issue has been inconclusively consid-
ered by four Justices of this equally-divided Court
in *Dearborn Fire Fighters v Dearborn,* 394 Mich
229; 231 NW2d 226 (1975), where pre-amendment
Act 312 was assessed. All four Justices found that
there existed sufficient standards to guide the
exercise of delegated authority. Beyond this con-
sensus, however, one Justice would hold the pre-
amendment act constitutional on the facts with
relation to public accountability where the impar-
tial chairperson of the arbitration panel was ap-
pointed by the Michigan Employment Relations
Commission ("MERC") chairperson, but indicated
that the act was of doubtful constitutionality in
that instance where the panel chairperson was
alternatively selected by the parties' delegates
alone. Two Justices would hold the act unconstitu-
tional because both the method of panel member
selection and tenure of the panel chairperson did
not provide sufficient political responsibility and
accountability. Another Justice would hold the act
constitutional in all respects.

Subsequent and responsive to the *Dearborn*
opinion, the Legislature significantly amended Act
312 by providing for the composition of an arbitra-

tion panel including a representative of each party plus an impartial chairperson selected by MERC from a permanent panel established by MERC and known as the MERC Panel of Arbitrators.[1] Eligibility for this permanent panel is restricted to impartial, competent and reputable United States citizens, who must be residents of Michigan. Members of the panel must subscribe an oath or affirmation of office. The term of these panelists is

[1] As originally enacted in 1969 and considered by Justices LEVIN, T. G. KAVANAGH, COLEMAN and WILLIAMS in the 1975 *Dearborn* opinion, 1969 PA 312 provided the following § 5 mechanism for the selection of arbitration panel members:

"Within 5 days thereafter [after the employer's and employees' § 4 delegates have been selected *to represent their interests on the three-member panel*], or within such further additional periods to which they may agree, the delegates shall designate an impartial, competent and reputable person to act as an arbitrator, hereafter called the arbitrator or chairman of the panel of arbitration, and with them to constitute an arbitration panel to further consider and order a settlement of all matters. Upon their failure to agree upon and appoint the arbitrator within such time, or mutually extended time, either of them may request the chairman of the state labor mediation board to appoint the arbitrator, and the chairman of the state mediation board shall appoint, in not more than 7 days, an impartial, competent and reputable citizen as the arbitrator." MCL 423.235; MSA 17.455(35).

Subsequent to the *Dearborn* decision, § 5 was significantly amended by 1976 PA 84, to provide the following:

"(1) Within 7 days of a request from 1 or both parties [§ 4 delegate(s)], the employment relations commission shall select from its panel of arbitrators, as provided in subsection (2), 3 persons as nominees for impartial arbitrator or chairman of the arbitration panel. Within 5 days after the selection each party may peremptorily strike the name of 1 of the nominees. Within 7 days after this 5-day period, the commission shall designate 1 of the remaining nominees as the impartial arbitrator or chairman of the arbitration panel.

"(2) The employment relations commission shall establish and appoint a panel of arbitrators, who shall be known as the Michigan employment relations commission panel of arbitrators. The commission shall appoint members for indefinite terms. Members shall be impartial, competent, and reputable citizens of the United States and residents of the state, and shall qualify by taking and subscribing the constitutional oath or affirmation of office. The commission may at any time appoint additional members to the panel of arbitrators, and may remove existing members without cause." MCL 423.235; MSA 17.455(35).

Other minor amendments to Act 312 as originally enacted and considered in *Dearborn* are detailed in Part III, B, *infra.*

indeterminate and they are subject to removal without cause by the MERC. Such persons are appointed to this panel by the MERC Commissioners who are, in turn, direct appointees of the Governor with the advice and consent of the state Senate.

The first question before us, then, is whether a delegation, accompanied by otherwise sufficient standards, to such an arbitration panel as provided in Act 312, as amended, is constitutional.

The second issue raises the question whether the arbitration panel's award as to the economic issue of cost of living allowance ("COLA") and wages and as to the non-economic issue of a residency hardship exemption was supported by competent, material and substantial evidence on the whole record. More specifically, as to the economic issue, we must answer the threshold question whether the city's last best offer of *elimination* of the already existing police officers' cost of living program plus wage increases over a three-year period of 4.8%, 4% and 4% more nearly complied with the applicable legislative standards than did the defendant Detroit Police Officers Association's ("DPOA") last best offer of *continuation* of the already existing cost of living program and the somewhat *lower* wage increases of 4.5%, 4% and 3.5% over a three-year period. As to the non-economic award of a residency hardship exemption, we must determine the threshold question whether that award was based on the applicable legislative standards.

Since the *Dearborn* decision, similar schemes have been enacted in many jurisdictions,[2] upheld

---

[2] At the time of the 1975 *Dearborn* decision, 13 jurisdictions had enacted similar interest arbitration schemes, *Dearborn, supra,* 298, fn 9 (opinion of Williams, J.); none of these acts have been repealed although some have been amended. Today, at least 20 jurisdictions

as constitutional by the overwhelming weight of authority,[3] and stamped by many with the imprimatur of success in averting critical-service strikes.[4] Guided by this ample judicial and schol-

including Michigan have enacted legislation providing for binding interest arbitration for public employees, or specifically for police and fire fighters. Those jurisdictions which have enacted similar legislation since the *Dearborn* decision include: Conn Gen Stat Ann, §§ 7-472 *et seq.,* 10-153f; Hawaii Rev Stat, § 89-11; Iowa Code Ann, § 20.22; Mass Ann Laws, ch 150E, § 9; Mont Code Ann, §§ 39-34-101 *et seq.;* NJ Stat Ann, §§ 34:13A-16 *et seq.;* NY Civil Service Law (McKinney), §§ 205, 209; Or Rev Stat, §§ 243.742 *et seq.;* Wash Rev Code Ann, §§ 41.56.100, 41.56.125, 41.56.430 *et seq.*

See Grodin, *Political Aspects of Public Sector Interest Arbitration,* 64 Cal L Rev 678, 678-683 (1976). See, *e.g.,* Newman, *Interest Arbitration—Practice and Procedures,* in Knapp, ed, Labor Relations Law in the Public Sector (Chicago: ABA, 1977), pp 54-61.

[3] See, *e.g., Amsterdam v Helsby,* 37 NY2d 19; 371 NYS2d 404; 332 NE2d 290 (1975); *Arlington v Board of Conciliation & Arbitration,* 370 Mass 769; 352 NE2d 914 (1976); *Biddeford v Biddeford Teachers Ass'n,* 304 A2d 387 (Me, 1973); *Division 540, Amalgamated Transit Union v Mercer County Improvement Authority,* 76 NJ 245; 386 A2d 1290 (1978); *Harney v Russo,* 435 Pa 183; 255 A2d 560 (1969); *Medford Fire Fighters Ass'n v Medford,* 40 Or App 519; 595 P2d 1268 (1979); *In the Matter of New Jersey Bell Telephone Co v Communications Workers of America,* 5 NJ 354; 75 A2d 721 (1950); *Richfield v Local No 1215, International Ass'n of Fire Fighters,* 276 NW2d 42 (Minn, 1979); *School Dist of Seward Education Ass'n v School Dist,* 188 Neb 772; 199 NW2d 752 (1972); *Spokane v Spokane Police Guild,* 87 Wash 2d 457; 553 P2d 1316 (1976); *State ex rel Fire Fighters Local No 946 v Laramie* 437 P2d 295 (Wyo, 1968) (equally split decision); *City of Warwick v Warwick Regular Firemen's Ass'n,* 106 RI 109; 256 A2d 206 (1969). See generally Anno: *Validity and construction of statutes or ordinances providing for arbitration of labor disputes involving public employees,* 68 ALR3d 885, 891-892 ("The validity of statutory provisions for arbitration of labor disputes involving public employees has generally been upheld against attacks on a variety of grounds. * * * The modern trend definitely appears to be in favor of finding a valid delegation.") But compare the distinguishable cases discussed in fn 56, *infra.* See also *Fire Fighters Union, Local 1186 v Vallejo,* 12 Cal 3d 608; 526 P2d 971; 116 Cal Rptr 507 (1974).

[4] Indeed, in a report of the Michigan Departments of Labor and Management & Budget, "Review of Michigan's Compulsory Arbitration Act & Public Act 312 of 1979", May 21, 1979 (mimeo), it was stated that only one strike relating to bargaining has followed adoption of Act 312. *Id.,* 8. This statement is to be compared with the following 1979 statement of Arvid Anderson, Chairperson of the New York City Office of Collective Bargaining, to the Association of Labor Relations Agencies:

"[T]here have been an increasing number of bitter strikes by police

arly authority, we are compelled to conclude that 1969 PA 312, as significantly amended by 1976 PA 84, is constitutional in all respects.[5] Furthermore, after careful review of the record and its relationship to the act's § 9 factors, MCL 423.239; MSA 17.455(39), relative to both economic and non-economic issues, and mindful of the statutorily prescribed standard of judicial review codified in § 12, we hold that the arbitration panel's economic award must also be upheld, whereas the record does not sustain the panel's non-economic award as to the residency hardship exemption. Interest is denied. The lower court is affirmed except as to the residency hardship exemption.

## I. FACTS

The city and the DPOA, the certified bargaining

and firefighters causing real hardship to communities where there are no orderly procedures for resolving contract disputes. These occurred in Dayton, Cleveland, and Toledo, Ohio; New Orleans, La.; Louisville, Ky.; Anderson, Ind.; and Wichita, Kan." Government Employee Relations Report (Washington, DC: BNA, August 13, 1979), 823:54.

See generally Anderson, MacDonald & O'Reilly, *Impasse Resolution in Public Sector Collective Bargaining—An Examination of Compulsory Interest Arbitration in New York*, 51 St John's L Rev 453 (1977); Benjamin, Final Offer Arbitration Awards in Michigan, 1973-1977 (Institute of Labor and Industrial Relations, University of Michigan & Wayne State University, 1978); Howlett, *Contract Negotiation Arbitration in the Public Sector*, 42 Cincinnati L Rev 47, 63-65 (1973); Kaye, *Impasse Resolution Mechanisms and Teacher Strikes*, 7 U of Mich J of L Reform 575 (1974), cited in *Dearborn, supra*, 293, fn 2 (opinion of WILLIAMS, J.); Rehmus, *Legislated Interest Arbitration*, Proceedings of the 27th Annual Winter Meeting of the Industrial Relations Research Association (December 28-29, 1974), pp 307, 308-309.

[5] In addition to our ruling on the focal issue of this opinion that Act 312, as amended, does not unconstitutionally delegate "legislative and political responsibility to politically unaccountable arbitrators", we also hold that the act does not impermissibly usurp constitutionally vested home rule powers and does not unconstitutionally deny the right to cast effective ballots in municipal elections. These claims of the city are summarily rejected in fns 14, 15, *infra,* and accompanying text for the reasons that the home rule issue was unanimously disapproved of in *Dearborn* and the equal protection argument is without merit.

agent of the police officers of Detroit, reached an impasse in 1977 on several of the terms and conditions of employment in bargaining for a new contract. Thereafter, upon demand of the DPOA, the MERC appointed an arbitration panel pursuant to 1969 PA 312, as amended ("act" or "Act 312"); the unsettled issues remaining between the parties were submitted to that panel for binding arbitration. After some 15 hearings before this panel, plus oral arguments by the parties, conducted over a period of eight months, the panel issued its award on December 20, 1978.

In essence, the panel majority[6] accepted the city's "last offer of settlement"[7] as to all disputed economic issues except its COLA and wage proposals.[8] On these two items, the DPOA's last offers—a preservation of the parties' previous COLA arrangement and a lower three-year wage increase than that proposed by the city—were adopted by the panel.[9] As to the non-economic issues, most were settled, withdrawn or remanded to the par-

[6] The DPOA delegate concurred in the panel's decision on all issues except its rejection of the DPOA's dental plan, to which the DPOA delegate expressly dissented. The city delegate dissented from the panel's opinion on the issues of wages, COLA, and the hardship exemption from the residency requirement.

[7] As provided in § 8 of the act, MCL 423.238; MSA 17.455(38), which has been significantly amended by 1972 PA 127, the panel is required to adopt "the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9 [MCL 423.239; MSA 17.455(39)]". See fn 17, infra, and accompanying text. As will be developed in Part III, B, infra, this requirement significantly differs from that effective at the time of the Dearborn decision in 1975.

[8] As to the economic issue of how much sick time would be charged to an employee unable to finish his or her shift because of illness, although the DPOA's last offer of a continuation of the present practice was accepted by the panel, the panel additionally recommended that the parties effect a system of computerized hour-by-hour computation.

[9] Reproduced below is a comparison of the three-year costs of the DPOA and city last best offers on an individual benefit basis. This comparison was included in the opinion of the arbitration panel dated December 20, 1978:

ties.[10] One of the remanded issues involved the prior contractual provision that all city police officers be residents of the City of Detroit. The city had won this provision in the parties' previous

| "Benefit | Cost of DPOA Last Best Offer | Cost of City Last Best Offer |
|---|---|---|
| Wages | $32,810,000 | $34,711,000[2] |
| COLA | 28,130,000 | ------- |
| Shift Premium | 669,000 | ------- |
| Dental Care | 1,003,000 | ------- |
| Longevity | 4,280,000 | ------- |
| Holidays | 1,506,000[1] | 1,456,000 |
| Pension | 18,027,000 | ------- |
| Sick Leave Payoff | 1,685,000 | ------- |
| TOTAL COST | $88,110,000 | $36,167,000 |

"[1] This is the direct cost of the union proposal. In addition to this the city would lose 22 man years of service in 1978-79 and 66 man years of service in 1979-80. If the city hires additional employees to cover this lost time it would cost $600,000 in 1978-79 and $1,900,000 in 1979-80.

"[2] This is the cost of the 4.8%-4.0%-4.0% wage proposal. The 4%-2%-2%-2%-2% plus limited COLA proposal would cost $33,000,000."

For an explanation of the city's two wage proposals, see fn 66, *infra*.

In reviewing this data, it is significant that the arbitration panel's *actual* award rejected the DPOA's last best offer on the economic issues of shift premium, dental care, longevity, holidays, pension and sick leave payoff in favor of the city's last best offer to continue the existing policy as to all those items, except holiday pay where the city's offer to raise holiday pay from an additional 150% to an additional 200% of daily pay was accepted.

[10] Some non-economic issues were finally resolved by the panel itself. On the disputed issue of furlough allocation, the panel awarded the city's requested contract language limiting the number of police officers in a given precinct, section or unit who could be on furlough at the same time to 10% of the total number of police officers.

The DPOA, on the other hand, won contract language on the issue of police reserves which explicitly provided that the city could not use police reserves to do the normal work of bargaining unit members or to circumvent the holiday, overtime or other provisions of the agreement. The DPOA was also awarded its proposed continuation of the previous contract's sick leave language. Under this provision, an officer could be absent from home while sick without the permission of a superior officer.

contract through the award of another Act 312 arbitration panel (Platt panel) issued September 5, 1977. Although the present panel upheld the city's position that the residency provision be maintained, it ruled for the DPOA that some provision should be made for the exercise of reasonable discretion by either the mayor or a city official designated by the mayor to exempt persons with hardship circumstances. Accordingly, the panel remanded this narrow issue to the parties with the instruction that should they be unable to resolve the matter themselves within 30 days of the issuance of the award, the panel would do so.

Shortly after the issuance of this arbitration panel's December 20, 1978 award, this matter began its complicated procedural course in our courts. On January 9, 1979, the city filed suit in the circuit court for Wayne County seeking judicial review of the arbitration panel's award. Initially, the city sought review of the award limited to those portions which dealt with COLA, wages and the residency hardship exemption. Thereafter, the city filed the first of two amended complaints, the first one raising the issue of Act 312's constitutionality. Meanwhile, both the DPOA and the Detroit Fire Fighters Association ("DFFA"), which had been allowed to intervene by stipulation of the parties, filed counterclaims seeking enforcement of the panel's December 20, 1978 award and the payment of interest on the economic awards from the time of their issuance.

The circuit court initially declined to either stay the proceeding as requested by the city or to order immediate city compliance with the arbitration award as requested by both the DPOA and the DFFA. On February 13, 1979, however, the circuit court issued an opinion *pendente lite* which or-

dered enforcement of the panel's award in its entirety pending that court's complete review of the panel's decision and order. The reasons given by the trial court in its interlocutory opinion ordering enforcement of the arbitration panel's award were threefold:

"(1) The public policy underlying and expressed in Act 312 encourages immediate enforcement under the circumstances present in this case;

"(2) The city is not likely to prevail in the proceedings for judicial review [the court had earlier stated that the order of the panel seemed to be supported by competent, material and substantial evidence on the whole record]; and

"(3) The DPOA and DFFA [Detroit Fire Fighters Association] make a somewhat stronger showing than the city on the issue of irreparable or disproportionate injury."

In an addendum to its opinion, also dated February 13, 1979, the trial court found no reason to alter its order of enforcement despite the city's first amended complaint challenging the act's constitutionality. The trial court reasoned, *inter alia,* that: every statute enacted by the Legislature is presumed constitutional; the presumed constitutionality of Act 312 was left unaltered by our equally divided decision in *Dearborn Fire Fighters v Dearborn, supra,* which affirmed the Court of Appeals ruling of constitutionality; and, the weight of national authority favored the constitutionality of compulsory arbitration statutes in public labor disputes.

The city appealed the trial court's interlocutory order to the Court of Appeals. On February 26, 1979, that Court applied the "clearly erroneous" standard to uphold the trial court's order of immediate enforcement. The ruling was made applicable

to the period commencing January 1, 1979[11] and continuing until completion of either the trial court's review or until further order of the Court of Appeals. As to the award period commencing July 1, 1977 (the date on which the previous contract between the city and the DPOA had expired) and ending December 31, 1978, the Court of Appeals stayed enforcement of the arbitration award until the trial court should enter final judgment. On July 5, 1979, we denied the city's emergency application for leave to appeal from this decision.

Thereafter, acting pursuant to the DPOA's and DFFA's motions seeking dismissal of the city's complaint and an order of enforcement, the trial court, on April 6, 1979, remanded the residency hardship exemption issue to the arbitration panel for completion of its award. This was done because the parties had failed to reach agreement on this issue pursuant to the panel's remand order. In response to the trial court remand, the panel issued a supplemental opinion and award on May 21, 1979. This award granted the DPOA's minimum request of a hardship exemption to the residency requirement as contemplated in the panel's original December 20, 1978 opinion. That award was supplemented, however, with an additional grievance procedure provision, including final and binding arbitration, to contest the grant or denial of such an exemption. The city's delegate to the panel dissented to the inclusion of this grievance procedure, while the city itself filed a second amended complaint based on this same provision, claiming that the supplemental award was invalid.

[11] Even though the arbitration award was announced on December 20, 1978, for purposes of its order and to facilitate accounting thereunder, the Court of Appeals assumed that the arbitration award was announced January 1, 1979.

On June 29, 1979, the DPOA and the DFFA
again sought to dismiss the city's complaint and
enforce the arbitration panel's award. However,
the circuit court again denied these motions and
*sua sponte* remanded the hardship exemption is-
sue to the panel for findings relating its May 21,
1979 supplemental award to the applicable factors
of § 9 of Act 312. In its opinion on remand dated
August 8, 1979, the panel found its supplemental
award on the residency hardship exemption to
have met the applicable § 9 factors. The panel also
concluded that the use of grievance arbitration as
a terminal provision in the resolution of individual
hardship cases was proper.

In response to the arbitration panel's opinion on
remand of the residency issue, the DPOA and the
DFFA again filed motions for enforcement of the
panel's award. Accordingly, on August 31, 1979,
the circuit court issued a final order enforcing the
panel's award in its entirety and holding the city's
complaints to be without merit. In doing so, the
trial court relied on the reasoning found in its
*pendente lite* opinion of February 13, 1979. In this
final order the trial court also denied the DPOA's
and DFFA's prayer for interest. Shortly thereafter,
the city filed a motion for a stay of proceedings
with the Court of Appeals in conjunction with its
appeal of the trial court's order granting the mo-
tion for enforcement of the entire award. The
DPOA and DFFA cross-appealed on the trial
court's ruling which denied interest.

By a 2-to-1 order dated October 5, 1979, the
Court of Appeals denied the city's motion for a
stay of proceedings and ordered the award en-
forced in its entirety. This order included the July
1, 1977 to December 31, 1978 retroactive period
which the Court of Appeals had earlier exempted

from its enforcement order of the trial court's
*pendente lite* decision; one judge would have con-
tinued the stay as to the retroactive period. The
Court of Appeals based its decision on the belief
that: (1) the city was not likely to prevail on
appeal; (2) a balancing of hardships favored imme-
diate enforcement; and (3) the act had as its stated
policy the provision of an "alternate, expeditious,
effective and binding procedure for the resolution
of disputes", was to be liberally construed, and was
subject to a statutorily limited scope of judicial
review.

On November 8, 1979, this Court granted the
city's delayed application for leave to appeal prior
to a Court of Appeals decision on the merits. We
also granted the city's motion to stay enforcement,
pending appeal, of the arbitration award restricted
to the retroactive period beginning July 1, 1977
and ending December 31, 1978. 407 Mich 909
(1979). Oral arguments of the city, the DPOA, and
the DFFA were heard by this Court on January
10, 1980.

## II. ISSUES

Since our order granting leave to appeal simply
requested the parties "to include among the issues
to be briefed whether 1969 PA 312 is constitu-
tional", 407 Mich 909 (1979), we have framed the
following general issues in accordance with our
sense of the parties' statement of the issues and
their arguments:

(1) Whether 1969 PA 312, as amended, consti-
tutes an invalid delegation of authority?[12]

---

[12] This issue has been more specially framed by the city in the
following terms:

"1969 PA 312, insofar as it provides for compulsory arbitration,
violates the United States Constitution and the Constitution of the

(2) Whether 1969 PA 312, as amended, impermissibly usurps constitutionally vested home rule powers?

(3) Whether 1969 PA 312, as amended, unconstitutionally denies the right to cast effective ballots in municipal elections?

(4) Whether the instant panel's award is unsupported by competent, material and substantial evidence on the whole record?[13]   .

---

State of Michigan by improperly delegating legislative and political responsibility to politically unaccountable arbitrators."

We perceive the city's issue as incorporating two distinct questions: (1) whether Act 312, as amended, is violative of the Michigan delegation doctrine in general as framed by the "standards test" of *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25 (1956); and (2) whether Act 312, as amended, is violative of general notions of public accountability or political responsibility. These distinct questions are specifically addressed in Part IV, A and B, *infra.*

[13] This general issue represents a summary of the four issues which the city framed in its brief relating to the validity of the rendered award with respect to wages, COLA and the hardship exemption from the residency requirement.

Verbatim, these four issues were framed as follows:

(1) "Whether the scope of judicial review under 1969 PA 312 is broader than that defined by the lower court, such review being governed by article 6 § 28 of the Constitution of the State of Michigan."

(2) "Whether the lower court erred in holding that the panel's award on a hardship exemption to the residency requirement of the contract met the standards required by the act and any failure to comply with the act had been corrected by the panel on remand."

(3) "Whether the lower court erred in holding that the panel's award denying the city's request to amend the collective bargaining agreement to conform to the amendments made to the city charter of the City of Detroit was supported on the record as a whole."

(4) "Whether the 1969 [PA] 312 panel, through its chairman, violated § 6 of 1969 [PA] 312 (MCL 423.236) by refusing to admit evidence relevant to economic demands of the union."

Although the city contends in its first issue that the applicable scope of judicial review of the arbitration award is that found in Const 1963, art 6, § 28, we find the review prescribed in § 12 of Act 312, MCL 423.242; MSA 17.455(42), for all relevant intents and purposes, to be identical with the constitutional standard, *i.e.,* was the award supported by competent, material and substantial evidence on the whole record. *Cf. Midland Twp v State Boundary Comm,* 401 Mich 641, 671-672; 259 NW2d 326 (1977).

(5) Whether interest should be permitted on the panel's award?

For the reasons offered below, we resolve all five issues in the negative except that part of issue 4 *re* the panel's residency hardship exemption, which we remand. Because issue 2 was definitively addressed and rejected in *Dearborn* by all four participating Justices, we will not consider the home rule argument further.[14] Because issue 3 is without merit and has been universally rejected by other courts considering this equal protection challenge to similar binding arbitration schemes, we will likewise not consider this argument further.[15]

## III. 1969 PA 312

A brief survey of Act 312, as amended, will be of assistance in understanding our rulings.

[14] The city contends that the Act 312 compulsory arbitration scheme unconstitutionally divests home-rule cities of their powers granted by Const 1963, art 7, §§ 22 and 34. This contention was rejected by Justices LEVIN, T. G. KAVANAGH, and COLEMAN and implicitly by Justice WILLIAMS in the 1975 *Dearborn* opinion. *Dearborn, supra,* 243-246 (opinion of LEVIN, J.), 273 (opinion of T. G. KAVANAGH, C.J., concurring with LEVIN, J.), 281-283 (opinion of COLEMAN, J.). Since the city's contention substantially follows that set forth in *Dearborn,* we will not consider the home rule argument further. See *Amsterdam v Helsby,* 37 NY2d 19, 26-27; 371 NYS2d 404; 332 NE2d 290, 292-293 (1975); *Arlington v Board of Conciliation & Arbitration,* 370 Mass 769, 773-774; 352 NE2d 914, 918 (1976).

[15] The city here contends that Act 312, because of the alleged delegation of authority to politically insensitive persons, violates equal protection by depriving city constituents of the right to cast effective ballots in local elections. The city's argument is a *non sequitur;* the equal protection principle of "one-man, one-vote" here invoked guarantees that legislative districts embrace substantially equal numbers of citizens in order to preclude debasement of the vote. *Baker v Carr,* 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962). Moreover, arguments similar to that made here against other binding arbitration schemes have likewise been rejected as lacking merit in those three jurisdictions expressly considering the claim. *Amsterdam v Helsby,* 37 NY2d 19, 28; 371 NYS2d 404; 332 NE2d 290, 293 (1975); *Arlington v Board of Conciliation & Arbitration,* 370 Mass 769, 777-778; 352 NE2d 914, 920-921 (1976); *Harney v Russo,* 435 Pa 183, 190-192; 255 A2d 560, 563-564 (1969).

*A. The Constitutional Background of 1969 PA 312, as Amended*

Constitution 1963, art 4, § 48 replaced the former provision of Const 1908, art 16, § 7 for "courts of conciliation". The contemporary provision reads as follows:

"The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service."

The convention's committee comment to art 4, § 48 stated the article's purpose in the following terms:

"The purpose of this section is to make it clear that the legislature has power to establish procedures for settling disputes in public employment. This section does not say what the procedure should be, but leaves that decision up to future legislatures." 2 Official Record, Constitutional Convention 1961, p 2337.[16]

---

[16] Const 1908, art 16, § 7 provided that "The legislature may establish courts of conciliation with such powers and duties as shall be prescribed by law". Delegates to the Constitutional Convention of 1961 criticized this provision as ineffectual, stating:

*"Mr. Hoxie:* * * * First I would like to state that neither agencies, cities, anyone hiring public employees, nor labor subscribe to the theory of courts in the way of settling disputes. * * * They have never been used even though the provisions of the constitution so provided, because employers of public employees as well as organized labor did not want to resort to that particular provision.

* * *

*"Mr. Murphy:* * * * Since 1850 the legislatures have had the right to establish courts of conciliation. After many long hours of public hearings and debate within the committee on legislative powers, the committee properly recognized the importance of giving the legislature the flexibility it needs to set up the necessary and appropriate machinery to solve legal problems in public employment without freezing into the constitution a particular agency which might be outmoded before we finish this constitution." 2 Official Record, Constitutional Convention 1961, p 2340.

Responsive to these criticisms, the Const 1908 provision was repealed and replaced by Const 1963, art 4, § 48, a significant departure from

Unlike the 1908 Constitution, therefore, art 4, § 48 did not specify the type of legislation which it authorized but posited wide discretion in the Legislature to establish those means and methods most effective for the accomplishment of the article's objective.

A legislative response to the 1908 organic grant of authority was the 1947 enactment of the public employment relations act ("PERA"), MCL 423.201 *et seq.;* MSA 17.455(1) *et seq.*

Twenty-two years later, the Legislature enacted 1969 PA 312, a statutory scheme to provide for the compulsory interest arbitration of labor disputes in municipal police and fire departments, MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.* The Legislature stated the act's purpose as follows:

"It is the public policy of this state that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes * * *." MCL 423.231; MSA 17.455(31).

In considering the constitutional propriety of Act 312 prior to its critical amendments in 1972[17] and 1976,[18] then-Justice, now-Chief Justice COLE-

the prior call for courts of conciliation and more consistent with modern conditions. 2 Official Record, Constitutional Convention 1961, p 2340.

[17] As originally enacted, Act 312 was scheduled to expire on June 30, 1972, MCL 423.245; MSA 17.455(45). This limitation was extended and later repealed by 1975 PA 3 "in view of the record of success of procedures under the act". *Dearborn, supra,* 295.

The first significant amendment to the act occurred in 1972 relative to the § 8 last offer provision, MCL 423.238; MSA 17.455(38). This amendment is discussed in greater detail in fn 26, *infra,* and accompanying text.

[18] 1976 PA 84, significantly amended the § 5 mechanism considered in *Dearborn* for the selection of particular dispute arbitration panel

MAN summarized the *raison d'être* of the scheme:

"PERA procedurally requires the parties to meet at the bargaining table and confer in good faith with an open mind and a sincere desire to reach an agreement. It does not mandate agreement. If the parties fail to agree on one or more mandatory subjects, an 'impasse' situation is reached and the employer may take unilateral action on an issue consistent with its final offer to the employees' representative. The duty to bargain is then suspended until there is a change in the surrounding conditions or circumstances.

"In the private sector 'impasse' often results in a strike. The employees refuse to accept the unilateral conditions imposed by the employer and withhold their services as a bargaining weapon. In the public sector strikes are prohibited but nevertheless occur. If the public employees do strike, the public employer may resort to the courts in order to return the labor situation to the status quo. By the time that court relief is obtained, however, the public may well have been left for a long period without the services and protection of the striking employees.

"When policemen engage in a strike, the community becomes immediately endangered by the withdrawal of their services. Likewise, our case law has often focused on the fact that fire fighters have a distinct and crucial employment relationship with a public employer.

"The Legislature, with knowledge of the vital character of police and fire services and with reference to the specific recommendations of the Governor's Advisory Committee on Public Employee Relations (February, 1967) moved to foreclose strikes to police officers and fire fighters by enacting 1969 PA 312." *Dearborn, supra,* 278-279 (opinion of Coleman, J.) (footnotes omitted).

There is and has been no question that pursuant to the broad discretionary grant of authority embodied in art 4, § 48, the Legislature may enact

members. This amendment is discussed in fn 1, *supra,* and accompanying text.

such supplementary labor schemes subject to other constitutional constraints. Indeed, this was made clear by each of the four Justices participating in *Dearborn*[19] and is supported by a series of earlier decisions.[20] However, it is on the topic of the application of such constitutional constraints to Act 312 that the parties differ. Before responding to these differences, a brief sketch of the act as amended will be of assistance in analyzing the scheme's constitutional viability.

## B. 1969 PA 312, as Amended

Act 312, as it read at the time of the *Dearborn* case, substantially resembles the amended statute except as to both the § 5 mechanism for appointment of arbitrators[21] and the § 8 consideration of last offer economic issues.[22] The following précis of the act's present structure will, therefore, largely reflect the pre-amendatory as well as post-amendatory scheme except in those two significant respects.

As was earlier stated, the act has as its principal objective the provision of "an alternate, expeditious, effective and binding procedure for the reso-

[19] *Dearborn, supra,* 244-246 (opinion of LEVIN, J.), 273 (opinion of T. G. KAVANAGH, C.J., concurring with LEVIN, J.), 277 (opinion of COLEMAN, J.), 294 (opinion of WILLIAMS, J.).

[20] *Escanaba v Labor Mediation Board,* 19 Mich App 273, 281-282; 172 NW2d 836 (1969). Prior to the institution of Const 1963, art 4, § 48, such schemes were constitutionally sanctioned under the police and general welfare powers of the state. See, *e.g., Local Union No 876 International Brotherhood of Electrical Workers v State Labor Mediation Board,* 294 Mich 629, 635-636; 293 NW 809 (1940); *Grosse Pointe Park Fire Fighters Ass'n v Village of Grosse Pointe Park,* 303 Mich 405, 409; 6 NW2d 725 (1942); *Detroit v Division 26 of the Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of America,* 332 Mich 237; 51 NW2d 228 (1952).

[21] See fn 1, *supra,* and accompanying text which discusses the 1976 PA 84, amendment to § 5 as originally enacted.

[22] See fn 26, *infra,* which discusses the 1972 PA 127, amendment to § 8 which was not effective at the time of the *Dearborn* litigation although considered by the Justices in that decision.

lution of [interest] disputes". MCL 423.231; MSA 17.455(31).

Act 312 seeks to accomplish this purpose through the development of a final and binding compulsory arbitration scheme emanating from the broad constitutional grant of discretionary authority in Const 1963, art 4, § 48. Attempting to constitutionally animate the act's stated policy, the Legislature has provided through § 3 that, in those instances where the public employer and employee representatives have arrived at an impasse concerning a dispute other than a grievance within 30 days of such dispute's submission to a mediator, either party may initiate binding arbitration to avert a proscribed strike. MCL 423.233; MSA 17.455(33).[23]

Binding arbitration having been initiated, the following mechanism has been legislatively prescribed for the selection of three arbitration panel members. First, pursuant to § 4, the employer and employee are each required to select a single delegate to represent their respective interests on a three-member panel. MCL 423.234; MSA 17.455(34).

Next, § 5, as amended, clearly describes the important selection of the chairperson/third, public, member of the panel:

---

[23] After the *Dearborn* decision, § 3 was amended in minor part by 1977 PA 303, to expressly except from Act 312 those disputes "concerning the interpretation or application of an existing agreement (a 'grievance' dispute)". This amendment makes clear that the scope of Act 312 is restricted to interest arbitration alone.

While this amendment to § 3 expressly restricted the act's subject matter, two amendments to § 2, MCL 423.232; MSA 17.455(32), expanded its scope to include both emergency medical service personnel employed by a police or fire department, 1976 PA 203, and emergency telephone operators employed by a police or fire department, 1977 PA 303. Additionally, the award of retroactive benefits was simplified by the 1977 PA 303, amendment to § 10, MCL 423.240; MSA 17.455(40), by eliminating the former requirement that arbitration proceedings be initiated prior to the commencement of the relevant fiscal year.

"(1) Within 7 days of a request from 1 or both parties, the employment relations commission shall select from its panel of arbitrators, as provided in subsection (2), 3 persons as nominees for impartial arbitrator or chairman of the arbitration panel. Within 5 days after the selection each party may peremptorily strike the name of 1 of the nominees. Within 7 days after this 5-day period, the commission shall designate 1 of the remaining nominees as the impartial arbitrator or chairman of the arbitration panel.

"(2) The employment relations commission shall establish and appoint a panel of arbitrators, who shall be known as the Michigan employment relations commission panel of arbitrators. The commission shall appoint members for indefinite terms. Members shall be impartial, competent, and reputable citizens of the United States and residents of the state, and shall qualify by taking and subscribing the constitutional oath or affirmation of office. The commission may at any time appoint additional members to the panel of arbitrators, and may remove existing members without cause."[24]

Once the panel is composed, its action is bounded by both express time limitations and procedural guidelines. For instance, the panel is directed to commence its hearing within 15 days of impanelment and, unless otherwise agreed by the parties, to conclude its hearing within 30 days of commencement. MCL 423.236; MSA 17.455(36). Also, unless either otherwise agreed or in the event the dispute has been remanded for further bargaining subject to a three-week limitation, MCL 423.237a; MSA 17.455(37a),[25] the Legislature has mandated rendition of a decision within 30 days of the hearing's conclusion. MCL 423.238;

[24] See fn 1, *supra,* for a discussion of the significant amendments wrought by 1976 PA 84.

[25] This section was added to the act by 1972 PA 127, effective May 4, 1972 and was, therefore, not before the *Dearborn* Court. This remand provision insures that the arbitration panel will be presented with sharpened issues necessitating resolution.

MSA 17.455(38). Additionally, evidentiary guidelines are detailed—the onus, of course, being on the parties to introduce supporting evidence—MCL 423.236; MSA 17.455(36), subpoena power is imparted for the production of documents and the attendance of witnesses, MCL 423.237; MSA 17.455(37), and the panel is directed to make written findings of fact and to promulgate a written opinion and order upon the issues presented based upon the record developed by the parties. MCL 423.238; MSA 17.455(38).

Beyond these careful time limitations and evidentiary guidelines, the panel's decisional authority has been significantly channeled by eight specific factors or standards listed in § 9. MCL 423.239; MSA 17.455(39). That section trenchantly circumscribes the arbitral tribunal's inquiry to only those disputes involving "wage rates or other conditions" of employment embraced by a newly proposed or amended labor agreement, and commands the panel to "base its findings, opinions and order" relative to those narrow disputes on the eight listed "factors, as applicable":

"Where there is no agreement between the parties, or where there is an agreement but the parties have begun negotiations or discussions looking to a new agreement or amendment of the existing agreement, and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable:

"(a) The lawful authority of the employer.

"(b) Stipulations of the parties.

"(c) The interests and welfare of the public and the financial ability of the unit of government to meet those costs.

"(d) Comparison of the wages, hours and conditions of

employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:

"(i) In public employment in comparable communities.

"(ii) In private employment in comparable communities.

"(e) The average consumer prices for goods and services, commonly known as the cost of living.

"(f) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.

"(g) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

"(h) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between the parties, in the public service or in private employment." See MCL 423.238; MSA 17.455(38).

Perhaps of interest here is that among the standards listed are two interacting legislative directives: first, that the panel invest its deliberations with specific contemplation of the public welfare, both as a distinct inquiry as well as an inexorable adjunct of the governmental unit's financial ability to sustain the proposed costs; and, second, that the tribunal consider comparable public- and private-sector wages, hours and conditions of employment.

The panel's decisional authority is further restricted by § 8, as significantly amended by 1972 PA 127, to provide for last-offer arbitration of

economic issues subject to the factors enunciated in § 9.[26] Section 8 provides in pertinent part:

"As to each economic issue, the arbitration panel

[26] Prior to the 1972 PA 127, amendments to § 8, effective May 4, 1972, this section merely required the rendition of a written opinion and order upon the record, which shall be "just and reasonable and based upon the factors prescribed in sections 9 and 10"; it did not differentiate between economic or non-economic issues:

"Sec. 8. The arbitration panel, within 30 days after the conclusion of the hearing, or such further additional periods to which the parties may agree, shall make written findings of fact and promulgate a written opinion and order upon the issues presented to it and upon the record made before it, and shall mail or otherwise deliver a true copy thereof to the governing body of the public employer and to the attorney or other designated representatives of the employees of the public employer. The findings, opinions and order shall be just and reasonable and based upon the factors prescribed in sections 9 and 10."

Comparison of § 8 as enacted and amended reveals significant modification. Prior to 1972 PA 127, the panel was required by § 9 alone to consider and resolve *all* issues ("wage rates or other conditions of employment") *based upon* the applicable § 9 factors. Pursuant to the 1972 amendments, however, the panel is restricted by § 8 to the adoption of that *last offer of settlement as to each economic issue* which, in the panel's opinion, *more nearly complies* with the applicable § 9 factors; resolution of all other issues is to be based upon the applicable § 9 factors. Thus, not only is the panel's authority to resolve economic issues strictly circumscribed by the parties' sharpened last best offer but that authority is further bounded by the necessity of considering the applicable § 9 factors.

Although these amendments were not applicable to the litigation concerned in the 1975 *Dearborn* decision because that litigation preceded their effective date, Justices LEVIN, COLEMAN and WILLIAMS directly addressed their significance. *Dearborn, supra,* 270 (opinion of LEVIN, J. "Last-offer arbitration does not, however, address the constitutional deficiency we find in this act: the power of the decision maker, who does not have continuing responsibility, to make critical choices on economic and non-economic issues without political accountability."), 281, fn 6 (opinion of COLEMAN, J. "Indeed, the 1972 amendments to Act 312 have made the arbitrator's duty even more circumscribed."), 297 (opinion of WILLIAMS, J. "A subsequent amendment provides a further constraint on the authority of the panel in the requirement to consider only the last offer of settlement made by each party for each economic issue. This also encourages good-faith bargaining by the parties, as it prevents submission of an offer so outlandish as to effectively require acceptance of the other's position. Not only is the panel restricted to accepting or rejecting the last proposal, it must base its determinations on [the § 9] standards, * * * .")

shall adopt the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9. The findings, opinions and order as to all other issues shall be based upon the applicable factors prescribed in section 9." MCL 423.238; MSA 17.455(38).

Significantly, the conjunction of the § 9 factors with the panel's consideration of *both* economic and non-economic issues, therefore, further circumscribes the panel's scope of decisional authority.

Finally, the Legislature has made specific provision for appellate review of such limited orders of the panel as to both economic and non-economic issues. Thus, although the tribunal's order "shall be final and binding upon the parties", MCL 423.240; MSA 17.455(40), that decision

"shall be reviewable * * * for reasons that the arbitration panel was without or exceeded its jurisdiction; the order is unsupported by competent, material and substantial evidence on the whole record;[27] or the order was procured by fraud, collusion or other similar and unlawful means." MCL 423.242; MSA 17.455(42).[28]

---

[27] As indicated in fn 13, *supra,* the § 12 standard of judicial review is, for all relevant intents and purposes, identical to the constitutional standard of review of administrative decisions found in Const 1963, art 6, § 28, which provides in pertinent part:

"All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders *are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.*" (Emphasis supplied.) See MCL 24.301, 24.302, 24.306; MSA 3.560(201), 3.560(202), 3.560(206).

See fns 60-64, *infra,* and accompanying text.

[28] This section resembles the Const 1963, art 6, § 28 provision for judicial review which is patently more expansive than the restrictive court rule provision for the review of arbitral awards in general, GCR 1963, 769.9(1):

## IV. PROPER/IMPROPER DELEGATION TO POLITICALLY UNACCOUNTABLE ARBITRATORS?

Plaintiff city has framed the first of its major arguments in the following terms:

"1969 PA 312, insofar as it provides for compulsory arbitration, violates the United States Constitution and the Constitution of the State of Michigan by improperly delegating legislative and political responsibility to politically unaccountable arbitrators."

As a matter of procedure in addressing ourselves to this argument as posited by the city, let us analyze the constitutionality of the Act 312 delegation scheme first without, and then in conjunction with, consideration of the city's point of political accountability.

---

".9 Vacating an [Arbitration] Award.

"(1) Upon application of a party, the court shall vacate an award where:

"(a) The award was procured by corruption, fraud or other undue means;

"(b) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

"(c) The arbitrators exceeded their powers; or

"(d) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing as to prejudice substantially the rights of a party.

"But the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award."

As such, § 12 significantly incorporates all appropriate bases for review without either permitting expansive *de novo* litigation as some jurisdictions have provided, *McAvoy, Binding Arbitration of Contract Terms: A New Approach to the Resolution of Disputes in the Public Sector,* 72 Colum L Rev 1192, 1204, fn 73 (1972)—which would likely frustrate the binding and expeditious nature of the Act 312 concept— or, as in the case of GCR 1963, 769.9(1), so narrowly restricting the judiciary's basis for review as to arguably shelter such significant arbitral decisions from judicial inquiry. See fns 60-64, *infra,* and accompanying text.

*A. Constitutionality of Delegation Generally: Act
312 Standards Are as Reasonably Precise as the
Subject Matter Requires or Permits*

The Michigan doctrine of delegation was suc-
cinctly stated by this Court in *Osius v St Clair
Shores,* 344 Mich 693, 698; 75 NW2d 25 (1956), in
terms of the following "standards" test:[29]

"There is no doubt that a legislative body may not
delegate to another its lawmaking powers. It must
promulgate, not abdicate. This is not to say, however,
that a subordinate body or official may not be clothed
with the authority to say when the law shall operate, or
as to whom, or upon what occasion, *provided, however,
that the standards prescribed for guidance are as rea-*

───────────

[29] Perhaps the most concise description of the delegation doctrine
was enunciated in the seminal case of *Locke's Appeal,* 72 Pa 491, 498-
499 (1873):

"The legislature cannot delegate its power to make a law; but it can
make a law to delegate a power to determine some fact or state of
things upon which the law makes, or intends to make, its own action
depend. To deny this would be to stop the wheels of government."

As in Plato's allegory of the cave, since 1854 in *People v Collins,* 3
Mich 343 (1854), this Court has intermittently struggled to distinguish
the shadows from the light surrounding the question posed in *Locke's
Appeal* whether the Legislature may delegate authority to a subordi-
nate body of non-elected individuals. Although this Court initially
adopted "true" and "proper" tests to distinguish valid from invalid
delegations, judicial focus has sharpened to an inquiry "whether the
limits [on the exercise of discretion conferred on the non-legislator]
are sufficiently defined to avoid delegation of legislative powers". *Argo
Oil Corp v Atwood,* 274 Mich 47, 52; 264 NW 285 (1935). See *People v
Soule,* 238 Mich 130, 139; 213 NW 195 (1927); *Hoyt Brothers, Inc v
Grand Rapids,* 260 Mich 447, 451-452; 245 NW 509 (1932).

Despite certain criticism, 1 Davis, Administrative Law Treatise (2d
ed), § 3:3, p 152, the test of delegation has come to be framed in terms
of "standards" as developed in *Osius.* The standards test has been
recently recognized as a valid measure of a delegation scheme's
constitutionality in the context of both administrative agency action,
*Westervelt v Natural Resources Comm,* 402 Mich 412; 263 NW2d 564
(1978); *Dukesherer Farms, Inc v Director of the Dep't of Agriculture
(After Remand),* 405 Mich 1; 273 NW2d 877 (1979); *Dep't of Natural
Resources v Seaman,* 396 Mich 299; 240 NW2d 206 (1976), as well as
action by otherwise appointed groups or persons, see *Dearborn, supra,*
259, 269-270 (opinion of LEVIN, J.), 273 (opinion of T. G. KAVANAGH,
C.J., concurring with LEVIN, J.), 288 (opinion of COLEMAN, J.), 303-304
(opinion of WILLIAMS, J.); *Westervelt, supra,* 443-444, fn 21.

*sonably precise as the subject matter requires or permits."*[30] (Emphasis supplied.)

[30] Construing the general principle enunciated in *Osius* that such standards must be "as reasonably precise as the subject matter requires or permits", it has been recognized that "[t]he preciseness of the standard will vary with the complexity and/or the degree to which [the] subject regulated will require constantly changing regulation". *Dep't of Natural Resources v Seaman,* 396 Mich 299, 309; 240 NW2d 206 (1976).

Neither exhaustive nor excessively detailed standards must be found to uphold a delegation scheme. As stated by the United States Supreme Court in *American Power & Light Co v Securities & Exchange Comm,* 329 US 90, 105; 67 S Ct 133; 91 L Ed 103 (1946):

"The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."

See *Ray v Mason County Drain Comm'r,* 393 Mich 294, 306-307; 224 NW2d 883 (1975); *State Highway Comm v Vanderkloot,* 392 Mich 159, 172-173; 220 NW2d 416 (1974) (opinion of WILLIAMS, J.); *Pleasant Ridge v Governor,* 382 Mich 225, 243-248; 169 NW2d 625 (1969). This sentiment was likewise urged by this Court in *G F Redmond & Co v Michigan Securities Comm,* 222 Mich 1, 5; 192 NW 688 (1923):

"The power to carry out a legislative policy enacted into law under the police power *may be delegated to an administrative board under quite general language,* so long as the *exact policy* is clearly made apparent, * * *. This marks the line between arbitrary officiousness and the exercise of delegated power to carry out a designated policy under the police power." (Emphasis supplied.)

What is required to satisfy the *Osius* inquiry is the inclusion of either explicit or derivative standards, *Pleasant Ridge v Governor, supra,* 243-248; *Vanderkloot, supra,* commensurate with the complexity of the regulated area:

"In making this determination whether the statute contains sufficient limits or standards we must be mindful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power in the hands of administrative officials." *Seaman, supra,* 308-309.

When standards as reasonably precise as the subject matter requires or permits are found, the principle that the Legislature may not delegate or dedicate "law-making" or "legislative" power, but only "administrative" power, becomes merely a principle of description or convenience, not substance. See *Argo Oil Corp v Atwood,* 274 Mich 47, 53; 264 NW 285 (1935). This tenet was analyzed with respect to administrative rule-making in *Westervelt, supra,* 440-441:

Factually addressing the adequacy of Act 312's legislatively prescribed standards, we need only highlight our précis of Act 312's provisions in Part III, B, *supra,* that Act 312: specifically enunciates its guiding purpose, MCL 423.231; defines the parties to whom it is and is not applicable, MCL 423.232; establishes specific time limits circumscribing arbitral initiation and resolution, MCL 423.233, 423.236 and 423.238; provides a detailed procedure for both the appointment and removal of a permanent MERC panel of potential chairpersons as well as for the selection of the arbitration panel's representative delegates and public chairperson, MCL 423.234 and 423.235; formulates procedural guidelines relative to the arbitral hearing and remand, MCL 423.236, 423.237 and 423.237a; narrowly channels the panel's scope of decisional authority to eight specific factors in its review of last-offer economic issues, MCL 423.238 and 423.239; mandates the application of eight specific factors in rendering a finding, opinion and order relative to both economic and non-economic issues, MCL 423.238 and 423.239; and details the effect of an arbitral decision subject to the availability of judicial review, MCL 423.240 and 423.242.

"[T]he making of rules by an administrative agency pursuant to legislatively delegated rule-making power differs from 'legislation' or 'law-making' in two essential aspects. First, the *source of the power to make the rule is in the Legislature.* Second, the concept of 'legislation', in its essential sense, is the power to speak on any subject *without any specified limitations.*

"However, constitutionally, 'standards * * * as reasonably precise as the subject matter requires or permits' do specify limitations on agency rule-making. Thus, when such standards exist, agency rule-making is not an unconstitutional action because the Legislature has (1) authorized and (2) limited such action. Also, agency rule-making is not a usurpation of the 'legislative' law-making function because the Legislature has (1) directed the agency to so act and (2) limited the scope within which it may act. Finally, agency rule-making is not 'legislating' in the essential sense of the word, because the agency is acting within specified limitations ('standards') established by the Legislature and is not acting in accordance with its *own* will."

It is generally acknowledged that the instant and similar statutory schemes are directed toward the resolution of complex contractual problems which are as disparate as the towns and cities comprising the locations for these critical-service labor disputes.[31] The Legislature, through Act 312, has sought to address this complicated subject through the promulgation of express and detailed standards to guide the arbitrators' decisional operations.[32]

We must conclude that the eight factors expressly listed in § 9 of the act provide standards at least as, if not more than, as, "reasonably precise as the subject matter requires or permits" in effectuating the act's stated purpose "to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes". MCL 423.231; MSA 17.455(31). These standards must be considered by the panel in its review of both economic and non-economic issues. In its resolution of non-economic issues, the panel *"shall base* its findings, opinions and order upon the following factors, *as applicable"*, MCL 423.239; MSA 17.455(39) (emphasis supplied). See MCL 423.238; MSA 17.455(38),

---

[31] See generally Barr, *The Public Arbitration Panel as an Administrative Agency: Can Compulsory Interest Arbitration Be an Acceptable Dispute Resolution Method in the Public Sector?*, 39 Albany L Rev 377 (1975); Grodin, *Political Aspects of Public Sector Interest Arbitration,* 64 Cal L Rev 678 (1976); Howlett, *Contract Negotiation Arbitration in the Public Sector,* 42 Cincinnati L Rev 47 (1973); McAvoy, *Binding Arbitration of Contract Terms: A New Approach to the Resolution of Disputes in the Public Sector,* 72 Colum L Rev 1192 (1972); Case Note, *The Uncertain Status of Public Sector Labor Arbitration in Colorado,* 48 Colo L Rev 451 (1977); Comment, *Salt Lake City v International Ass'n of Firefighters,* 1977 Utah L Rev 457; Summers, *Public Employee Bargaining: A Political Perspective,* 83 Yale L J 1156 (1974).

[32] The express and detailed standards of § 9, MCL 423.239; MSA 17.455(39), applicable to both §§ 8 and 9 economic as well as non-economic issues, are set out in Part III, B, *supra.* The instant panel's consideration of those § 9 factors with relation to the issues before it is analyzed in Part V, C and D, *infra.*

"The findings, opinions and order as to all other issues *[i.e.,* non-economic issues] *shall be based upon* the applicable factors prescribed in section 9." (Emphasis supplied.) When these eight specific § 9 factors are coupled with the § 8 mandate that "[a]s to each economic issue, the arbitration panel *shall adopt the last offer of settlement which,* in the opinion of the arbitration panel, *more nearly complies with* the applicable factors prescribed in section 9", MCL 423.238; MSA 17.455(38) (emphasis supplied), the sufficiency of these standards is even more patent.[33]

Four Justices of this Court have already, in *Dearborn,* individually recognized that Act 312 provides sufficient standards to guide the exercise of delegated authority.[34] In *Dearborn,* each of the four participating Justices agreed to this proposi-

[33] The precision of these standards appears to have been tacitly conceded by the city as it merely attacks the relative weight to be given the § 9 factors rather than their sufficiency. The city's argument in this respect is discussed and rejected in Part V, B, *infra.*

[34] Justice WILLIAMS' opinion began with the premise that "[t]his Court straight-forwardly requires 'sufficient standards so as to obviate any delegation of legislative power' ", *Dearborn, supra,* 303 (opinion of WILLIAMS, J.), and concluded that the pre-amendment scheme provided "legal accountability through sufficient standards of delegation". *Id.,* 323.

Justice COLEMAN, also upholding the pre-amendatory scheme, similarly found the act's standards sufficient to sanction the delegation: "The final decision of the arbitrator is made pursuant to the adequate guidelines of § 9." *Id.,* 280 (opinion of COLEMAN, J.).

Justice LEVIN's opinion likewise found sufficient the adequacy of the act's standards:

"Generally, when legislation is challenged as an invalid delegation of legislative power, the controversy revolves around the adequacy of the standards * * *.

"The challenged act provides * * * generalized standards to guide the exercise of this delegated power are stated [§ 9 reprinted in footnote]; and the decision is subject to judicial review. All that is generally required has been done." *Id.,* 259 (opinion of LEVIN, J.).

Justice KAVANAGH, concurring separately with Justice LEVIN, implicitly agreed with this observation of Justice LEVIN, "satisfied that he has correctly stated the law". *Id.,* 273 (opinion of T. G. KAVANAGH, C.J., concurring with LEVIN, J.).

tion even before the § 9 factors had become opera-
tive to *both* non-economic and § 8 last offer eco-
nomic issues alike.[35] As Justice LEVIN remarked in
this regard: "All that is generally required has
been done." *Dearborn, supra,* 259 (opinion of
LEVIN, J.).

Applying the *Osius* explication of the delegation
doctrine, all that is required to constitutionally
sustain this dispute resolution mechanism is that
the statutory scheme provide standards at least as
reasonably precise as the subject matter requires
or permits. We have found that the standards
embraced by the § 9 factors fulfill this require-
ment. The Legislature has determined that these
express and detailed § 9 standards must be consid-
ered in the panel's resolution of economic "last
best offer" issues as well as non-economic issues
alike. Although the Legislature has chosen to
provide for the resolution of economic issues on a
last offer of settlement basis expressly circum-
scribed by the applicable § 9 standards in an ap-
parent attempt to effectuate the act's § 1 purpose
of "afford[ing] an alternate, expeditious, effective
and binding procedure for the resolution of dis-
putes", we do not believe that either the presence
or absence of this last best offer provision is neces-
sary to the act's constitutionality under the dic-
tates of the delegation doctrine or otherwise.[36]

[35] See the comments of Justices COLEMAN, WILLIAMS and LEVIN
reprinted in fn 26, *supra.* It should be emphasized that Justice LEVIN
did not consider this amendment in terms of the standards inquiry.

[36] As discussed in footnote 26, *supra,* as originally enacted, Act 312
did not provide for last-offer settlement of economic issues. Rather,
economic as well as non-economic issues were to be assessed by the
§ 9 standards alike. The last offer provision of § 8 was introduced into
the act by 1972 PA 127. Although that provision was therefore not
before this Court in its 1975 consideration of the act, both Justices
COLEMAN and WILLIAMS commented favorably on this amendment in
dicta, respectively as follows:
"The final decision of the arbitrator is made pursuant to the

However, we are unaware of any court which has declared a similar critical-service act unconstitutional on the basis of the inclusion of such an economic issue provision but can point to two cases which have considered last-best offer settlement and have willingly sustained their act's constitutionality provided sufficient standards are enumerated to focus arbitral decision-making.[37]

In reaching this conclusion, we are also persuaded by the fact that the Act 312 standards are patently more precise than those which this and other courts have previously upheld under similar modes of delegation analysis and involving subject matters at least as complex as that considered here.[38] Other jurisdictions have sanctioned their compulsory interest arbitration schemes even

---

adequate guidelines of § 9. The arbitrator resolves the dispute by selecting a bargaining position proposed by a party or by fashioning a compromise position. The arbitrator, acting as an adjunct to the PERA bargaining process, is not at liberty to impose his own solutions or to go beyond the boundaries established by the parties' bargaining positions. The arbitrator's singular duty is to fashion a workable resolution for the dispute in keeping with the limits set by the parties and the dynamics of the particular bargaining situation.[6] Even this limited decision may be appealed to the courts." *Dearborn, supra,* 280-281 (opinion of COLEMAN, J.).

---

"[6] Indeed, the 1972 amendments to Act 312 have made the arbitrator's duty even more circumscribed. When resolving *a disputed economic matter the arbitrator must select the 'last best offer' that more closely reflects the guidelines found in § 9 * * *.*"

---

"A subsequent amendment provides a further constraint on the authority of the panel in the requirement to *consider only the last offer of settlement made by each party for each economic issue.* This also encourages good-faith bargaining by the parties, as it prevents submission of an offer so outlandish as to effectively require acceptance of the other's position. Not only is the panel restricted to accepting or rejecting the last proposal, *it must base its determinations on these standards,* [§ 9]." *Id.,* 297 (opinion of WILLIAMS, J.).

[37] See *New Jersey State Policemen's Benevolent Ass'n v Town of Irvington,* 80 NJ 271; 403 A2d 473; 102 LRRM 2169 (1979); *Arlington v Board of Conciliation & Arbitration,* 370 Mass 769; 352 NE2d 914 (1976).

[38] See fn 30, *supra.*

though presented with less precise[39] or even non-explicit standards for decision.[40] Furthermore, in two cases where standards identical to those codified in Act 312 were subjected to judicial scrutiny, their sufficiency was upheld.[41] Also, in another case

[39] *Amsterdam v Helsby*, 37 NY2d 19, 27, 37 fn 4; 371 NYS2d 404; 332 NE2d 290, 293, 299 fn 4 (1975) ("[The Legislature] has also established specific standards which must be followed by such a panel [NY Civil Service Law (McKinney), § 209, subd 4, par (c), cl (v).] [The four § 209 standards to be "take(n) into consideration" are enumerated in the concurring opinion, p 37, fn 4.]"); *Harney v Russo*, 435 Pa 183, 189; 255 A2d 560, 563 (1969) (Despite the lack of other precise standards, the constitutional mandate that arbitrators act "in accordance with law" was sufficient in view of the legislative policy to protect the public from strikes by municipal police and fire fighters: "To require a more explicit statement of legislative policy in a statute calling for labor arbitration would be sheer folly."); *Spokane v Spokane Police Guild*, 87 Wash 2d 457, 463; 553 P2d 1316, 1320 (1976); *City of Warwick v Warwick Regular Firemen's Ass'n*, 106 RI 109, 117-118; 256 A2d 206, 211 (1969) ("The legislature in [RI Gen Laws] § 28-9.1-10 sets out specifically a number of comprehensive limitations on the actions of a board of arbitration when exercising the power delegated. They require that certain factors '* * * be given weight by the arbitrators in arriving at a decision * * *.' "). See *East Providence v Local 850, International Ass'n of Fire Fighters*, 117 RI 329, 333-336; 366 A2d 1151, 1153-1155 (1976); *In the Matter of New Jersey Bell Telephone Co v Communications Workers of America*, 5 NJ 354, 370-372; 75 A2d 721, 728-730 (1950); *New Jersey State Policemen's Benevolent Ass'n v Town of Irvington*, 80 NJ 271, 291-292; 403 A2d 473, 480-481; 102 LRRM 2169, 2174-2175 (1979). See generally Anno, 68 ALR3d 885, 902-908.

[40] *Division 540, Amalgamated Transit Union v Mercer County Improvement Authority*, 76 NJ 245, 252; 386 A2d 1290, 1294 (1978) (The Court implied the "inherent" standards that the arbitrators must: act within the scope of statutory authority; consider the public interest as well as the decision's impact; act fairly and reasonably to stabilize and promote labor peace; and, make adequate and sufficient findings.); *Richfield v Local No 1215, International Ass'n of Fire Fighters*, 276 NW2d 42, 46-47 (Minn, 1979) (Sufficient standards provided although the only specific guideline was found in the act's provision that arbitration panel must give "due consideration to the statutory rights and obligations of public employers to officially manage and conduct its operations within the legal limitations surrounding the financing of such operations".) See *Biddeford v Biddeford Teachers Ass'n*, 304 A2d 387, 402, 412 (Me, 1973). *Fire Fighters Union, Local 1186 v Vallejo*, 12 Cal 3d 608, 613, fn 3; 526 P2d 971, 974, fn 3; 116 Cal Rptr 507 (1974). See generally Anno: 68 ALR3d 885.

[41] *Medford Fire Fighters Ass'n v Medford*, 40 Or App 519, — fn 9; 595 P2d 1268, 1272 fn 9 (1979); *Arlington v Board of Conciliation & Arbitration*, 370 Mass 769, 775 fn 5; 352 NE2d 914, 919 fn 5 (1976).

where the prescribed standards were found insufficient, the court expressly indicated that its decision would have been otherwise had the Legislature modeled its standards after those found in Michigan's Act 312.[42]

## B. Public Accountability

We have just made clear that Act 312 meets the constitutional delegation requirements as framed in *Osius* without directly considering the city's question of "political responsibility". Does, however, the theory of public accountability nonetheless require us to rule Act 312, as amended, unconstitutional? For the reasons offered below, we conclude not. Indeed, since we find as a practical matter that the act as now amended sufficiently provides for public responsibility and accountability, this Court in this matter is neither required to accept nor reject the city's argument that political responsibility is necessary to sustain the act's constitutionality separate and apart from the overall question of constitutional delegation.

In *Dearborn,* lack of political, or public, accountability was basically approached from two view-

See *City of Warwick v Warwick Regular Firemen's Ass'n,* 106 RI 109, 117-118; 256 A2d 206, 211 (1969).

[42] Although the Connecticut Superior Court in *Town of Berlin v Santaguida,* 98 LRRM 3259, 3265 (Conn Superior Court, 1978), ruled the state's act unconstitutional on the grounds that it failed to provide either sufficient standards or judicial review and evidenced insufficient political accountability, the court had this to say with respect to the standards issue:

"The standards contained in the act, which are too imprecise to properly guide an arbitration panel in its decision-making, give arbitrators unbridled flexibility and will facilitate, rather than guard against arbitrary action by arbitration panels. When the standards set forth in the act are compared to the more precise standards included in similar arbitration statutes in other jurisdictions, the inadequacy of the act's standards is even more striking. See [Mass Ann Laws, ch 150E, § 9, note; MCL 423.239; MSA 17.455(39); NY Civil Service Law (McKinney), § 209, subd 4, par (c), cl (v); RI Gen Laws, § 28-9.1-10]."

points. First, individuals chosen as arbitrators were thought by two Justices to have been provided insufficient tenure to ensure responsibility and accountability. Then-Chief Justice T. G. KAVANAGH referred, for example, to pre-amendment Act 312 arbitrators as "hit-and-run arbitrators". *Dearborn, supra,* 273 (opinion of T. G. KAVANAGH, C.J.).[43] Second, the system of arbitrator selection was attacked as rendering the line of accountability between the arbitrators and the people too tenuous.[44] One opinion indicated that choice of the panel's impartial chairperson by the parties' delegates alone would provide insufficient public accountability even though one party represented a municipal corporation; appointment of that impartial arbitrator by the MERC chairperson, however, provided sufficient public accountability and responsibility largely because the MERC chairperson

---

[43] Justice LEVIN concentrated his efforts on whether the scheme violated "[t]he constitutional principle restricting the delegation of legislative power * * * to resolve a labor dispute to persons other than government officials or tribunals" enlisted as members of an arbitral panel pursuant to the procedures of pre-amendment § 4—delegate selection—and § 5—chairperson selection. *Dearborn, supra,* 246 (opinion of LEVIN, J.). Primarily utilizing Professor Davis' "safeguards" approach to legislative delegation, and after finding the § 9 standards adequate, Justice LEVIN generally ruled the scheme unconstitutional but appended the following instructive caveat:

"To avoid possible misunderstanding, we add that our holding does not preclude the Legislature from vesting the authority to resolve disputes concerning public employees in a governmental officer or agency with continuing responsibility for the day-to-day exercise of that delegated power. Such a decision-maker (arbitrator) would not be 'expendable' but, rather, would be responsible through the appointing authority to the electorate for the manner in which the delegated power is exercised." *Id.,* 272.

Justice KAVANAGH concurred with Justice LEVIN but wrote separately to amplify Justice LEVIN's caveat:

"Although the present law's provision for hit-and-run arbitrators is constitutionally defective, a law providing for a continuing politically responsible arbitrator could meet the constitution's demands." *Id.,* 273. (T. G. KAVANAGH, C.J., concurring with LEVIN, J.).

[44] *Dearborn, supra,* 241-242 (opinion of LEVIN, J.), 273 (opinion of T. G. KAVANAGH, C.J., concurring with LEVIN, J.).

was the Governor's direct appointee with the advice and consent of the Michigan Senate.[45] It was also recognized that there existed an inherent tension, if not dichotomy, in the twin objectives of affording the arbitrators a high degree of independence on the one hand, and, on the other, requiring public accountability and responsibility.[46]

1976 PA 84 significantly modified the Act 312 scheme addressed in *Dearborn* both as to the § 5 tenure of the impartial chairperson and as to the § 5 method of the chairperson's selection.[47]

*1. Tenure of the Impartial Chairperson*

As to the tenure of the impartial chairperson, the Legislature responded to the "hit-and-run" characterization of Act 312 arbitrators by significantly modifying § 5 of the original act in four major respects. First, eligibility for and MERC appointment as panel chairperson is now restricted to MERC-appointed members of a MERC-established permanent panel—"the Michigan Employment Relations Commission Panel of Arbitrators"—whereas, before, *any* "impartial, competent and reputable person" might be selected by either the delegates *or* the chairperson of the State Labor Mediation Board to fulfill this role. Second, members of the MERC-established and -appointed permanent panel now not only have to be "impartial, competent, and reputable citizens of the United States" but must also be "residents of the state" of Michigan; this latter requirement was absent from the earlier act's express terms. Third, permanent panelists must "qualify by taking and subscribing

---

[45] *Dearborn, supra,* 325 (opinion of WILLIAMS, J.).

[46] *Dearborn, supra,* 321-323 (opinion of WILLIAMS, J.), 287-289 (opinion of COLEMAN, J.) (The pre-amended act is a "balanced, reasonable and fair implementation of a constitutional directive", *id.,* 284, in reaction to which "[o]ur legislators balanced the competing interests with admirable skill", *id.,* 287).

[47] See fn 1, *supra,* and accompanying text.

the constitutional oath or affirmation of office",
whereas neither an oath nor an affirmation had
been previously required. Fourth, the term of office
on the MERC Panel of Arbitrators is indetermi-
nate; tenure can either run as long as a panelist
chooses—for that matter, for life—or the panelist
may be removed without cause by the MERC.

The four modifications wrought by the 1976 PA
84 amendments to § 5 have greatly altered the
atmosphere of accountability surrounding the ser-
vice of arbitration panel chairpersons. In the first
place, the chairperson is no longer treated as an
at-large one-time chair of a single and particular
labor dispute panel. Rather, the chairperson is
treated as a member of a permanent MERC Panel
of Arbitrators who can be called upon by MERC,
as appropriate, to serve as panel chairperson for
any number of labor disputes.[48] This obviously
paints out the picture of a "hit-and-run arbitrator"
who is allegedly unconcerned about the impact of
his or her decision, and paints in the true picture
of an arbitrator seeking continued employment by
both MERC and public employers/employees over
a length of time, and consequently recognizing the
impact of his or her decisions as a significant
factor in re-employment.[49]

---

[48] Justice COLEMAN commented on the pre-amendment tenure of
panel members in the following terms:

"Although the Legislature could have established another bureauc-
racy, it chose short-term panels to meet impasses immediately—no
matter how many or where they might occur simultaneously. The
duties do not require office work outside of the immediate arbitration
activity, so a permanent staff could prove costly and unnecessary or
inadequate. (There could be many or no impasses within a given span
of time.) The Legislature also could have believed bias and corruption
less likely to settle into these panels." *Dearborn, supra,* 285 (opinion
of COLEMAN, J.).

[49] Zemetis, *Compulsory Binding Arbitration for Municipal Employ-
ees in Connecticut: Constitutional? Town of Berlin v Santaguida,* 11
Conn L Rev 583, 592-593 (1979). See *Richfield v Local No 1215,
International Ass'n of Fire Fighters,* 276 NW2d 42, 47 (Minn, 1979).

Second, since members of the MERC Panel of Arbitrators must be "residents of the state", the panelist cannot escape the impact of his or her decision by retreating to a foreign jurisdiction but will be required to bear its impact on his or her reputation and credibility for arbitral employment in Michigan where continued employment is sought.[50] This too militates against a "hit-and-run" mentality.

Third, the oath-taking requirement certainly imposes an aura of tenure.[51] It is an aspect of public office and responsibility. This requirement should act as both a psychological deterrent to "hit-and-run" service and an encouragement to public responsibility.

Fourth, the indeterminate term on the permanent panel, although terminable without cause, certainly implies a degree of tenure and continuation. It also implies the importance of continued responsible behavior. This is so especially because obviously irresponsible behavior can terminate tenure.[52] Again, this tenure provision encourages accountability and responsibility.

Considered collectively, the aforementioned factors tend to eradicate the image of "hit-and-run arbitrators" and act as a catalyst to the establishment of a class of arbitrators possessing both the aspects of tenure and responsibility which are certainly compatible with the notion of political or public accountability. This complexion of political responsibility and accountability has been further magnified by the 1976 PA 84 intensification of selection responsibility in a traditionally politi-

---

[50] See fns 31 and 49, *supra*.

[51] See *City of Warwick v Warwick Regular Firemen's Ass'n*, 106 RI 109, 114-115; 256 A2d 206, 209 (1969).

[52] See fn 49, *supra*.

cally accountable center of authority, *i.e.,* MERC Commissioners who are direct appointees of the Governor subject to Senate confirmation.[53]

*2. Method of Chairperson Selection*

Under § 5, as originally enacted, the chairperson selection system alternatively permitted either appointment by the parties' delegates alone or, in the event of their default, appointment by the MERC chairperson.

Obviously, there was very little political accountability in the first alternative as that approach shielded the private selectors from both public scrutiny and the democratic form of government's greatest sanction—the vote. The line of political accountability drawn between the private representatives and the public was very far from direct.

The second alternative, however, presented quite a different accountability perspective since that alternative required MERC intervention in the selection process. By appointing the panel chairperson, it could be presumed that the MERC chairperson—a direct appointee of the Governor with the Senate's advice and consent—would exercise great concern for the Governor's political welfare as well as the chief executive officer's concern for good public service. This alternative precluded isolation from the public process and cleared the way for direct public expressions of satisfaction or dissatisfaction to those individuals ultimately responsible for the panel members' decisions.

The present § 5 selection system, as amended by 1976 PA 84, has eliminated the minimally accountable first alternative of delegate selection and expressly retained the second alternative's

_____

[53] MCL 423.3; MSA 17.454(3); MCL 423.4; MSA 17.454(4).

spirit of public accountability through its provision
for MERC selection of a chairperson from a
MERC-appointed permanent panel. Albeit tem-
pered by the parties' right of exercising a peremp-
tory veto,[54] § 5 focuses the power of chairperson
appointment in the commission alone to the exclu-
sion of either the parties' delegates or the MERC
chairperson as earlier provided. Furthermore, the
MERC appointee is no longer chosen at large but
must have been earlier screened by, appointed to,
and selected from a permanent panel of MERC
arbitrators established by the commission, a guber-
natorially appointed body.

Considered together, these significant amend-
ments fix a high order of political accountability in
the chairperson appointment scheme. Indeed, the
majority of jurisdictions which have considered
this question have found accountability;[55] those

---

[54] The city contends, in part, that exercise of the § 5 peremptory
strike of each § 4 delegate against the MERC nominees is no more
than a hollow contrivance aimed at sustaining the impression that
the alleged accountability deficiencies of the original scheme have
been eradicated without materially altering the chairperson selection
mechanism.

Any time MERC submits three names to the delegates, it is repre-
senting that it is satisfied that any one of the nominees would be
qualified to arbitrate that particular contract dispute. Even if, as the
city suggests, in certain instances the delegates will eliminate two of
the three nominees, thereby leaving MERC with the Hobson's choice
of selecting the only remaining nominee, the MERC will have none-
theless initially selected who will be on the MERC permanent panel
as well as which three of those panelists will be offered as nominees
to the delegates. The decision as to which panelist will be enlisted to
serve as chairperson, as well as which will be selected as a nominee,
will always be made by MERC in the final instance, thereby render-
ing both MERC and, derivatively, the Governor, accountable for the
manner in which the chairperson discharges his or her duties.

Similar mechanisms for the selection of arbitration panel members
have been upheld in *Richfield v Local No 1215, International Ass'n of
Fire Fighters,* 276 NW2d 42, 44-45 (Minn, 1979), and *Arlington v
Board of Conciliation & Arbitration,* 370 Mass 769; 352 NE2d 914
(1976) (construing a provision similar to pre-amendment § 5 of Act
312).

[55] The majority of decisions from other jurisdictions have rejected

the "unaccountability" argument, generally treating such attacks as directed more "to the wisdom rather than the constitutional permissibility of the delegation of authority to an arbitrator to formulate a binding public employment agreement". *Medford Fire Fighters Ass'n v Medford*, 40 Or App 519, —; 595 P2d 1268, 1271 (1979).

In *Richfield v Local No 1215, International Ass'n of Fire Fighters*, 276 NW2d 42, 47 (Minn, 1979), the Minnesota Supreme Court offered the following insightful analysis in finding sufficient accountability:

"It is also insisted that the arbitrators are not accountable to the electorate with respect to decisions that involve fundamental determinations of public policy.

\* \* \*

"There is also a pragmatic reason for the legislature's removal of the arbitrators from the immediate pressures of public opinion. The arbitrators' position is inherently one of trust; the parties must feel confident that the panel will listen to their positions, weigh the evidence, consider the panel's statutory obligations, and come to a reasonable decision. The legislature may well have believed that exposing the arbitrators to more direct public input would influence the panels and undermine the effort to prevent work stoppages."

Likewise, in *Medford, supra,* —, the Oregon Court of Appeals provided the following treatment to find the act constitutional:

"As to the City's contention that the arbitrator is neither elected nor otherwise politically responsible, we observe that an arbitrator appointed by ERB to carry out specified statutory functions acts in a public capacity. He is not to have a personal interest in the subject of the arbitration; therefore, this case is not analogous to cases in which the Supreme Court held unconstitutional statutes which delegated price-setting powers to interested private parties. [Citations omitted.] The arbitrator's decision is governed by the statutory criteria in [Or Rev Stat, §] 243.746(4), set out above. The delegation of authority to the arbitrator does not create any substantial danger that his decision will be based on private interest." (Footnotes omitted.)

The Massachusetts Supreme Court in *Arlington v Board of Conciliation & Arbitration*, 370 Mass 769, 779-780; 352 NE2d 914, 921-922 (1976), stated:

"Furthermore, the town vigorously argues that this particular scheme, in that it imposes a decision of 'politically unaccountable' arbitrators against the wishes of popularly elected local government officials, is not consonant with the proper 'exercise of political power in a representative democracy.' While we do not question the respectability of the political philosophy articulated or the apparent sincerity with which it, is expressed, the town fails to give this argument constitutional content."

The New Jersey Supreme Court in *Division 540, Amalgamated Transit Union v Mercer County Improvement Authority*, 76 NJ 245, 251; 386 A2d 1290, 1293 (1978), reviewed the authorities and concluded that "most of the cases that have dealt with the question [of alleged unlawful delegation of public authority and responsibility to a private person(s)] have sustained the concept as an innovative way to avoid the morass of deadlocked labor disputes in the public sector".

which have ruled otherwise have done so primar-
ily on the basis of distinguishable constitutional
provisions.[56] Little interference exists in that line

[56] Although the city relies on case law from other jurisdictions
holding compulsory arbitration acts unconstitutional, those decisions
are clearly distinguishable from the instant matter.

*Sioux Falls v Sioux Falls Fire Fighters, Local 814,* 89 SD 455; 234
NW2d 35 (1975), is cited as holding unconstitutional, as an unlawful
delegation, a similar compulsory arbitration statute. The Court, how-
ever, expressly distinguished its constitutional provisions from Michi-
gan's as well as from other states':

"The defendants urge this court to accept the reasoning of either
the Michigan or Rhode Island courts upholding binding arbitration.
The distinction between those decisions and our own in this case lies
not only in the history of our constitutional provision but also on
differing constitutional provisions.

"*Michigan, as does Pennsylvania, has a specific constitutional provi-
sion which governs. [Const 1963, art 4, § 48. Dearborn Fire Fighters
Union Local No 412 v Dearborn,* 42 Mich App 51; 201 NW2d 650
(1972)]. Rhode Island, on the other hand, had no provision in its
constitution of like import as our Article III, § 26 to confront the
court. *City of Warwick v Warwick Regular Firemen's Ass'n,* [106 RI
109; 256 A2d 206 (1969)]." 89 SD 460 (emphasis supplied).

The city also relies on *Greeley Police Union v City Council of
Greeley,* 191 Colo 419; 553 P2d 790 (1976), in which the Colorado
Supreme Court disapproved a proposed *city charter amendment* au-
thorizing binding arbitration. Colorado's constitution also contained
the same non-delegation constitutional provision as did South Dako-
ta's; the Colorado Court expressly relied on the *Sioux Falls* decision;
the Colorado Court merely extended its policy of disapproving *any*
public-sector arbitration, even *grievance* arbitration, as contrary to
public policy unlike the Michigan policy; and, the disputed charter
amendment would have provided for the selection of the arbitrator by
the parties alone. The decision in *Bagley v Manhattan Beach,* 18 Cal
3d 22, 24-25; 553 P2d 1140; 132 Cal Rptr 668; 93 LRRM 2435 (1976), is
also clearly distinguishable because that legislation did not permit the
city to fix salaries by arbitration.

Although the Utah Supreme Court in *Salt Lake City v Interna-
tional Ass'n of Fire Fighters,* 563 P2d 786, 789 (Utah, 1977), declared
its arbitration statute unconstitutional, the statute provided no stan-
dards, procedures or opportunity for judicial review. The Utah scheme
clearly differs from Act 312.

Finally, the trial court decision in *Town of Berlin v Santaguida,* 98
LRRM 3259 (Conn Superior Court, 1978), is equally of no persuasive-
ness. There, the court found a similar scheme invalid as providing no
standards whatever. In fact, the court expressly contrasted that
deficiency with the ample standards of Michigan, Massachusetts and
various other states. See fn 42, *supra.* The Connecticut statute simi-
larly was wanting in any judicial review. The Connecticut legislature
has since responded by amending the statute to include provisions
similar to those contained in Michigan's current law.

of public accountability connecting the Governor, MERC, the panel chairperson and the MERC permanent Panel of Arbitrators. Should the appointees "give away the store" or otherwise invite unfavorable comment,[57] the electorate may easily express dissatisfaction by directing complaints to the Governor as well as the gubernatorially appointed MERC Commissioners. These complaints may ultimately be couched in the democratic form of government's greatest sanction—the vote.

The city's argument that political accountability is absent since the MERC Commissioners and panel members are not directly accountable to the people of the specific community over which arbitral authority is exercised proves entirely too much.[58] Read carefully, the city's principal objec-

---

The decisions on which appellant relies have been roundly criticized. Case Note, *The Uncertain Status of Public Sector Labor Arbitration in Colorado: Greeley Police Union v City Council,* 48 Colo L Rev 451 (1977); Zemetis, *Compulsory Binding Arbitration for Municipal Employees in Connecticut: Constitutional? Town of Berlin v Santaguida,* 11 Conn L Rev 583 (1979); Comment, *Salt Lake City v International Ass'n of Firefighters: A Responsive Analysis and Proposal for Public Sector Bargaining in Utah,* 1977 Utah L Rev 457.

[57] *Dearborn, supra,* 316, 323 (opinion of WILLIAMS, J.):

"If we push through the thicket of language which has grown up around this issue, we find what we are all really concerned about is not what the Legislature can or cannot give away, and what the circumstances of such donations should be, but rather, what the people can or cannot give away. What the people cannot give away seems to be public responsibility and accountability in the management of its business, whatever the managers are called."

[58] An authority on public sector collective bargaining and interest arbitration, Arvid Anderson, has written in a thoughtful law review article that the "political process" argument is "faulty":

"A frequently heard objection to interest arbitration in the public sector is that it removes from elected officials the ultimate power to fix wages and other terms and conditions of employment and thus constitutes a 'threat to the ability of elected officials to continue to set public policy priorities for use of public funds * * *.'

"[T]he decision of the panel is not purely political, for the panel's award must adhere to the statutory standards, and be within the lawful scope of bargaining and is subject to judicial review. The existence of judicial review does not mean that it will always be utilized, nor that the judges will find themselves compelled to decide

tion to Act 312 is really directed at the underlying
legislative wisdom of formulating a *state-wide* pol-

---

terms and conditions of employment for public employees. If past
experience is taken as a guide, the majority of arbitration awards will
be confirmed by the courts, and any awards that are found to be
contrary to law will be sent back for a further arbitration proceed-
ing." Anderson, MacDonald & O'Reilly, *Impasse Resolution in Public
Sector Collective Bargaining—An Examination of Compulsory Inter-
est Arbitration in New York,* 51 St John's L Rev 453, 512-513 (1977).

A second answer to the general contention that compulsory arbitra-
tion procedures in the public sector under laws like Act 312 are
inimical to the concepts of representative government is found in the
writings of Dr. Charles Rehmus of the University of Michigan, Co-
Chairman of the Institute of Labor and Industrial Relations of the
University of Michigan and Wayne State University, and currently
Chairperson of MERC. In a paper on Legislated Interest Arbitration
to the 27th Annual Winter meeting of the Industrial Relations
Research Association (1974), Dr. Rehmus stated:

"Answers to such questions must in part be philosophical and in
part practical. Rampant disregard of antistrike laws also erodes the
foundations of government. If binding arbitration is necessary and
sufficient to forestall illegal strikes, it too strengthens our democratic
system.

\* \* \*

"Secondly, it is not at all clear that binding arbitration awards
invariably represent an imposition of terms to which the parties
themselves are unalterably opposed. Nearly two-thirds of the arbitra-
tion awards rendered by tripartite panels thus far in Michigan have
been unanimous, and a national survey of American Arbitration
Association cases shows the same. \* \* \* Although some fear that
arbitrators will impose unworkable or unreasonable contract terms on
bargaining parties, experience to date is proving that arbitration has
not resulted in a large number of third-party determinations imposed
without regard to the needs or wishes of the parties." Rehmus,
*Legislated Interest Arbitration,* Proceedings of the 27th Annual Win-
ter Meeting of the Industrial Relations Research Association (Decem-
ber 28-29, 1974), pp 307, 308-309.

As noted by Professor Joseph R. Grodin in Grodin, *Political Aspects
of Public Sector Interest Arbitration,* 64 Cal L Rev 678, 693 (1976):

"An attempt to make arbitrators more politically responsible by
electing them, or by having them appointed by elected officials to
serve on a continuing basis, poses a difficult dilemma. The problem of
political responsibility arises initially from the fact that arbitrators
may be called upon to determine policy issues otherwise subject to the
local legislative process. But if the arbitrator is made politically
responsible to the local electorate, which is in effect a party to the
dispute, then arbitration loses its neutral character; and to the extent
that the arbitrator's constituency is the same as that of the legislative
body that would otherwise exercise authority over the policy ques-
tions posed, the process becomes redundant."

icy governing resolution of inherently local public-sector labor disputes. Thus, the city claims that the relationship of the Act 312 panel—including the MERC appointed chair—to the City of Detroit electorate is diluted by the §§ 4 and 5 panel selection process.

This argument blinks the reality that the role of both the Act 312 arbitrators and the MERC appointing authority is to effectuate a *state* labor policy as formulated by the *state* Legislature serving the *state* electorate. Work stoppages by municipal police and fire departments, although primarily local in situs, were legislatively deemed to pose a threat to the state's public health, safety and welfare. Should the people be dissatisfied with the accountability aspect of the engineered scheme which must necessarily transcend local boundaries, the onus is upon the state's electorate, including the locally affected voting population, to exercise its political will.

### 3. Inherent Tension Between Independence and Accountability

Inherent in the Act 312 scheme, as well as such delegation schemes in general, is the tension, if not apparent dichotomy, between the act's dual objective of affording arbitrators sufficient decisional independence to resolve complex disputes on the one hand, and, on the other, maintaining public responsibility and accountability of those arbitrators.[59] Indeed, since the act specifically seeks to speedily resolve complex contractual impasses in the dynamic critical-service public labor sector, this tension is especially and necessarily enhanced

[59] See *City of Warwick v Warwick Regular Firemen's Ass'n,* 106 RI 109, 117-118; 256 A2d 206, 211 (1969).

by the scheme's need to allow flexibility in the resolution of those disputes.

However, we find that these inevitable tensions have been adequately balanced in view of the act's provision for standards, the extremely public atmosphere in which the Act 312 mechanism operates, and the § 12 provision for judicial review.

As we have seen, operational flexibility has been successfully maintained within the context of legislatively prescribed standards both to check unfettered exercise of arbitral authority and to provide the arbitrators with guideposts of decisional consideration which have been deemed significant by the people through their representatives. Although the panel operates with a certain degree of independence in fashioning economic as well as noneconomic awards, its exercise is significantly guided by a well-articulated series of standards for resolving those previously negotiated and sharpened, yet unresolved, matters.

This tension between independence and accountability is further alleviated by the extremely public atmosphere in which the chairperson is appointed by MERC and the Act 312 panel operates. Indeed, the context in which the matter proceeds is one of high visibility and profound scrutiny, where publicity is sharply focused on both MERC's selection and the panel's deliberations. Such public attention undoubtedly enhances the accountability of both the appointers and the appointees. Since both bodies are the focal point of great public and political interest during this intense session of activity, any affront to either the legislative mandates or the public will would likely invite immediate and effective reaction. The twin facts that, first, permanent panelists do not serve for a fixed term but are removable at any time at the discre-

tion of the MERC and, second, seek continuing employment in this area of concern, presumably quicken the arbitrator's awareness that statutory guidelines are to be closely heeded, thereby encouraging enhanced accountability.

Further balancing the exercise of arbitral independence is the act's § 12 provision for judicial review. See Part V, A, for interdependence of §§ 8 and 9 requirements with § 12. This section resembles the Const 1963, art 6, § 28 provision for review of administrative orders[60] which is more expansive than the restrictive court rule provision for the review of arbitral awards in general, GCR 1963, 769.9(1), which precludes judicial inquiry into the factual merits of an arbitrator's resolution.[61] As such, § 12 significantly incorporates all appropriate bases for review without either permitting expansive *de novo* litigation as some jurisdictions have provided[62]—which would likely frustrate the binding and expeditious nature of the Act 312 concept—or, as in the case of GCR 1963, 769.9(1), so narrowly restricting the judiciary's basis for review as to arguably shelter such significant arbitral decisions from judicial inquiry.[63] The inclusion of similar provisions in other acts has likewise recommended their wisdom.[64]

---

[60] See fn 27, *supra.*

[61] See fn 28, *supra.*

[62] See fn 28, *supra.*

[63] See Britton, *Judicial Review and Enforcement of the Arbitration Award,* 16 Trial (No. 3) 22, 24-25 (March, 1980).

[64] *Amsterdam v Helsby,* 37 NY2d 19, 38-39; 371 NYS2d 404; 332 NE2d 290, 300-301 (1975) (by judicial interpretation); *Division 540, Amalgamated Transit Union v Mercer County Improvement Authority,* 76 NJ 245, 253-254; 386 A2d 1290, 1294 (1978) (by judicial interpretation); *Medford Fire Fighters Ass'n v Medford,* 40 Or App 519, — fn 1, —; 595 P2d 1268, 1269-1270 fn 1, 1272 (1979); *Richfield v Local No 1215, International Ass'n of Fire Fighters,* 276 NW2d 42, 47 (Minn, 1979); *Spokane v Spokane Police Guild,* 87 Wash 2d 457, 463; 553 P2d 1316, 1319-1320 (1976). Even in those cases where similar

Because Act 312, as amended, provides standards as reasonably precise as the subject matter requires or permits, *Osius, supra,* and since we find, as a practical matter, that the scheme exhibits adequate accountability, we find the amended act constitutional.

## V. REVIEW OF THE ARBITRATION PANEL'S AWARD

Having ruled Act 312 constitutional, we turn our attention to the general question of whether the arbitration award should be enforced. In addressing this issue, we must be especially alert to follow the limited scope of judicial review expressly provided by § 12 of the act. That section, in relevant part, states:

"Orders of the arbitration panel shall be reviewable * * * only for reasons that the arbitration panel was without or exceeded its jurisdiction; the order is unsupported by competent, material and substantial evidence on the whole record; or the order was procured by fraud, collusion or other similar and unlawful means." MCL 423.242; MSA 17.455(42).

As we have just noted, this section neither provides this Court with a license to consider the wisdom of an arbitration award nor to subject an award to *de novo* review. *Dearborn, supra,* 318. Rather, the Legislature having confined our scope of review in assessing compulsory, binding arbitration awards, we are statutorily bound to uphold an award if it meets the prescriptions of § 12.

The city claims that the arbitration panel re-

statutory schemes were ruled unconstitutional, the necessity for judicial review was expressed. *Town of Berlin v Santaguida,* 98 LRRM 3259, 3265 (Conn Superior Court, 1978) (no provision for judicial review); *Salt Lake City v International Ass'n of Firefighters,* 563 P2d 786, 789 (Utah, 1977) (no provision for judicial review).

versibly erred in only three particulars: the panel's ruling and award on wages, COLA, and the hardship exemption to the city's requirement that all Detroit police officers be residents of Detroit. The main thrust of the city's attack on the award as to these three items is twofold: (1) the award is violative of § 12 as "unsupported by competent, material and substantial evidence on the whole record"; and (2) the arbitration panel failed to comply with the requirements of §§ 8 and 9 in rendering its award. Except as to one facet of the panel's residency hardship exemption award which will be discussed *infra,* fn 73, the city does not assert that the panel was without or exceeded its jurisdiction or that the order was procured by fraud, collusion or other similar and unlawful means.

However, before we may entertain these two central issues, we must dispose of two collateral issues.

*A. The Contextual Interdependence of §§ 8, 9 and 12 of the Act: Judicial Review of the § 9 Factors*

Preliminary to our consideration of the contested items of the award, it is necessary to stake out the perimeters of judicial review under § 12 of the act. Close examination of the act, in light of the well-known rule of statutory construction that each section of an act is to be read with reference to every other section so as to produce a harmonious whole, see 2A Sutherland, Statutory Construction, § 46.05, p 56, leads us to conclude that §§ 8, 9 and 12 evidence a contextual interdependence that necessitates their joint consideration by a court sitting in review of an Act 312 arbitration panel's award.

Section 12 specifically provides that an *order* of the arbitration panel shall be reviewable for the

reason that it is unsupported by competent, material and substantial evidence on the whole record. To make such a review, however, we must of necessity have in mind the statutorily mandated requirements of such an *order*. Section 9 unequivocally directs that where "wage rates or other conditions of employment * * * are in dispute, the arbitration panel *shall base its findings, opinions and order* upon the following [eight listed] factors, as applicable" (emphasis supplied). Section 8 likewise directs the arbitration panel, in its determination of both economic and non-economic issues, to these same § 9 factors: "As to each economic issue, the arbitration panel shall adopt the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9. The findings, opinions and order as to all other issues shall be based upon the applicable factors prescribed in section 9." It is patent therefore that these sections require the rendition of an ultimate award which is either "based" on the § 9 factors— in the case of non-economic issues—or "more nearly complies with" the § 9 factors—in the case of economic issues governed by the last offer prescription. In effect then, *any* finding, opinion or order of the panel on *any* issue *must* emanate from a consideration of the eight listed § 9 factors as applicable.

In making an Act 312 disposition which must statutorily be "based upon" or "in compliance with" the § 9 factors as applicable, the Legislature has deemed such a disposition of the panel final and binding "if supported by competent, material and substantial evidence on the whole record". MCL 423.240; MSA 17.455(40). Section 12 likewise provides that such final and binding determina-

tions or "[o]rders of the arbitration panel" shall be reviewable by the courts "only for reasons that * * * the order is unsupported by competent, material and substantial evidence on the whole record". Construing §§ 9 and 12 together then, our review must find that the arbitration panel did indeed base its findings, opinion or order upon competent, material and substantial evidence relating to the applicable § 9 factors. *Cf. Caso v Coffey,* 41 NY2d 153, 158; 359 NE2d 683, 686 (1976). In other words, the order of the panel must reflect the applicable factors and the evidence establishing those factors must be competent, material and substantial evidence on the whole record. It is only through this judicial inquiry into a panel's adherence to the applicable § 9 factors in fashioning its award that effectuation can be given to the legislative directive that such awards be substantiated by evidence of, and emanate from consideration of, the applicable § 9 factors.[65]

*B. Relation of Economic and Non-Economic Issues to § 9 Factors*

One other matter of statutory interpretation needs to be addressed preliminary to our examination of the panel's award. The city seems to argue that the act must be considered unconstitutional if the panel has the freedom to determine which of the § 9 factors are most applicable to a certain case. The apparent foundation for this argument is some perceived repugnance between the concept of assessing a statute's constitutionality on the sufficiency of its standards to guide delegated author-

---

[65] Our review of the interrelationship between Act 312's sections requires us to overrule that part of *Alpena v Alpena Fire Fighters Ass'n, AFL-CIO,* 56 Mich App 568, 571-572; 224 NW2d 672 (1974), which held that failure to base an arbitral award on the applicable § 9 factors was not reviewable under § 12 of the act, but rather was reviewable under the constitutional requirement of due process.

ity, while simultaneously allowing the recipient of this delegated authority the discretion to weight these standards within the context of a particular case.

We disagree with the city's contention. The fact that an arbitral majority may not be persuaded by a party's evidence and argument as to certain items does not mean that those arbitrators failed to give the statutory factors that consideration required by law. The Legislature has neither expressly nor implicitly evinced any intention in Act 312 that each factor in § 9 be accorded equal weight. Instead, the Legislature has made their treatment, where applicable, mandatory on the panel through the use of the word "shall" in §§ 8 and 9. In effect then, the § 9 factors provide a compulsory checklist to ensure that the arbitrators render an award only after taking into consideration those factors deemed relevant by the Legislature and codified in § 9. Since the § 9 factors are not intrinsically weighted, they cannot of themselves provide the arbitrators with an answer. It is the panel which must make the difficult decision of determining which particular factors are more important in resolving a contested issue under the singular facts of a case, although, of course, all "applicable" factors must be considered. Our comment in *Midland Twp v State Boundary Comm,* 401 Mich 641, 676; 259 NW2d 326 (1977), is here apposite.

"Merely because some criteria were factually inapplicable or were found by the commission to be of less importance than other criteria does not mean that the commission 'ignored' relevant criteria. The commission may regard a particular criterion to be of decisive importance outweighing all other criteria."

*C. The Economic Award is Supported by Competent, Material and Substantial Evidence on the Whole Record*

At this juncture, our initial observation respecting our limited scope of review deserves quick reiteration. If a panel's award is supported by competent, material and substantial evidence on the whole record, we are mandated to uphold it. As we noted in the analogous context of appellate review of a MERC finding:

"Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views. Cognizant of these concerns, the courts must walk the tightrope of duty which requires judges to provide the prescribed meaningful review." *Michigan Employment Relations Comm v Detroit Symphony Orchestra, Inc,* 393 Mich 116, 124; 223 NW2d 283 (1974).

After having made a painstaking examination of the voluminous arbitration hearing record as well as the opinions (original and supplemental) and orders of the arbitration panel, the trial court and the Court of Appeals, we are satisfied that the instant arbitration award on the economic issues of COLA and wages is supported by competent, material and substantial evidence on the whole record.

The arbitration panel conducted some 15 hearings not including final arguments by the parties and wrote a 44-page opinion setting forth the basis of its award. In its original opinion on COLA and wages the panel carefully delineated specific evidence relating to each of the factors of § 9. Indeed, this opinion included a specific section devoted to

an analysis of the § 9 factors with respect to the two contested economic items. As the trial court noted in its opinion *pendente lite,* which reasons were later adopted in its final order of enforcement, "[t]he Panel's opinion is replete with specific findings related to the criteria of § 9 of the act and related, also, to the evidence in the case".

### 1. A Review of the Panel's Application of the § 9 Factors in Rendering Its Economic Award

However, in recognition of the importance of this case, and at the risk of being considered tedious, we have decided to briefly summarize on these pages the weightier evidence pertaining to the § 9 factors which was heard by the panel and formed the basis of its award. It is this evidence which compels our conclusion that the arbitration award respecting the economic issues of COLA and wages must be upheld.

As a framework to our consideration of the evidence in support of the panel's disputed economic awards, some general observations merit voicing: We stress again that § 8 of the act requires the panel to choose one of the parties' "last offer of settlement". Thus while the panel is precluded from fashioning what it might consider a more equitable award or a compromise award, it is also prevented from independently shooting too high or too low. Further, it should be recognized that § 8 gives the arbitrators a not insignificant measure of discretion in adopting a particular last offer of settlement vis-à-vis the § 9 factors by providing that the last offer chosen by the panel shall be the one that "in the opinion of the arbitration panel, more nearly complies" with the "applicable" factors prescribed in § 9. We would also note that the economic issues of COLA and wages were inextricably related in this case, COLA being the

item of paramount significance to both parties. Thus, because the city advocated the abolishment, or severe diminution,[66] of the COLA arrangement won by the DPOA in its previous contract, its wage proposal was understandably higher than that of the DPOA. Conversely, because the DPOA requested the maintenance of the previous COLA provision, its wage proposal was more modest than that of the city. In recognition of this nexus, the panel discussed together the relationship of the COLA and wage proposals to the § 9 factors. Finally, it must also be recognized that evidence relating to the eight factors of § 9 is not completely segregable; evidence relevant to one factor will often be relevant to others, causing some measure of interdependence among the factors. However, each factor, if applicable, must still be given separate consideration by the panel.

*Factor 1: The lawful authority of the employer.*

Evidence on this factor centered on the city's taxing powers. The panel acknowledged the city's uncontradicted evidence that it was at the legal limit of its taxing powers. Although the panel explicitly recognized these limits on the lawful authority of the employer to tax in rendering its economic award, this factor was not considered conclusive in and of itself by the panel; rather it

[66] The city actually proposed a two-plan alternative in their last offer. In the first plan the city offered no COLA, but offered wage increases of 4.8%, 4% and 4% in each of the three years of the contract. The city's second plan offered a settlement identical to that reached by the city and the American Federation of State, County, and Municipal Employees (AFSCME) after a short strike. Although the second alternative plan did provide for some COLA, it was less advantageous to the DPOA than the COLA under its prior contract. For example, the city's COLA offering in plan 2 required a greater increase in the consumer price index to trigger a cost of living allowance, provided no roll-in of COLA payments into base wage rates and provided no benefit from consumer price index increases above the "cap".

was simply a facet of the city's basic contention that its ability to pay was limited.

*Factor 2: Stipulations of the parties.*

To this point, the panel expressly acknowledged its appreciation to the parties for stipulations on economic and non-economic matters which helped simplify or dispose of issues.

*Factor 3: The interests and welfare of the public and the financial ability of the unit of government to meet those costs.*

Respecting its financial capabilities, although the city specifically failed to present its budget or other evidence as to how the city spent its money, the city introduced evidence of a "limited" ability to pay any arbitral award. The city also introduced considerable evidence concerning the various strains on the city's fiscal abilities due *inter alia* to a reduction in city population and the dependency of the city budget on state and federal revenues.

While recognizing such limitations on the city's finances, the panel was acutely aware of the city's explicit statement that it did not have an inability to pay an award. As an attorney for the city stated, "The city does not assert an inability to pay any additional sum as may be determined, but that its ability to pay has limits".

The third factor juxtaposes the city's ability to pay and the interests and welfare of the public. Respecting the public interest and welfare, the panel considered of major consequence the fact that the Detroit Police Lieutenants and Sergeants Association ("LSA") had recently been awarded,[67]

---

[67] On the city's petition for judicial review of the October 18, 1978 LSA award as to wages, COLA and sick leave, the circuit court remanded the award to the arbitration panel on December 18, 1978 for supplemental findings of fact on wages and COLA, and directed the panel to adopt the last offer of one of the parties concerning the economic aspect of sick leave. On February 20, 1979 the circuit court

in another Act 312 arbitration, a continuation of its previous COLA provision which was substantially the same as the DPOA's last COLA offer in the instant case.[68] In light of the fact that the DPOA and LSA enjoyed a strong historic relationship, a majority of the panel believed that a denial of COLA to the DPOA would imperil police morale and the effective performance of their services to the detriment of the public.

*Factor 4: Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:*

*(i) In public employment in comparable communities.*

*(ii) In private employment in comparable communities.*

With respect to this factor, the panel reviewed evidence comparing Detroit police officers' salaries and fringe benefits to those of Detroit metropolitan area communities, as well as to large, out-of-state cities. The panel found the former the more appropriate, since not only is there a lack of comparability of conditions in other major cities, but it is

---

upheld the arbitration panel's January 24, 1979 supplemental decision which reaffirmed its earlier decision adopting the LSA's last offer with respect to wages and COLA. *Detroit v Detroit Police Lieutenants & Sergeants Ass'n* (Wayne Circuit Court, Docket No. 78-836-638-AV, February 20, 1979) (order of affirmance). The circuit court's order of enforcement of the award was stayed by the Court of Appeals, until completion of the appeals process, only as to the retroactive period between July 1, 1977 and January 24, 1979. In an unpublished per curiam dated October 19, 1979, the Court of Appeals affirmed the circuit court's decision upholding the arbitration panel's award. (Mich App Docket No. 44095, October 19, 1979) (affirmance of trial court). The city appealed this decision to us on November 8, 1979 and we held the case in abeyance by order of February 7, 1980 pending the resolution of the instant case (Docket No. 64065).

[68] The LSA award was placed into evidence as DPOA Exhibit 56.

against these nearby communities that Detroit must compete for police officers. The panel also relied on the recent LSA award for comparison since the LSA was the only other group of Detroit employees performing services similar to those of the DPOA. In short, the panel found the more apt and persuasive comparisons for purposes of this factor to be with other city security personnel, and not with other city employees in general. The panel did not consider comparisons with private employment persuasive and therefore did not base any of its conclusions upon such comparisons.

*Factor 5: The average consumer prices for goods and services, commonly known as the cost of living.*

The panel regarded as of importance testimony concerning the need for and use of a COLA provision as a not unusual means, in the public sector, of providing some protection to the real wage position, as well as the standard of living, of both wage and salary workers during inflationary periods. Thus the panel determined that with an expected increase in the cost of living from 6% to 8% a year during the three years of the new contract, the COLA requested by the DPOA would only afford 50% to 80% protection.

*Factor 6: The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.*

It was very significant to the panel that the DPOA's last offer respecting COLA merely represented a continuation of the COLA provision that had been won by the DPOA in the collective bargaining agreement which expired at the end of

June, 1977. In adopting the DPOA's COLA proposal, the panel simply opted for a maintenance of the status quo regarding that provision.

*Factor 7: Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.*

The development of primary importance to the panel was the award in the LSA arbitration case handed down October 18, 1978 by the Howlett panel. As noted earlier, in relevant part this award granted the LSA a COLA provision essentially the same as that put forth in the DPOA's last offer. The LSA award was of considerable importance to the instant panel in fashioning its own award since the panel was intent on maintaining the historic relationship between the compensation of police officers below the rank of sergeant and those above.

*Factor 8: Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between the parties, in the public service or in private employment.*

The panel noted that the parties had not specifically delineated in their presentations any "other factors". Therefore, the only "other factor" which the panel relied on was morale. As noted under our discussion of the third factor, the panel believed that the maintenance of high police morale was an important factor to be considered in rendering its award.

Briefly summarizing the panel's application of § 9 in rendering its award on the economic issues in dispute, the panel determined that the interests

of the public in high police morale could more effectively be insured by a preservation of the previous COLA arrangements. Since the panel had adopted the city's proposal that the contract run for three years, as opposed to the DPOA's proposal of a two-year contract, the panel was persuaded of the necessity of such a COLA provision to maintain some partial shield against the unforeseeable erosion of an officer's wage position by inflation that could occur over such an extended period. Also of concern to the panel in the maintenance of the COLA provision was the recognition of the DPOA's relationship to the LSA. Central to this award was the city's failure to plead or establish a position of inability to pay or to introduce its budget[69] indicating what curtailment of services would be necessitated by the DPOA's last COLA offer.

Given the fact that the wage issue was inextricably related to that of COLA, the panel, having opted for the COLA proposal of the DPOA, then chose the lower of the two wage proposals; it chose the DPOA's proposed 4-1/2%, 4% and 3-1/2% wage increase in each of the three years of the contract as compared to the city's proposed 4.8%, 4% and 4%[70] wage increase in each of those same three years. While we recognize that the city's

---

[69] The city's brief recognizes that the trial court noted in its opinion that the city failed to provide the budget to show how expenditures were made. The city did introduce a post-award affidavit of the city's budget director which tends to show, in a general way, that enforcement of the panel's award would have a detrimental effect on the city's public services. However, this affidavit is inadmissible for purposes of judicial review of the award since it was not before the arbitration panel at the time it rendered its award. See also the comments of the trial judge on the limited value of this affidavit.

[70] Taking into account all of the terms and conditions of the city's alternate wage plan set out in fn 66 *supra*, the total benefits to the DPOA under this alternate plan, including COLA, would also amount, approximately, to wage increases of 4.8%, 4%, and 4% over the three-year life of the labor contract.

wage proposal was higher than that of the DPOA
due to the city's lack of (or, in the case of its Plan
II, a minor) COLA proposal, the fact remains that
having accepted the DPOA COLA proposal, the
panel then awarded the lower of the two wage
proposals.

In light of the foregoing analysis, we find the
panel's award of the DPOA's last offers on the
contested economic items to have been supported
by competent, material and substantial evidence
on the whole record.

One final argument of the city remains to be
discussed with respect to the arbitration panel's
economic award. The city asserts that the panel's
award should be vacated due to the panel's refusal
to admit into evidence City's Exhibit 30. This
exhibit was intended to show the cost impact of
any award made by the instant panel on COLA
and wages, relative to the DFFA and the LSA. In
short, the city argued that such an award would
affect the DFFA since the city had already agreed
in another Act 312 arbitration proceeding to a
parity agreement, respecting certain economic ben-
efits, between the police officer and the fire fighter,
the police sergeant and the fire lieutenant, and the
police lieutenant and the fire captain. The effect
on the lieutenant's and sergeant's bargaining unit
inhered in the fact that the previous contract
between the city and the LSA, as well as the
proposed one before an Act 312 arbitration panel
at the time Exhibit 30 was offered, provided that
the lieutenant's and sergeant's pay would be a
percentage of that of a police officer. The city's
argument, then, was that Exhibit 30 was relevant,
as one piece of evidence under the third factor of
§ 9, to the extent that it illustrated the ramifica-
tion of any COLA or wage award of the instant

panel on total cost to the city on the total budget, and the ability of the city to pay.

At the time Exhibit 30 was offered, the chairman of the panel, per the parties' pre-hearing statement, exercised his responsibility for ruling on evidentiary and procedural matters and declined to receive the exhibit. He did so on the grounds that its admission was premature since the Act 312 arbitration proceedings involving the fire fighters and the lieutenants and sergeants had not then been concluded.

Preliminarily, we stress that this Court is not constituted some "super-arbitrator" to oversee and redirect the arbitral process when our opinion may differ with a panel's on such an evidentiary/procedural matter as this. Section 6 of the act explicitly accords a wide degree of latitude to the panel in the introduction of evidence. It is true that the "[t]echnical rules of evidence" do not apply to the hearings; however, the panel "may" receive into evidence any oral or documentary evidence and other data "deemed relevant" by it. In view of such discretion reposed in the panel on this matter, our review is limited to the determination of whether, in this instance, the exclusion of City's Exhibit 30 was so egregious as to cause the award of the panel on the contested economic issues to be unsupported by competent, material and substantial evidence on the whole record.

The arbitration panel was well-informed on the cost of its award to the city. In making the disputed evidentiary ruling, the panel chairman observed:

"[Y]our panel is composed of persons who are knowledgeable and sophisticated as far as public affairs gener-

ally, and indeed about labor relations matters. And, what everybody else knows, we are charged with knowing."

"I know the cost, and everyone on the panel, everyone sitting out there is very conscious of the fact cost is of consideration. We're not naive, and we're not unmindful of costs."

More specifically, we find the following in the majority panel's decision:

"The panel cannot escape the history of the city in its relations with its unions, not only as evidenced by contractual undertakings but by actions of the electorate from time to time. For years there has been a correlation between benefits of police and fire personnel, commonly referred to as security personnel. * * * After years of debate, both the general electorate and in collective bargaining, the principle of parity was established between police and fire. Even more interestingly, there is a correlation to a degree between certain positions in the Fire Department and positions among the Lieutenants and Sergeants."

"As indicated earlier, the chairman is of the opinion that this panel cannot remake or change history nor can it escape the history the parties themselves have made, that is, of certain internal relationships in comparisons between and among Lieutenants and Sergeants and DPOA members as well as between and among these groups or bargaining units and the fire fighters."

In light of the foregoing, the exclusion of City's Exhibit 30 from evidence cannot be said to have caused the economic award to be unsupported by competent, material and substantial evidence on the whole record. Accordingly, we reaffirm our holding as to the validity of the economic award.

*D. The Non-Economic Award is Not Supported by Competent, Material and Substantial Evidence on the Whole Record*

We cannot find that the hardship exemption to the residency requirement is supported by competent, material and substantial evidence on the whole record. The panel, in its August 8, 1979 opinion on remand on the residency issues, did not consider all the *applicable* § 9 factors in making its award, as Act 312 mandates.

As we emphasized under Part V, B, *supra,* the Legislature, through the language of §§ 8 and 9, has unequivocally directed that the panel, in making an award, treat the § 9 factors where applicable. Such language is not precatory and therefore the panel does not have the discretion to ignore any applicable § 9 factors. Moreover, this legislative directive is no less obligatory on the panel when the parties themselves have failed to introduce evidence on an applicable factor. In such a case the panel, in order to comply with the intention of Act 312 that arbitral decisions be substantiated by evidence of, and emanate from consideration of, the applicable § 9 factors, must direct the parties to introduce evidence relating to the applicable factors.[71] By so doing, the panel will be able, per the dictates of §§ 8 and 9, to make findings based upon the applicable factors enumerated in § 9 from the evidence of record before it.

In rendering the present award on the non-economic issue of a hardship exemption to the residency requirement, the panel did not consider all *applicable* factors. The panel only considered the first, third and last factors of § 9 in its August 8,

---

[71] *Alpena v Alpena Fire Fighters Ass'n, AFL-CIO,* 56 Mich App 568; 224 NW2d 672 (1974), is overruled insofar as it held that an Act 312 arbitration panel need not consider a particular factor simply because the parties have failed to present evidence on it. *Id.,* 573.

1979 opinion on remand from the trial court. As to the other factors, the panel merely stated:

"So far as the other § 9 criteria, neither party offered comparisons and except in the enforcement sense, as noted, money factors are not in issue."

Such *pro forma* deference to the requirements of §§ 8 and 9 of the act will not do. These sections, by their terms, require rigid adherence. Thus, for example, it was error for the panel, in making an award of a residency hardship exemption, to refuse to consider, however convincing the evidence on other factors, the applicable fourth factor involving a comparison of the residency requirement for DPOA members (a condition of employment) with the residency requirements for other employees performing similar services and for other employees generally in both public and private employment in comparable communities, as well as any other factors if applicable. The parties' omission of evidence on this factor did not excuse the panel's inattention to the factor.[72]

We note that the residency requirement requested by the city and affirmed in the earlier Platt panel award was left intact and unchanged by the panel's award except for the hardship exemption. Since we find the hardship exemption

[72] The failure to introduce comparability evidence on residency is patently different from either the city's decision not to introduce its budget, discussed *supra,* p 488, or the chairman's exclusion of City's Exhibit 30, discussed *supra,* p 493. The present situation involves the total failure of either party to introduce any evidence whatsoever on the applicable fourth factor, with the consequences that the panel was unable to consider a factor which the Legislature has deemed relevant in making an Act 312 award. In contradistinction to this total lack of evidence, the city's budget and Exhibit 30 would merely have been pieces of evidence in addition to others which were introduced relating to its ability to pay under the third factor. These omissions from evidence, therefore, did not serve to deprive the panel of the ability to consider the applicable third factor.

award by the panel to have been unsupported by competent, material and substantial evidence on the whole record, the residency requirement, in its entirety, must be reaffirmed. It is now up to the parties to either introduce evidence on the applicable factors before a reconvened panel or to return to collective bargaining.[73]

The rationale of this holding provides the resolution of the city's last argument. The city asserts that it was error for the trial court as well as the arbitration panel to ignore its request to amend the "residency" portion of the present collective bargaining agreement so that the word "resident" would be defined in terms of a 1978 City of Detroit ordinance which provides that "residence" is to be construed as the "actual domicile" of the individual, with an individual being capable of having only one "domicile". Detroit City Code, § 2-1-1.2; Detroit Ordinance No. 245-H. The predecessor 1968 ordinance had defined residency in terms of where an individual normally ate, slept and maintained his normal personal and household effects. Detroit Ordinance No. 327-G. This former ordinance, the city contends, created difficulties in enforcement.

Initially, we disagree with the city's complaint that the arbitration panel ignored the city's requested amendment. In its opinion on remand on the residency issue, the following appears:

"In the interest of completeness, it must be stated that the unanimous action of the panel as noted above,

---

[73] Since we have disallowed the panel's residency hardship exemption award favorable to the DPOA, there is no need to respond to the city's contention that the panel's hardship exemption award, as promulgated on May 21, 1979 in a supplemental opinion and award, is invalid because the panel lacked the jurisdiction to unilaterally alter its original December 20, 1978 award with which the city claims it had complied.

under its December 20, 1978, opinion, when it was reduced to formal award, brought a dissent from the city delegate, who asserted that it had been his understanding that the panel was adopting the definition change proposed by the city. The majority of the panel, the chairman with the labor delegate concurring, however, made clear that no changes were contemplated by the panel except a change that would provide a hardship exemption, and the award so provided."

More importantly, however, we, as a reviewing court, cannot amend the language of the contract to include the new Detroit ordinance. The panel has not made specific findings of fact and an award relating such a non-economic issue to the applicable § 9 factors and the evidence of record. It is not our job to fill this void by acting as *de novo* arbitrators in this matter. The proper course is for the parties to seek a resolution of this issue via collective bargaining, and failing that, through the invocation of Act 312.

### VI. INTEREST ON AN ACT 312 ECONOMIC AWARD?

Both the DPOA and the DFFA have appealed the trial court's denial of interest on the arbitration panel's economic award. Since Act 312 itself is silent on the subject of interest, the DPOA and the DFFA base their appeal on MCL 438.7; MSA 19.4, as well as MCL 600.6013; MSA 27A.6013.

We find MCL 600.6013 to be inapposite to the situation at bar. In relevant part, this statute provides:

"Interest shall be allowed on any *money judgment recovered in a civil action,* such interest to be calculated from the date of filing the complaint at the rate of 6% per year * * *." (Emphasis supplied.)

The Act 312 arbitration award is not a "money judgment recovered in a civil action". MCL 600.6013, as part of the Revised Judicature Act of 1961, does not apply to compulsory interest arbitration in the public sector. The preamble to the Revised Judicature Act states its concern, instead, to be with such matters as the "organization and jurisdiction of the courts" and the "forms and attributes of civil claims and actions". Our reasoning in the analogous context of disallowing an interest claim on a workers' compensation award made under MCL 600.6013 is here valid. Cf. *Solakis v Roberts*, 395 Mich 13; 233 NW2d 1 (1975). An Act 312 arbitration panel is not "a court", "is not possessed of judicial power" and the concept of a money judgment is "totally alien to the policy and philosophy" of Act 312 which looks to the expeditious and effective resolution of critical-service public sector labor disputes. 395 Mich 21-22.

We also find MCL 438.7 to be an inappropriate vehicle for the granting of interest. That statute, in pertinent part, states:

> "*In all actions founded on contracts express or implied, whenever in the execution thereof any amount in money shall be liquidated or ascertained* in favor of either party, by verdict, report of referees, award of arbitrators, or by assessment made by the clerk of the court, or by any other mode of assessment according to law, it shall be lawful, unless such verdict, report, award, or assessment shall be set aside, to allow and receive interest upon such amount so ascertained or liquidated, until payment thereof or until judgment shall be thereupon rendered; * * *." (Emphasis supplied.)

As the trial court noted, an Act 312 arbitration

proceeding is not "founded" on a contract, but instead has as its very purpose the *making* of a contract. Thus we find the rationale of *Solakis, supra,* ill-suited to the concerns of Act 312. *Solakis,* in construing our earlier decision of *Wilson v Doehler-Jarvis Division of National Lead Co,* 358 Mich 510; 100 NW2d 226 (1960), held that MCL 438.7 was the appropriate statute under which to grant interest on a workers' compensation award. The *Solakis* Court satisfied the "contract" requirement of MCL 438.7 by finding that the right to a workers' compensation award was *contractual* since it arose out of the *contractual* relationship between employer and employee. Here, conversely, Act 312 is not dependent on an already existing contractual relationship between employer and employee for its existence. Indeed, § 9 of the act expressly provides in its introductory phrase that it must be considered even "[w]here there is no agreement between the parties". Furthermore, as in the present case, an Act 312 award often will not be issued by an arbitration panel until the parties' previous collective bargaining agreement (or statutorily imposed Act 312 contract) has already expired.

Nor do we find entirely persuasive the argument that the statutorily imposed Act 312 contract can itself serve as the "contract" contemplated by the terms of MCL 438.7. The Act 312 contract, as issued by a panel, is not, as required by MCL 438.7, one that has been executed to the extent that an amount of money is liquidated or ascertained. Further, an Act 312 proceeding cannot be "founded" on a contract since its very purpose is to make a contract.

In sum, we can find no statutory provision under

which to grant interest on the economic portion of the panel's award.[74]

## VII. Conclusion

As to the two major issues posed at the outset of this opinion, we conclude: (1) amended Act 312 does not include an unconstitutional delegation of power; and (2) considering the disputed award in accordance with our ruling that judicial review under the act requires § 12 to be read in conjunction with §§ 8 and 9, we find that—with the exception of the residency hardship exemption—the award complies with the requisite factors and is supported by competent, material and substantial evidence on the whole record. As to the issue of interest, we conclude that statutory support for the grant of interest on Act 312 arbitration awards is absent; interest is therefore denied. With respect to the home rule and equal protection claims discussed in footnotes 14 and 15 *supra,* we conclude that these subjects have been resolved by precedent adverse to the city.

No costs, a public question being involved.

Ryan and Blair Moody, Jr., JJ., concurred with Williams, J.

Blair Moody, Jr., J. *(concurring).* We generally agree with the legal analysis employed in this case by our colleague Justice Williams. However, an additional comment with respect to a key portion of the opinion of our colleague Justice Levin is warranted.

The lead dissent offers what may be deemed by

---

[74] It has long been established that the question of interest in Michigan is purely statutory. *Solakis v Roberts,* 395 Mich 13, 19, fn 2; 233 NW2d 1 (1975).

some as an attractive compromise alternative to a vexatious economic problem. This result would remand the contested economic issues to the arbitration panel for redetermination unencumbered by the statutorily prescribed last-best-offer choice.

The redetermination of the economic awards would be based on the record already made supplemented by certain excluded economic evidence. The panel would be free to set any wage-rate or COLA award they deemed appropriate. Reduced current payments would be contemplated. The retroactive amount payable would be based on the new award. Yet any redetermination would be applied prospectively as in no event would police officers be required to repay any sum.

This proposed expedient solution, however, would require an ex post facto usurpation of the rules of the contest. It would cause the parties to debate anew over what has been resolved in accordance with original reasonable standards. One must question whether this extraordinary suggestion would have been as legally compelling had the parties presented wiser, more appealing, or compatible choices to the arbitration panel in the first place.

Key to this proffered solution is reasoning that "[t]he last-offer system yields results which are unconstitutionally arbitrary". This conclusion does not necessarily follow in fact or law. No section of the Michigan or United States Constitution is cited as a basis for this alleged constitutional breach. Furthermore, it is even recognized by the dissent that the last-offer-system has a sound rationale for its adoption by the Legislature and Governor— "the promotion of private settlements by penalizing those who did not try hard enough to settle".

As was succinctly stated by the majority of this

Court in *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524, 543; 273 NW2d 829 (1979):

"In short, we do not sit 'as a superlegislature to judge the wisdom or desirability of legislative policy determinations'. We sit as a court to determine whether there is a rational basis for the Legislature's judgment. If there is, then that judgment must be sustained:

" 'It is *not* this Court's role to decide whether the Legislature acted wisely or unwisely in enacting this statute. We will not substitute our own social and economic beliefs for those of the Legislature, which is elected by the people to pass laws.' " (Footnotes omitted.)

The proper test for judging the constitutionality of socioeconomic legislation such as 1969 PA 312, the police and fire compulsory arbitration act, is found in *Shavers v Attorney General,* 402 Mich 554, 612-613; 267 NW2d 72 (1978):

"The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective. See *Michigan Canners & Freezers Ass'n, Inc v Agricultural Marketing & Bargaining Board,* 397 Mich 337, 343-344; 245 NW2d 1 (1976).

"The test to determine whether a statute enacted pursuant to the police power comports with equal protection is, essentially, the same. As the United States Supreme Court declared in *United States Dep't of Agriculture v Moreno,* 413 US 528, 533; 93 S Ct 2821; 37 L Ed 2d 782 (1973):

" 'Under traditional equal protection analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest.' "[1] (Footnote and citations omitted.)

---

[1] It is now clear that the main center of controversy in the present

This Court does not possess the power predicated upon judicial whim to arbitrarily declare that certain legislation is unconstitutionally arbitrary. Accordingly, for this additional reason, we concur with Justice WILLIAMS that amended Act 312 is not unconstitutional.

RYAN, J., concurred with BLAIR MOODY, JR., J.

FITZGERALD, J. *(concurring in constitutionality).* I agree that 1969 PA 312 is constitutional. I also agree with Justice WILLIAMS' analysis of the other issues in this case. However, since I conclude that the act is constitutional for reasons which differ somewhat from those advanced by Justice WILLIAMS, I write separately.

I do not subscribe to the view that the degree of "political accountability" which can be postulated with regard to the arbitration panel is the crucial test for determining this legislation's constitutionality. I agree with Justice WILLIAMS that there is "accountability" in that 1969 PA 312 specifically provides that any award must be based upon certain legislatively prescribed criteria. MCL 423.239; MSA 17.455(39). Thus the arbitration panel is not free to issue an award premised on the panel's unique view of what the criteria ought to be.

---

case is the last-best-offer feature of Act 312. The emphasis on this feature, however, is misplaced.

The question before this Court is whether Act 312 unconstitutionally delegates legislative power to the chairman or arbitration panel as a whole. Under analysis and scrutiny traditionally applied in delegation cases, no such constitutional infirmity exists. Thus, the Act, including its last-best-offer feature, passes constitutional muster.

With this said, it becomes necessary to analyze the last-best-offer feature itself in terms of other constitutional standards to insure that there are no equal protection or due process violations. As we have seen, in applying "traditional" concepts of equal protection and due process analysis, the last-best-offer feature is rationally related to a legitimate legislative purpose, *i.e.,* promotion of private settlements in labor disputes.

More importantly, the arbitration panel's fidelity to the application of the criteria prescribed by the Legislature will be examined by the judiciary if review of the award is sought. Not only must the award be based upon the criteria set forth in 1969 PA 312, it must also be found to be supported "* * * by competent, material and substantial evidence on the whole record * * *". MCL 423.240; MSA 17.455(40).

Certainly then there is "accountability". But what of the concept of "political accountability" which forms the basis for much of the opinions of my colleagues? I believe it stretches credulity to contend that the arbitrators, including the chairperson, are "politically accountable" in the sense that they are directly responsible, in some fashion, to the electorate. However, I believe the debate in this case on the question of the degree of "political accountability" of the arbitrators to constitute a misplacement of emphasis.

What appears to have been ignored on this score is that a "politically accountable" entity, to wit the Legislature, has enacted this mechanism for the peaceful resolution of labor disputes. Yet another "politically accountable" entity, the local unit of government which constitutes "management", has been charged with the responsibility of putting on the bargaining table its offers to settle the dispute. Must the arbitrators themselves also be directly "politically accountable"? I think not. Such a system might make for politically expedient arbitration awards but it would hardly be consonant with the spirit of having an impartial forum for binding arbitration.

Much of the language in my colleagues' dissenting opinion should be recognized for what it is in reality—an examination of the wisdom of this

legislation rather than of its constitutionality. If, as the dissent seems to imply, 1969 PA 312 is simply bad legislation, the electorate should call to account those who were responsible for its promulgation. To argue that the legislation is unconstitutional because the arbitrators are not "politically accountable" misses the mark, and does so by a wide margin.

Although I find the dissent's criticism of the "last best offer" standard to be attractive, I cannot declare the legislation to be unconstitutional because we think it unwise.

I conclude, for these reasons, that 1969 PA 312 is constitutional. I agree with Justice WILLIAMS' resolution of all other issues in this case.

LEVIN, J. This is an action to review the award of an Act 312[1] arbitration panel resolving a collective bargaining dispute between the Detroit Police Officers Association and the City of Detroit.

We granted bypass of the Court of Appeals to review a judgment of the circuit court enforcing the award.

I

The city challenges Act 312, and the award in the instant case, on constitutional grounds. It additionally contends that the panel's award on the economic issues of wages and COLA and of a hardship exemption to the city's residency requirement is not supported by competent, material and substantial evidence on the whole record,[2] and that

---

[1] 1969 PA 312; MCL 423.231 et seq.; MSA 17.455(31) et seq., as amended.

[2] The city's contention that the wages and COLA portions of the award are unsupported rests upon its claims that: (1) no record evidence supports the chairman's statement that failure to award the DPOA the same COLA awarded police lieutenants and sergeants

the chairman of the panel erred in refusing to admit relevant evidence concerning economic demands of the DPOA.

We dissent from the Court's disposition:

1) We would hold the act unconstitutional on the ground that it delegates the power to prescribe policy (law) to the chairman of the panel without adequate safeguards circumscribing the exercise of that power.

2) We are of the opinion that the last-best-offer feature of the amended act exacerbates rather than cures the deficiencies which lead us to conclude that the act is unconstitutional, so that, entirely apart from whether the act would be unconstitutional without this feature, it is unconstitutional with this feature.

3) Although we would hold the act unconstitutional, we would, for the reasons set forth in *Dearborn Fire Fighters*,[3] give that decision prospective effect only.

---

would engender "despair, frustration and indeed, hostility" in day-to-day police operations; (2) the panel's failure to give equal consideration to all decisional criteria provided by the legislature violated the act's design and hence the award was not "authorized by law", and cannot survive review under Const 1963, art 6, § 28, which the city urges as the applicable standard.

[3] *Dearborn Fire Fighters Union Local No 412, IAFF v Dearborn*, 394 Mich 229, 271-272; 231 NW2d 226 (1975) (LEVIN, J.):

"Decisions holding legislative acts unconstitutional have, on occasion, been given limited retroactivity in recognition of the necessities of governmental administration.[57]

"*Lemon I* (*Lemon v Kurtzman*, 403 US 602; 91 S Ct 2105; 29 L Ed 2d 745 [1971]) held Pennsylvania's statutory program to reimburse nonpublic sectarian schools for certain secular educational programs violative of the Establishment Clause of the First Amendment. *Lemon II* (*Lemon v Kurtzman*, 411 US 192; 93 S Ct 1463; 36 L Ed 2d 151 [1973]) questioned whether the payment of some 24 million dollars, already allocated to nonpublic sectarian schools for services rendered before the statute's invalidation, should be enjoined.[58]

"The majority in *Lemon II*, particularly concerned with the obligations incurred by the schools in reliance on the compensatory statute, affirmed the district court's allowance of the payments.

"In addition to the almost insurmountable administrative, political, and judicial problems that would be created by any attempt to

For over a year the police officers have been paid the increased wages and COLA awarded by the panel. It would cause undue hardship to call upon them to repay what has already been paid.

4) That consideration, however, does not require that we enforce the full unpaid retroactive portion of the award.

The chairman of the arbitration panel in the instant case indicated (see fn 60) that he might have made an economic award less costly to the city had he not been required to select the last best offer of one of the parties.

It would not cause undue hardship to readjust

unravel and renegotiate the 'contracts' imposed by police and fire department arbitration panels, application of this decision retroactively would cause hardship on employees and employers and would not be constructive. Michigan labor organizations, their members and municipalities have justifiably relied on a presumptively valid statute.[59]

---

"[57] *Cipriano v City of Houma,* 395 US 701; 89 S Ct 1897; 23 L Ed 2d 647 (1969); *Phoenix v Kolodziejski,* 399 US 204; 90 S Ct 1990; 26 L Ed 2d 523 (1970); *Allen v State Board of Elections,* 393 US 544; 89 S Ct 817; 22 L Ed 2d 1 (1969).

"[58] There was no effort to effect the return of money that had already been paid for services rendered before *Lemon I* was decided. *Lemon II* considered only whether money allocated, but not yet paid, for services contracted before *Lemon I* should be paid.

"[59] Chief Justice Burger, writing for the majority in *Lemon II,* analyzed the stifling effect a doctrine of undeviating full retroactivity would have on the prompt implementation of new governmental programs in the future:

" 'Appellants would have state officials stay their hands until newly enacted state programs are "ratified" by the federal courts, or risk draconian, retrospective decrees should the legislation fall. In our view, appellants' position could seriously undermine the initiative of state legislators and executive officials alike. Until judges say otherwise, state officers—the officers of Pennsylvania—have the power to carry forward the directives of the state legislature. Those officials may, in some circumstances, elect to defer acting until an authoritative judicial pronouncement has been secured; but particularly when there are no fixed and clear constitutional precedents, the choice is essentially one of political discretion and one this Court has never conceived as an incident of judicial review.' *Lemon v Kurtzman,* 411 US 192, 207-208; 93 S Ct 1463; 36 L Ed 2d 151 (1973)."

the amount of the award as of July 1, 1977 to eliminate the excess implicit in adoption of a last best offer and to offset the excess already paid against the unpaid retroactive compensation.

We would remand the awards in the instant case and the Lieutenants and Sergeants Association case (see ¶ 5, *infra)* to the respective panels for redetermination of the economic awards unrestrained by the last-best-offer limitation, on the basis of the records already made, supplemented in this case by the economic evidence previously excluded.

Until such a redetermination, the police officers should continue to be paid on the basis of the award and the stay on payment of retroactive amounts should continue in force. After redetermination of the economic award, i) current payments should be readjusted, ii) the retroactive amount payable should be based on the new award, and iii) that amount should be reduced by the amount of the overpayment, but in no event should the officers be required to repay any amount.

5) The hearing on remand should be deferred until the Court decides the city's appeal from an arbitration award to the Detroit Police Lieutenants and Sergeants Association.[4]

After oral argument in the instant case this Court entered an order holding that case in abeyance pending this decision.

The chairman of the panel in this case indicated that he was persuaded to follow the decision in that case so that police officers would not be treated differently than lieutenants and sergeants.

The merits in this case thus depend in part on

---

[4] *Detroit v Detroit Police Lieutenants & Sergeants Ass'n* (Docket No. 64065).

the merits of the city's appeal in that case and therefore there can be no final decision in this case before decision on the city's application for leave to appeal in that case.

A

The question on which the four Justices participating in *Dearborn Fire Fighters* (decided in June, 1975) were equally divided is again presented in the instant case.

Two (Justice KAVANAGH and myself) would have held the act unconstitutional as an unlawful delegation of legislative power because it entrusts chairmen of ad hoc arbitration panels[5] "with the authority to decide major questions of public policy concerning the conditions of public employment, the levels and standards of public services, and the allocation of public revenues" but, because their appointments are only for an individual dispute and they have no continuing responsibility, insulates their "decision[s] from review in the political process" which "is not consonant with the constitutional exercise of political power in a representative democracy".[6] We added that the Legislature could vest "authority to resolve disputes concerning public employees in a governmental officer or agency with continuing responsibility for the day-

_____

[5] Although arbitration awards are nominally rendered, at least in the absence of express dissent, by a tripartite panel composed of one delegate chosen by each party to represent its interests, MCL 423.234; MSA 17.455(34), and an impartial chairman selected as provided in MCL 423.235; MSA 17.455(35), it is apparent that the chairman is the pivotal figure in determining the outcome because the panel members chosen by the parties can be expected to identify with the partisan positions they represent. The chairman always writes the panel's opinion and award. It is for this reason that we refer in this opinion to the arbitration awards as being determined by the "chairman" or "arbitrator".

[6] *Dearborn Fire Fighters v Dearborn, supra,* pp 241-242 (LEVIN, J.).

to-day exercise of that delegated power".[7] "Although the present law's provision for hit-and-run arbitrators is constitutionally defective, a law providing for a continuing politically responsible arbitrator could meet the Constitution's demands."[8]

Justice WILLIAMS said that while selection of the chairman by the municipal and employee representatives might not satisfy the requirements of public accountability, the act was constitutional insofar as it provided for his appointment by the chairman of the Michigan Employment Relations Commission when the parties fail to agree on a chairman (as was done in *Dearborn Fire Fighters*). He said that the "proximity of the appointment to the electoral process guarantees a high degree of political accountability".[9]

Justice COLEMAN said that the statute was constitutional because the Legislature intended to vest in the panel the "sovereignty necessary to accomplish its mandates" and the "panel is a public body performing a public function".[10]

In the instant case, a majority of the Court, in separate opinions, concludes that the act is constitutional. Justice WILLIAMS, speaking for himself, and Justices RYAN and MOODY, states that, if accountability is constitutionally required, "as a practical matter" "the scheme exhibits adequate accountability".[11]

B

We would hold the act unconstitutional as violative of the delegation doctrine.

---

[7] *Id.*, p 272 (LEVIN, J.).

[8] *Id.*, p 273 (KAVANAGH, C.J.).

[9] *Id.*, p 324 (WILLIAMS, J.).

[10] *Id.*, pp 285, 288 (COLEMAN, J.).

[11] WILLIAMS, J., *ante*, p 480.

The delegation doctrine seeks to safeguard against excessive delegation and misuse or abuse of delegated law-making power.

The chairman of the panel is empowered to formulate public policy on such subjects as wages, hours of employment, pensions, retirement, residency, affirmative action, health insurance and crew size. He does not merely find the facts and apply thereto established policy. Rather, he fashions the public policy for the case at hand—at once drawing the policy line and deciding on which side of the line the case falls. If the chairman's only role was to find the facts and apply to them policy predetermined by the Legislature or, say, the Michigan Employment Relations Commission—if all he did was decide the "on which side of the line" question—there would be less, perhaps no, need for the safeguards the absence of which we believe renders this act unconstitutional. He is not confined by the statutory factors; they are sufficiently amorphous to allow the chairman to reach and justify a result in favor of either party on virtually any issue.

The power to prescribe public policy having the effect of law is generally delegated only to full-time public officers or agencies. This provides a structure for the development of policy in a uniform and politically responsive manner.

Act 312 is novel in that the policy-making power is dispersed among ad hoc arbitrators. The dispersal of policy-making power prevents the emergence of visible and intelligible principles. It is often difficult to separate the policy-making from the fact-finding in any individual award, and no Act 312 chairman has any duty to develop a coherent body of law or to follow the decision of another Act 312 chairman.

The failure to develop a body of policy masks the Legislature's responsibility for the policies made by the chairmen in its stead and is not consonant with the concept that public policy should be developed in a politically responsive manner. Constructive political response presupposes that the electorate and the Legislature can determine the policy being applied.

This requires that the delegation of policy-making power be structured in a manner which does not inhibit the emergence of intelligible principles and coherent policies to guide the resolution of individual cases.

The potential for non-uniformity in policy inherent in the diffusion of state power among ad hoc chairmen is itself an evil. Just as the Legislature cannot enact laws which treat the same situation differently, neither can it empower others to do so.

The vague and malleable factors enumerated in the statute neither confine the chairmen's power nor supply a meaningful legislative statement of public policy. Because the factors are so general and the chairman decides how they are weighed and applied, any reasonable decision can be justified. The limited judicial review provided by the act does not safeguard against misuse or abuse of delegated policy-making power.

Last-offer arbitration exacerbates rather than cures the constitutional deficiencies of the act by divesting the chairman of the power to fashion the most appropriate award. Unless one of the last offers coincides with what in the chairman's judgment is the most appropriate award, the last-best-offer feature prevents the process from yielding results reflecting the best public policy, producing instead a result which may arbitrarily assess a penalty on the losing party measured by the differ-

ence between the last offer selected and the award
the chairman, if not so constrained, would have
made. Policy-making power is thus taken from
government and conferred on the parties, the pos-
sibility of principled decision-making is reduced,
and the risk of non-uniformity is increased. Be-
cause he is limited to the last best offer, the
chairman can disassociate himself from the award.
It is unrealistic to argue that the structure is
politically responsive when even the chairman
need not take responsibility for the award.

Finally, the revision of the process for selecting
panel chairmen has not altered the basic struc-
tural defects of ad hoc interest arbitration of pub-
lic policy. As before, the structure does not provide
for consistency of the decision-maker, decisional
principles or fundamental policy, or for the devel-
opment of a body of precedent from which policy
may be deduced.

A delegation of the power to make basic policy
decisions declaring the priorities of government
and the allocation of revenues is permissible only
where the structure of such a delegation does not
cloak the legislative nature of the power being
exercised and of the policy decisions being made,
promotes uniformity in the development of policies
and in the application of the policies so developed,
and does not mask the accountability of elected
officials for the actions of those who wield the
delegated power and the responsibility of the Leg-
islature to rectify erroneous policy judgments
made on its authority.

In *Dearborn Fire Fighters,* we contrasted the
prototypical delegation with arbitral delegation:
Where "decision making is concentrated in one
person or agency exercising the delegated power
on a continuing basis, the public can focus on the

manner in which the power is exercised and can hold the appointing authority accountable. Here decision-making power has been dispersed through so many individual, independent arbitrators that it is not possible to hold any public official or authority responsible for the manner in which the delegated power has been exercised."[12]

We added that "[t]he primary obligation of government is to govern. We seek to safeguard the final authority of government. Decision making by an independent outsider in operative effect excludes government as the final authority", and that:

"It is the unique method of appointment, requiring independent decision makers without accountability to a governmental appointing authority, and the unique dispersal of decision-making power among numerous *ad hoc* decision makers, only temporarily in office, precluding assessment of responsibility for the consequences of their decisions on the level of public services, the allocation of public resources and the cost of government, which renders invalid this particular delegation of legislative power."[13]

## II

Implicit in the Legislature's constitutionally conferred power to "enact laws providing for the resolution of disputes concerning public employees"[14] is the power to delegate the resolving authority. The city argues that Act 312 is unconstitutional because it improperly delegates policy-making power to politically unaccountable arbitrators.

Justice WILLIAMS' analysis of the delegation is-

---

[12] *Dearborn Fire Fighters v Dearborn, supra,* p 260 (LEVIN, J.).

[13] *Id.,* pp 270, 269.

[14] Const 1963, art 4, § 48.

sue concludes (1) that the Act 312 standards "are as reasonably precise as the subject matter requires or permits" and adequately channel the chairman's decision-making under the principle of *Osius v St Clair Shores*,[15] and (2) that the revised method of selecting the chairman adequately provides for public responsibility and accountability.

We disagree with his second conclusion and believe that the first answers a question which is too narrowly framed. The delegation doctrine and other constitutional principles seek to protect against excessive delegation or misuse and abuse of delegated law-making power. "As a practical matter", Act 312 does not provide adequate safeguards respecting the law-making power delegated to the chairman of the arbitration panel.

## A

The delegation doctrine is rooted, at least in part, in the constitutional provision vesting the "legislative power" in the Senate and House of Representatives[16] and reflects the fundamental democratic premise that the law should be made by representatives chosen by the people. The history of the doctrine reflects attempts to reconcile that precept with the complexity of the governing process.[17] Legislative declarations frequently require interstitial interpolation and not every as-

---

[15] *Osius v St Clair Shores*, 344 Mich 693, 698; 75 NW2d 25 (1956).

[16] Const 1963, art 4, § 1.

The Separation of Powers and Due Process Clauses—Const 1963, art 1, § 17 and art 3, § 2—have also been suggested as sources of various aspects of the doctrine. See *Westervelt v Natural Resources Comm*, 402 Mich 412, 427, 433, 455; 263 NW2d 564 (1978). See, also, Const 1963, art 1, § 1: "All political power is inherent in the people. Government is instituted for their equal benefit, security and protection."

[17] See generally, Jaffe, Judicial Control of Administrative Action, pp 33-40; 1 Cooper, State Administrative Law, pp 35-36.

pect of every subject lends itself to prospective regulation.

By the 1950's much state delegation jurisprudence had crystallized around the concept that a legislature must articulate "standards" to guide the exercise of delegated power.[18] *Osius*[19] exemplifies that mode of analysis.

Writing in dissent in *Arizona v California,*[20] Mr. Justice Harlan explained the purpose of this test:

"The principle that authority granted by the legislature must be limited by adequate standards serves two primary functions vital to preserving the separation of powers required by the Constitution. *First,* it insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people. *Second,* it prevents judicial review from becoming merely an exercise at large by providing the courts with some measure against which to judge the official action that has been challenged."

## B

We believe those objectives to be sound. The judicial search for adequate statutory standards has, however, proved ineffectual in assuring legislative responsibility for "fundamental policy decisions" and in structuring the exercise of delegated power.

Professor Davis, a leading advocate of acknowledging the necessity and propriety of delegating policy-making power to administrators, has force-

[18] 1 Davis, Administrative Law Treatise (1st ed), §§ 2.07-2.08, pp 101-108; 1 Cooper, *supra,* p 54.

[19] *Osius v St Clair Shores, supra.*

[20] *Arizona v California,* 373 US 546, 626; 83 S Ct 1468; 10 L Ed 2d 542 (1963).

fully criticized the standards test,[21] has argued
persistently and influentially that the more appro-
priate inquiry is whether the totality of standards
and safeguards surrounding the delegation of legis-
lative power sufficiently protects "against unneces-
sary and uncontrolled discretionary power".[22]

Other commentators, calling for the doctrine's
re-emergence in the federal sphere, have empha-
sized its underlying function of guaranteeing ulti-
mate legislative responsibility for the formulation
of public policy (law).[23]

Thus, the delegation doctrine is not today mono-

---

[21] 1 Davis (1st ed), *supra*, § 2.07, pp 102-105. Indeed, Professor Davis
criticized *Osius* specifically. *Id.,* pp 102-103, 108-109.

[22] 1 Davis, Administrative Law Treatise (2d ed), § 3:15, p 206. See,
also, *id.,* § 3:14, pp 204-206; 1 Davis (1st ed), *supra,* § 2.15, pp 148-151.

[23] "[T]he delegation doctrine retains an important potential as a
check on the exercise of unbounded standardless discretion by admin-
istrative agencies. At its core, the doctrine is based on the notion that
agency action must occur within the context of a rule of law previ-
ously formulated by a legislative body. * * *

                              *   *   *

"* * * When Congress is too divided or uncertain to articulate
policy, it is no doubt easier to pass an organic statute with some
vague language about the 'public interest' which tells the agency, in
effect, to get the job done. But while this observation is no doubt
correct, it seems to me to argue for a vigorous reassertion of the
delegation doctrine rather than against it. An argument for letting
the experts decide when the people's representatives are uncertain or
cannot agree is an argument for paternalism and against democracy.
As Justice Brennan has argued,

" '[F]ormulation of policy is a legislature's primary responsibility,
entrusted to it by the electorate, and to the extent Congress delegates
authority under indefinite standards, this policy-making function is
passed on to other agencies, often not answerable or responsive in the
same degree to the people [citing *United States v Robel,* 389 US 258,
276; 88 S Ct 419; 19 L Ed 2d 508 (1967) (BRENNAN, J, concurring)].'

"The whole reason we have broadly based representative assemblies
is to require some degree of public consensus before governmental
action occurs." Wright, *Beyond Discretionary Justice,* 81 Yale L J
575, 583-585 (1972).

See, also, Ely, Democracy and Distrust: A Theory of Judicial Review
(Cambridge, Mass: Harvard U Press, 1980), pp 131-134; McGowan,
*Congress, Court and Control of Delegated Power,* 77 Colum L Rev
1119 (1977).

lithic. Professor Cooper has "demonstrated that it is not possible to devise a 'true test' for determining whether a particular delegation will be sustained, one articulating and enumerating all the factors that motivate the judicial response.[24] In the final analysis, courts, 'weighing the advantage of [the] delegation against the hazards involved,'[25] make a pragmatic analysis of whether the consequences of the delegation are so undesirable as to require judicial intervention".[26]

The hazards involved may range from the legislature's parting with or abdicating its policy-making role to the risk of arbitrariness or injustice resulting from the delegate's failure to forge coherent policy to guide the day-to-day exercise of the delegated power.[27]

A court reviewing a challenged delegation of legislative power should, we agree, examine whether adequate checks have been provided against arbitrary or uncontrolled official action. Such an inquiry cannot, however, supplant the basic inquiry whether the legislatively devised framework for official action—considered in its application—secures the fundamental goal of the delegation doctrine: preserving legislative responsibility for the determination of public policy.

Mr. Justice Brennan has said that "if state power is to be exerted," the choices among competing social and economic theories in the ordering of life

"must be made by a *responsible* organ of state government. For if they are not, the very best that may be

---

[24] 1 Cooper, *supra,* pp 53, 73.

[25] *Id.,* p 53.

[26] *Dearborn Fire Fighters v Dearborn, supra,* pp 246-247 (LEVIN, J.).

[27] See, generally, 1 Cooper, *supra,* pp 37-42, and Wright, *supra,* pp 585-591.

hoped for is that state power will be exercised, not upon the basis of any social choice made by the people of the State, but instead merely on the basis of social choices made at the whim of the particular state official wielding the power. *If there is no effective supervision of this process to insure consistency of decision,* it can amount to nothing more than government by whim. But ours has been 'termed a government of laws, and not of men.' *Marbury v Madison,* [5 US (1 Cranch) 137, 163; 2 L Ed 60, 69] (1803)." (Emphasis supplied.)[28]

# III

In *Dearborn Fire Fighters* we said that Act 312 was violative of the delegation doctrine "because it is designed to insulate and, in fact, does insulate the decision-making process and the results from accountability within the political process".[29] We adhere to that view.

Accountability requires a structure which does not inhibit the emergence of intelligible principles and coherent policies to guide the resolution of individual cases. The possibility of constructive

---

[28] *McGautha v California,* 402 US 183, 250; 91 S Ct 1454; 28 L Ed 2d 711 (1971).

*McGautha's* short-lived holding was that a jury could constitutionally be entrusted with unfettered discretion to impose the death penalty. Mr. Justice Brennan relied upon the Due Process Clause of the Fourteenth Amendment as the source of the principles set forth in the text.

In *Westervelt v Natural Resources Comm, supra,* this Court divided 3-to-3 over the question whether the delegation doctrine finds constitutional support in concepts of due process as well as separation of powers. I signed Justice WILLIAMS' opinion which argued for that proposition. Although my intention is not to reopen debate on that complex issue in this case, I must acknowledge that my conclusion that Act 312 improperly delegates legislative power reflects a concern that the method of ad hoc adjudication denies due process as well as a belief that the method does not adequately assure political accountability and disguises the essentially legislative nature of the decisions being made.

[29] *Dearborn Fire Fighters v Dearborn, supra,* p 258 (LEVIN, J.).

political response presupposes that the electorate and the Legislature can determine the policy being applied.

Act 312 arbitration is novel in that the policy-making power is dispersed among ad hoc arbitrators, which prevents the emergence of visible and intelligible principles. For this reason safeguards generally regarded as adequate in the context of delegations to administrative agencies do not assure accountability in this context.

## A

Act 312 arbitrators formulate public policy.

The factual components of a dispute between a city and a police or fire fighters union and the term "arbitration" obscure the policy-making components of the arbitrator's decision and the safeguards requisite to constitutional exercise of delegated policy-making power. The arbitrator decides not only whether the particular controversy is on one side or another of a line, but where the line is to be drawn. In drawing the line, although guided by statutorily prescribed standards, he decides public policy in the exercise of law-making power delegated to him by the Legislature.

We observed in *Dearborn Fire Fighters:*

"When the same term, here 'arbitration,' is used in different contexts, the analysis may become blurred. While both 'interest' arbitration and 'grievance' arbitration concern disputes, the nature of the dispute in one case is considerably different than the other.

"Grievance arbitration concerns disputes arising under written agreements negotiated and agreed upon by the parties. In grievance arbitration, the labor arbitrator acts in a judicial or quasi-judicial capacity. He determines the facts and seeks an interpretation of the agreement in accord with the understanding of the

parties as gleaned from the writing and the relationship.

"In interest arbitration, the functions and prerogatives of the arbitrator are significantly different. He is not bound by the agreement or understanding of the parties. He does not *interpret* a contract, he *makes* one. He then imposes his concept of what the 'agreement' ought to be on the parties." (Emphasis in original.)[30]

The notion that an Act 312 arbitrator is merely deciding a dispute is inaccurate. "[H]is decision does more than resolve the differences between the parties. It affects the allocation of public resources, the level of public services provided the community as a whole and the cost of government. It also establishes precedents affecting the terms and conditions of public employment generally in both the directly-affected and other units of government".[31]

[30] *Id.,* pp 254-255.

[31] *Id.,* p 263.

See Grodin, *Political Aspects of Public Sector Interest Arbitration,* 64 Cal L Rev 678, 687-690, 694 (1976):

"Those who favor the use of arbitration to resolve interest disputes in the public sector see it primarily as an extension of the negotiating process and evaluate it on the basis primarily of its effectiveness in adapting to that process. * * * There is an obvious tension between that perspective and one which views arbitration as part of an administrative mechanism for implementing governmental policy regarding wages and conditions of employment. One perspective sees the arbitrator as an essentially private person who happens to be involved in resolving a dispute concerning a public entity; the other sees the arbitrator as an agent of government involved primarily in implementing public policy."

In addition to those states which have recognized the legislative/political content of public sector dispute resolution by adopting the *Dearborn Fire Fighters* political accountability argument (see discussion at p 566), see also, *Schryver v Schirmer,* 84 SD 352, 355; 171 NW2d 634, 635 (1969) ("[T]he fixing of salaries of municipal officers and employees is a legislative function."); *State ex rel Everett Fire Fighters, Local No 350 v Johnson,* 46 Wash 2d 114, 120-121; 278 P2d 662, 666 (1955) (invalidating local initiative providing for binding arbitration saying that "[t]he rule against delegation of legislative authority is applicable whether the law is enacted by the legislature or by initiative." "Here the council would be stepping out of the picture entirely and the arbitration board would be performing a

"It may not be prudent or possible to cut expenditures or reduce personnel. There is a level below which police and fire services cannot safely be reduced. * * * Viewed from the governmental perspective, from the perspective of the citizens/taxpayers, the decision is legislative-political."[32]

## B

The power to prescribe policy having the effect of law is generally delegated only to full-time public officers or agencies. This provides a structure for the development of policy in a uniform and politically responsive manner.

While some writers assert that the Legislature may entrust the making of policy to others so long as the one to whom the power is delegated develops meaningful principles to guide the exercise of the power in individual cases[33] and others would require that more specific policy direction be provided by the Legislature,[34] virtually all discussions

---

function which, by law, is the responsibility of the council."); *Bagley v Manhattan Beach,* 18 Cal 3d 22, 25; 132 Cal Rptr 668; 553 P2d 1140, 1141-1142 (1976) ("Although standards might be established governing the fixing of compensation and the city council might delegate functions relating to the application of those standards, the ultimate act of applying the standards and of fixing compensation is legislative in character, invoking the discretion of the council.").

The general rule is that a city may not agree to submit to binding interest arbitration in collective bargaining agreements absent express statutory or charter approval, because to do so would be an unconstitutional abdication of legislative responsibility. See *Maryland Classified Employees Ass'n v Anderson,* 281 Md 496, 508-509 fn 12; 380 A2d 1032 (1977).

[32] *Dearborn Fire Fighters v Dearborn, supra,* p 264 (LEVIN, J.).

[33] "The contemporary approach is one of not invalidating even the broadest statutory delegations of power, but of assuring that they are accompanied by adequate controls on subsequent administrative behavior." Leventhal, *Principled Fairness and Regulatory Urgency,* 25 Case Western Reserve L Rev 66, 70 (1974).

See generally, 1 Davis (2d ed), *supra,* § 3:15, pp 206-216.

[34] See Ely, *supra,* pp 133-134, and Wright, *supra,* pp 581-587.

of the problem assume that the power in question is reposed in some body with continuing responsibility, typically an administrative agency.[35]

Implicit in a delegation to such a full-time public officer or agency are the safeguards resulting from such continuing responsibility and political accountability.[36] Generally agencies develop policies through quasi-judicial decision of individual cases or promulgate rules pursuant to an administrative procedures act. Their published decisions, separately stating the facts and the policies enunciated, and their published rules, tend to create a sense of agency responsibility for developing a coherent body of law.

The delegation doctrine developed in this context and thus it has not heretofore been necessary to articulate, and therefore few precedents recognize, the importance of the safeguards implicit in the centralization and continuing exercise of policy-making power and the mischief resulting from the unsupervised dispersal of policy-making power. It does not follow that such safeguards, generally implicit, are not required.

## C

Most courts have sustained interest arbitration statutes but they have done so without considering whether the traditional safeguards suffice when the policy-making power is dispersed among ad

---

[35] See, *e.g.,* Wright, *supra,* p 583:

"At its core, the doctrine is based on the notion that *agency action* must occur within the context of a rule of law previously formulated by a legislative body." (Emphasis supplied.)

[36] "The regular course of adjudication by a continuing body required to explain the reasoning upon which its decisions are based results in the accumulation of a body of precedent from which, over time, general principles may be deduced." *McGautha v California, supra,* p 279 (BRENNAN, J., dissenting).

hoc arbitrators. A few decisions have invalidated such statutes for the absence of the political accountability which Justice KAVANAGH and I would have required in *Dearborn Fire Fighters* and would now require. About the same number have concluded that political accountability is not required.

1

The decisions of Act 312 arbitrators involve fundamental questions of policy, principally the allocation of public funds. Yet it is left to the chairman to draw the lines and thus determine the policy which will govern his decision.

The act's standards, rather than "significantly channel[ing]," or "trenchantly circumscrib[ing]" the panel's decision-making authority, are sufficiently amorphous to allow a panel confronted with a given set of evidence to reach (and justify) a result in favor of either party on virtually any issue. See Section IV.A.1., *infra*.

Let us hypothesize that two panels chaired by different arbitrators are simultaneously convened to resolve disputes in two different communities. Each dispute involves the same issues: residency requirement and crew size. In each case, the union insists upon no residence requirement and no one-officer patrol cars; the city offers residency and one-officer crews.

Assuming no relevant city ordinance, only two § 9 statutory criteria (see fn 48)—clause (c), interests and welfare of the public and clause (d), "comparables"—seem to be applicable. Suppose that testimony shows that officer morale would be higher with two-officer patrol teams and no residency requirement, but all "comparable communi-

ties" utilize one-officer patrol cars and require officers to reside in the community.

One chairman might award two-officer patrol cars and no residency requirement because, in his judgment, maintaining officer morale protects the public and is more important than maintaining uniformity with comparable communities. Another chairman might find that the data on "comparables" outweighs any evidence adduced by the union because uniformity should be maintained.

Two different results, expressing two conflicting policy judgments, would have been reached in effectuating the aim of the act to resolve police or fire fighter labor disputes. Yet each of the awards would represent a judgment made on behalf of the people of the state[37] concerning the policy which should govern residency and staffing requirements.

If we assume no significant differences between the communities involved in our hypothetical arbitrations, it is impossible to reconcile the two awards as expressions of the same legislative policy. If we suppose that factual differences accounted for the differing results, we still may not know what rule of decision, what intelligible principle explains the divergent outcomes.

No Act 312 arbitrator has any duty to further the development of a coherent body of law or to follow the decision of another Act 312 arbitrator. The absence of principled decision-making is inherent in the ad hoc structure of the act.

2

This framework, inhibiting the emergence of a

---

[37] Justice WILLIAMS acknowledges "that the role" of "the Act 312 arbitrators" "is to effecutate a *state* labor policy." WILLIAMS, J., p 477 (emphasis in original).

coherent body of law, precludes meaningful political accountability.

When sensitive policy judgments of the sort made by Act 312 arbitrators are not based upon *any* known principles, they cannot be said to be based upon legislatively derived principles.[38]

Because questions of policy are not being decided in the first instance by the Legislature, the decisions once made must be accessible to legislative scrutiny. As one commentator has noted, the delegation doctrine "has an underlying core of validity in that it requires that those who have been selected by a given process and from a given constituency retain the power to make ultimate policy decisions *and override decisions made by others*". (Emphasis added.)[39]

The Legislature is uninformed whether to override policy decisions made by Act 312 arbitrators because those decisions are made only for the individual case. Any consistency of judgment that might be discernible in the multitude of decisions may be sheerly fortuitous.

A shift from ad hoc decision-making to a structure providing for principled development of arbitral guidelines would heighten the visibility of the process; the absence of discernible principles not only prevents the Legislature from effectively supervising and participating in the process, but also prevents the public from being able to scrutinize what is being decided in its interest.[40]

---

[38] It is no answer to say that the Legislature *has* determined the fundamental policy and that policy is to resolve disputes.

To be sure, the central purpose behind the enactment of Act 312 was the peaceful resolution of police and fire fighter disputes, and this represents a fundamental and entirely constitutional policy decision by the Legislature. There are, nevertheless, other fundamental policy decisions being made as such disputes are being resolved—decisions that trigger the requirement of political accountability.

[39] Goldstein, Book Commentary on Wellington & Winter, *The Unions and the Cities,* 22 Buffalo L Rev 603, 608 (1973).

[40] Judge J. Skelly Wright observed:

3

The dispersal of policy-making power among ad hoc arbitrators invites non-uniformity of policy in the dispute resolution process, in itself an evil.

A fundamental precept of both the state and federal constitutions is the concept of equal justice under law. Whatever its doctrinal basis, it is clear that it is not consonant with governance in a constitutional democracy for those who exercise the powers of government to apply different policies in the same situation.

Just as the Legislature cannot enact laws that treat the same situation differently, neither may those who exercise delegated law-making power. The Legislature cannot constitutionally empower state functionaries, whether called administrators or arbitrators, to apply different policies of state government in the same situation on such questions as residency, affirmative action, crew size, pensions or wages, or the allocation of tax revenues between the police, fire protection and other functions of local government. If the rule imposed by the state for a community having the characteristics of, say, Brighton is to require officers to be residents, then the same rule must be applied to all other "Brightons". Otherwise disparate rules for the same situation, which the Legislature could not enact, are being applied.

"We have recently seen enough evidence of what happens when a substantial number of people come to believe that major decisions have been made without their consent. If the social fabric is to survive, the politics of manipulation and delegation simply must be replaced by a politics of informed consent. It is perfectly natural for congressmen to attempt to avoid or delay substantial conflict by any device available, including broad delegations of power to the executive branch. But it is time we came to realize that in a democracy conflict over basic policy cannot be avoided and that when too long delayed it may, like Langston Hughes' dream deferred, explode." Wright, *supra,* p 586.

Inherent in the diffusion of state power among ad hoc arbitrators is potential non-uniformity in the policy-making function. While a chairman may choose the line drawn by another chairman, each is free to draw his own. There may or may not be substantial uniformity. The difficulty or impossibility of determining what policy decisions have been made by the many chairmen and the extent of uniformity or diversity in state policy in similar situations highlights that the Legislature has enacted a policy-making procedure which does not assure that like situations will be treated in a like manner. Two chairmen faced with identical disputes might employ different rules to reach the same or different resolutions. Even if each chairman fully explained his reasoning, there would be no assurance that the rule enunciated would be applied in future cases by the same arbitrator or others.

4

A related vice flowing from the absence of principles is that the Legislature is effectively accomplishing indirectly that which it cannot do directly: the creation of what are, in practical effect, local laws.[41] If the arbitral process were designed to culminate in statements of principles with general applicability, then the act would be creating not local, but general, laws.

---

[41] "The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected. Any act repealing local or special acts shall require only a majority of the members elected to and serving in each house and shall not require submission to the electors of such district." Const 1963, art 4, § 29.

# D

We do not wish to be understood as saying that the Legislature may not adopt a mandatory procedure for resolving collective bargaining disputes. Although the inability to produce observable principles is inherent in the present ad hoc structure of the act, case-by-case resolution of disputes can be structured so that consistency and continuity (and hence visibility and amenability to legislative supervision) are built into the system.

It cannot be said that the kind of issues presented in Act 312 arbitrations are not capable of resolution by principles. Just as agency action can be undertaken in such a way that rules evolve, so might principles develop in the impasse resolution framework. We recognize that such principles may of necessity be complex in many cases. But some of the reasoning employed by arbitrators belies any claim that the decision is based on the unique facts of the case at hand.

In the instant case, for example, it appears that the reason COLA was awarded is that COLA was thought to be fair in a contract of this duration.[42] It is difficult to conceive of a situation to which that reasoning would not be applicable; whatever

---

[42] The DPOA chairman stated:

"Traditionally, in collective bargaining, a COLA proposal is most persuasive in a contract of long duration such as this contract, that of three years, which is certainly a long time in the economics at the present time. Had the final ruling been for a two-year contract, COLA would not have been appropriate." Opinion and Award, p 9.

The chairman in the Lieutenants and Sergeants case, whose award of COLA figured prominently in the reasoning of the chairman of the DPOA panel, said that "maintaining the purchasing power of affected employees is a legitimate aim of the economic provisions of a labor contract" and found that "the cost of living is a more crucial factor" than the city's claims regarding its lawful authority and limited ability to bear the cost of COLA. *Detroit v Detroit Police Lieutenants & Sergeants Ass'n,* Supplemental Opinion and Award, pp 28, 15 (Docket No. 64065).

characteristics are unique to Detroit played no part in the chairman's reasoning.

Other issues, we would agree, depend on more complex analysis of numerous factors and characteristics. In such cases, however, the interplay of the applicable factors can be described in general terms which may evolve into increasingly specific models through the accretion of precedent from a range of factual situations.[43] "While it is sometimes inevitable that the rule of decision be developed on a case-by-case basis, this development should not be confused with a system under which decisions are made without rules."[44]

What is important is that there be a continuing body responsible for the development of coherent principles and duty-bound to explain the basis for distinction when a result different from that of past cases is reached. We repeat our observation in *Dearborn Fire Fighters* that we would "not preclude the Legislature from vesting the authority to resolve disputes concerning public employees in a governmental officer or agency with continuing responsibility for the day-to-day exercise of that delegated power".[45]

## IV

We turn to more specific consideration of Act

---

[43] "But the need for some discretion in no way justifies the vast scope of unnecessary discretionary authority which is harbored in our present administrative apparatus. While an agency is new and unfamiliar with the subject matter with which it is dealing, it may have to feel its way around for a while on a case-by-case basis. But from the very beginning, the agency should concentrate considerable attention on the problem of developing coherent general principles to guide its decisions." Wright, *supra,* pp 576-577.

[44] Wright, *supra,* p 594.

The dangers of decision-making without rules, perceived by Judge Wright in "situations where the agency cannot articulate a rule in advance", is even more evident where there is no agency but only a number of ad hoc decision-makers.

[45] *Dearborn Fire Fighters v Dearborn, supra,* p 272 (LEVIN, J.).

312 as it has been amended and of the arguments advanced in support of its constitutionality.

## A

The traditional safeguards—standards, advance rule-making[46] and judicial review—provide no meaningful protection against excessive delegation and misuse and abuse of delegated law-making power by Act 312 arbitrators.

## 1

Although the factors provided by the Legislature as guides for arbitral decision-making may satisfy traditional standards-oriented inquiry, they do not adequately protect against excessive delegation or unnecessary and uncontrolled discretionary power. Indeed, they reveal the policy-making power of the arbitrator.

The statement of "public policy" in § 1[47] is no more than a general directive that arbitrators shall go forth and settle disputes. Nor do the § 9 standards, ranging from the specific to the catchall "[s]uch other factors not confined to the foregoing which are normally or traditionally taken into

---

[46] Although other officers or agencies of state government exercising delegated law-making power are required to promulgate, after notice and comment, policies of general application, that is not required of Act 312 arbitrators, nor would it be practical to require that they do so because they are not in office long enough (and may never again be in office) to develop and articulate coherent policy.

[47] "It is the public policy of this state that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternate, expeditious, effective and binding procedure for the resolution of disputes, and to that end the provisions of this act, providing for compulsory arbitration, shall be liberally construed." MCL 423.231; MSA 17.455(31).

consideration",[48] supply the coalescing element of

[48] "At or before the conclusion of the hearing held pursuant to section 6, the arbitration panel shall identify the economic issues in dispute, and direct each of the parties to submit, within such time limit as the panel shall prescribe, to the arbitration panel and to each other its last offer of settlement on each economic issue. The determination of the arbitration panel as to the issues in dispute and as to which of these issues are economic shall be conclusive. The arbitration panel, within 30 days after the conclusion of the hearing, or such further additional periods to which the parties may agree, shall make written findings of fact and promulgate a written opinion and order upon the issues presented to it and upon the record made before it, and shall mail or otherwise deliver a true copy thereof to the parties and their representatives and to the employment relations commission. As to each economic issue, the arbitration panel shall adopt the last offer of settlement which, in the opinion of the arbitration panel, more nearly complies with the applicable factors prescribed in section 9. The findings, opinions and order as to all other issues shall be based upon the applicable factors prescribed in section 9. This section as amended shall be applicable only to arbitration proceedings initiated under section 3 on or after January 1, 1973." MCL 423.238; MSA 17.455(38).

"Where there is no agreement between the parties, or where there is an agreement but the parties have begun negotiations or discussions looking to a new agreement or amendment of the existing agreement, and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable:

"(a) The lawful authority of the employer.

"(b) Stipulations of the parties.

"(c) The interests and welfare of the public and the financial ability of the unit of government to meet those costs.

"(d) Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:

"(i) In public employment in comparable communities.

"(ii) In private employment in comparable communities.

"(e) The average consumer prices for goods and services, commonly known as the cost of living.

"(f) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.

"(g) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

"(h) Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary

policy. They are simply suggested ingredients in a recipe whose proportions are unknown until the end product is served up by the arbitrator. In most cases, particularly in the context of last-offer arbitration of economic issues, any reasonable decision can be justified in terms of one or more of the § 9 criteria.[49]

Those factors may serve to focus the arbitrator's inquiry but they provide only an illusory safeguard against haphazard decision-making. As a practical matter, the Legislature has offered the arbitrator little direction concerning what he should consider or how he should reach a decision and the electorate still less assurance that Act 312 arbitration awards will be fashioned through a principled, consistent, or fathomable process.

The two § 9 factors identified by our colleague as the "[m]ost salient * * * legislative directives" are also the least specific in defining their own substantive content and the most amenable to ad hoc definition and result-oriented characterization by the arbitrator.

Factor (c) requires the arbitrator to consider the "interests and welfare of the public", but he retains the essentially legislative freedom[50] to decide what the public welfare requires before evaluating what course of action will better serve those interests.

In this case, the chairman thought that the public welfare required awarding the DPOA-requested COLA provision because to do otherwise

collective bargaining, mediation, fact-finding, arbitration or otherwise between the parties, in the public service or in private employment." MCL 423.239; MSA 17.455(39).

[49] Most decisions are thus invulnerable to judicial review if reliance on one or more of the criteria is claimed. See Part IV.A.2, *infra,* for further discussion of judicial review.

[50] See *Westervelt v Natural Resources Comm, supra,* p 440.

after the Lieutenants and Sergeants Association had won COLA through Act 312 arbitration would "imperil morale and effective performance for the protection of the public".[51] The chairman noted that the "interest and welfare of the public * * * would include, of course, the *quality* of services delivered" (emphasis supplied) but made no mention of the public interest in the *quantity* of services delivered, *i.e.*, the reduction in police manpower or other city services that the cost of the police officers' COLA might necessitate. Under the act he was free in this manner to selectively determine which considerations affected the public welfare.[52]

Factor (c) also speaks of the "financial ability of the unit of government to meet those costs". The chairman of the DPOA panel said:

"[T]he city has not [pled] nor has the city proved in the traditional sense an inability to pay, but has, very specifically said, it is not pleading inability to pay but rather the financial condition of the city as a 'limiting factor.' The difference may be subtle, but the difference is fundamental since the panel was not in a position, the budget not having been introduced and debated, to ascertain what other needs of the city were met by those funds already spent in relation to the importance and the amounts necessary for funding of the future award of this panel."[53]

---

[51] Opinion and Award, pp 22-23.

The relationship between police morale and the "interests and welfare of the public" is not apparent from the face of § 9 and is certainly less self-evident than the public interest implications of the number of officers the city can afford to retain or the sacrifice of other city services.

[52] The chairman of the DPOA panel observed:

"The interest and welfare of the public are uppermost in the minds of the panel but the question is what constitutes in this context the interest and welfare of the public." Opinion and Award, p 22.

[53] *Id.*, p 23.

The chairman thus suggests that a city's claim of inability to pay the union's wage demands will not receive serious consideration unless the asserted inability is absolute.

To attach significance to a city's financial position only if payment would bankrupt the city is effectively to eliminate this factor from the equation. Seldom will a single arbitration award threaten to exhaust the entire city budget. The chairman's statement demonstrates an assumption that other budgeted items are presumptively of a lower priority than police or fire fighter salaries and can be sacrificed to provide additional funds to meet police and fire fighter demands—the prototype of a decision which should be entrusted only to a politically accountable official or body.[54] No specific guidelines for making this determination are provided by the act. Another chairman might opt for a policy which considers the fiscal integrity of the city of paramount importance.

Another factor—"comparables"—is also unspecific and does not guide the chairman's evaluation of the evidence because it implicitly accords him complete discretion in determining what are "similar services" and what are "comparable communities". While the chairman may accept the parties' stipulations in this regard, two chairmen con-

---

[54] The chairman of the Lieutenants and Sergeants panel squarely recognized this reality:

"[T]he panel recognizes that the city is restricted and not capable of raising taxes or increasing its revenue beyond what is stated in its exhibits and budget. The question presented by this arbitration is what proportion of the total budget will be allotted for wages and benefits for Detroit Police Lieutenants and Sergeants. The panel recognizes that the budget is a maximum amount of money which the city has to spend subject to occasional supplementary budgets and budget revisions and that the budget can be spent in many different ways. The panel also recognizes that if city officials can limit the scope of an arbitration panel's authority simply by declaring budget limitations, there often would be no purpose for conducting arbitration proceedings." Supplemental Opinion and Award, pp 9-10.

fronted with the identical evidence could either give it controlling weight or exclude it from consideration, depending upon the readiness of each to concede its validity as a basis for comparison.

A striking illustration of the pliability of this criterion appears in the successive opinions of the chairman in the Act 312 arbitration between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association (see Part V, *infra),* the COLA award in which was central to decision in this case. The chairman's original opinion and award on the wage issue stated in its entirety:

"The Association last offer on salaries for members of the bargaining unit is reasonable and not out of line with other settlements in other police departments in the comparison cities. It is also not out of line with private sector settlements during the past year. No persuasive evidence was offered to the panel to warrant that the settlement to which the parties agreed in the 1974-77 contract not be continued during the 1977-80 contract.

"The panel adopts the Association wages proposal." *Detroit v Detroit Police Lieutenants & Sergeants Ass'n,* Opinion and Award, p 25 (Docket No. 64065).

Following remand by the circuit court for supplemental findings relating the record evidence to the applicable § 9 factors, the chairman in effect disavowed his earlier reliance upon wage settlements in other cities. Although the parties had stipulated that certain cities would be regarded as comparable, the supplemental opinion and award gave overriding importance to maintaining the real level of compensation provided by the previous, negotiated agreement and virtually dismissed all evidence on "comparables" introduced by both sides:

"[T]he panel finds additionally that there has been no evidence submitted as to what Sergeants and Lieutenants do in those 'comparable' communities.

"Since the panel finds that the surveys, without relevant testimony regarding the function of those persons represented in the surveys, are less than persuasive with regard to whether increases in wages should be granted on the basis of those surveys, the panel must place great emphasis on the fact that the prior collective bargaining agreement was arrived at by mutual agreement and a meeting of the minds. The panel finds that with regard to those surveys the fact that the prior agreement was mutually agreed to by the parties is most relevant when considering the comparable data submitted."

The chairman thus initially indicated considerable reliance on "comparables" in reaching his decision only to dismiss the same evidence in a later opinion because no testimony established the functions of lieutenants and sergeants in cities the parties had agreed to regard as comparable. This change of position exposes the act's failure to give meaningful guidance or assure a measure of consistency in the reasoning of the same arbitrator, let alone different arbitrators.[55]

The remaining § 9 criteria are perhaps less protean but still incapable of imparting direction to the process of arbitral decision-making. Factor (a), the lawful authority of the employer, is often developed in terms of the city's ability to raise revenues and thus becomes ancillary to the financial ability component of factor (c). Factors (e) and (f)—cost of living and present overall compensation

---

[55] Requiring the proponent of such evidence as part of its prima facie case to establish comparability of function of identically titled employees through *testimony,* or even job descriptions, substantially reduces the practicality of introducing evidence of "comparables" and is arguably inconsistent with an apparent legislative intent to encourage use of such evidence.

—are clear enough in reference but not in significance. Must wages keep pace with inflation? Is COLA legislatively encouraged? May an arbitrator award a city offer calling for a pay cut? Factors (b) and (g)—stipulations of the parties and changes in any of the other factors during the pendency of the proceedings—depend on the particular course of proceedings for their content, and factor (h) is open-ended, leaving room for consideration of any other factor "normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment" through collective bargaining, mediation or arbitration (and for the exercise of broad arbitral discretion in determining whether a factor fits that description).

The point is not that the criteria of § 9 fall short of being "as reasonably precise as the subject matter requires or permits". The Legislature need not attempt to identify every circumstance that might bear upon resolution of a police or fire fighter bargaining impasse or to provide a universal formula for weighting the various factors and combining them into a single grand calculation that will compel the chairman to the correct result. The point is that Act 312 arbitrators make legislative-political decisions on an ad hoc basis within a framework which, although it directs their attention to several specific considerations, does not provide for consistency of decision maker, decisional principles or fundamental policy, or for the development of a body of precedent from which policy may be deduced.

2

The judicial review provided by Act 312 is not a safeguard against the improper exercise of delegated policy-making power. The scope of judicial

review provided in § 12 seeks only to confirm that
the panel's decision is supported by "competent,
material and substantial evidence on the whole
record".[56]

Justice WILLIAMS would require that the chair-
man's finding and opinion reflect consideration of
all applicable § 9 factors. But such a requirement
provides no assurance that decisions made with
reference to the § 9 "standards" will evidence
consistent use of intelligible principles of broader
application than the particular case.

As our colleague's opinion in this case illus-
trates, the act does not provide for meaningful
judicial review of substantive questions. The statu-
torily prescribed standards are so general that any
reasonable decision can be justified. In the ten
years that Act 312 has been operative, not one
decision of an Act 312 arbitrator has been reversed
by the Court of Appeals or this Court on a sub-
stantive question.[57]

Given the likelihood of record support for any
reasonable decision the chairman might reach,
affirmance of the award is assured unless the
chairman has considered evidence outside the rec-
ord or employed decisional criteria not contem-
plated by the statute. As we said in *Dearborn Fire
Fighters:*

"Most disputes in public employment will present a
wide range of reasonable alternatives each of which is
supported by 'competent, material and substantial evi-
dence on the whole record.' Providing for judicial modi-

---

[56] MCL 423.242; MSA 17.455(42).

[57] Justice WILLIAMS cites a New York case which frames the inquiry
on review as whether "any basis for [the arbitrator's] conclusion is
apparent to the court" or whether "the criteria specified in the
statute were 'considered' in good faith and * * * the resulting award
has a 'plausible basis' ". *Caso v Coffey,* 41 NY2d 153, 158; 359 NE2d
683, 686 (1976).

fication of those few decisions not so supported is not a substitute for political accountability and review of the choice between reasonable alternatives."[58]

One may ask how even arbitrariness can be detected if the rules of decision-making are unknown. Courts ordinarily determine arbitrariness by comparing official conduct with some objective notion of how a set of principles should be applied to a given case. If assigning weight to the § 9 factors and determining how they interact in a given case rests in the judgment of the chairman, any choice he makes between two positions having evidentiary support is, as a practical matter, final. For example, a chairman may be able to justify awarding a cost-of-living allowance in any case where testimony is offered that such an adjustment is fair and necessary to prevent employees from losing ground to inflation, however compelling the evidence the employer produces on the other factors.

Moreover, if a chairman's opinion fails adequately to explain his award in terms of the § 9 criteria, a circuit judge to whom such an award is appealed is likely to remand the matter for amplified findings of fact and explanation of the chairman's reasoning rather than reverse outright. Assuming that the prevailing party did not utterly fail to make a record, the arbitrator can, by selective reference to the evidence and the § 9 criteria, inflate his initial conclusion like a balloon: the space it consumes expands but the message it bears remains the same.

Ordinarily, the opportunity for judicial review provides a measure of protection against arbitrary decisions which would apply different rules in the

---

[58] *Dearborn Fire Fighters, supra,* p 268 (LEVIN, J.).

same situation. However, the decisions of Act 312 arbitrators are not required to be published, which prevents the accretion of a visible body of precedent. Moreover, while Act 312 arbitrators are required to make findings of fact, they have not been required—although this Court might impose such a requirement in the construction of the act —to separate the policy element from fact finding.

In all events, judicial review for non-uniformity in policy is not practicable. Even if such decisions were to be published, since no arbitrator's decision is more important than another's, a court confronted with non-uniformity could not resolve the conflict. It would not be for the court to make the policy judgment which of the two conflicting policies should prevail.

In another vein, we find a practical, if not a logical, inconsistency in a mode of judicial review which refuses to uphold the award of a hardship exemption to the residency requirement because the panel did not consider "comparables" although neither party had offered comparisons, yet refuses to remand the award on economic issues although the panel excluded clearly relevant evidence which indicated that choosing the DPOA's, rather than the city's, last offer on economic issues would cost an additional $24,000,000 because of parity agreements with the Detroit Fire Fighters Association and the Detroit Police Lieutenants and Sergeants Association. In considering the hardship exemption issue, it is said that the panel must solicit evidence from the parties if they initially fail to introduce evidence on an applicable factor, even though their failure to produce evidence may reflect a consensus that the particular factor is inapplicable. In considering the chairman's rejection of proffered relevant evidence, however, the

dispositive inquiry on appeal is framed as whether the exclusion of the proffered exhibit "was so egregious as to cause the award * * * to be unsupported by competent, material and substantial evidence on the whole record".

The latter approach implies that as long as the record before the panel contains support for its conclusions, the exclusion of additional evidence, no matter how material, is of no moment.[59] This is a consequence of the latitude accorded the chairman in weighing and considering evidence on the § 9 factors. If the chairman has discretion to ignore properly admitted evidence, a court's power to assign error for the erroneous exclusion of relevant evidence is meaningless.

### B

The act provides that "[a]s to each economic issue, the arbitration panel shall adopt the last offer of settlement which * * * more nearly complies with the applicable factors prescribed in section 9".

The chairman thus *must* choose a party's proposal on each economic issue; he is forbidden to

---

[59] Justice WILLIAMS cites remarks made by the chairman at the time of the ruling in question and excerpts from his written opinion, but none of these statements indicates that he knew precisely what acceptance of the DPOA's last offer would cost the city as a result of parity agreements with the LSA and fire fighters. And while it is certainly true, as the chairman stated, that the panel cannot "escape the history the parties themselves have made", it is equally true that a proper assessment of "the financial ability of the unit of government to meet those costs" must include recognition of all costs inherent in either proposal.

Because the arbitrator clearly assigned a low priority to the city's financial position in making his decision, remanding the economic award for reconsideration in light of the improperly excluded exhibit would inevitably be futile. However, I regard it as appropriate to make specific objection to the analysis that our colleague employs in determining the proper disposition of the case in light of the chairman's exclusion of City's Exhibit 30.

fashion his own award. Both last offers may be far from what the chairman may consider the best result. Nevertheless, his power stops at the point of choosing the better of the two offers. His options may be hopelessly inadequate, but choose he must.

1

Implicit in every decision, even on economic issues, are policy judgments. The judgment must be made whether wages should be increased without regard to increases in productivity or only to the extent of improved efficiency, whether they should be increased to compensate for all increases in the cost of living or only a portion or not at all. The relationship between wage increases and fringe benefits, pensions, vacation and sick leave, holidays, hours of employment and tasks assigned must also be determined.

In making a last best offer the union and city both enunciate implicitly the policies which they advocate with regard to these judgments. In requiring the chairman to pick the offer which "more nearly complies with the applicable factors", the Legislature in effect forces the chairman to adopt a policy which may be non-uniform as compared to the policy applied to similarly situated communities. The likelihood of non-uniformity is exacerbated by the last-best-offer feature because the chairman cannot formulate his own policy but must choose between the policies advocated by the parties.

There can be no administrative policy when the administrators cannot fashion the rules. The vitality of any policy that a chairman might develop is in the parties' hands. If they by chance learn of the policy and fashion their offers in accordance with it, the policy stands a chance of having some

life. If the parties can discern no policy or feel safe in rejecting it because they are certain the other side will also, the policy is for naught. If there is no discernible policy, the parties have inadequate information to guide them in fashioning their bargaining strategy or devising a last offer that they can expect the chairman to find reasonable and adopt except what they can discern of the individual chairman's personal preferences.

If there is no policy each individual chairman will decide not only which offer is best but also what is the measure of "best". If there is no known policy by which to evaluate an award, there can be no effective judicial review. In sum, where the chairman has no power to fashion the award but must choose between the parties' last offers, there can be no principled development of policies to govern in all cases as each case is shaped and determined by the parties' last offers.

### 2

Last-offer arbitration further reduces political accountability. It tends to reduce the responsibility of the chairman who no longer is required to announce the result which he thinks most in accord with the statutory factors declared by the Legislature or the particularized policy choices implicit in whichever decision he makes. He is required, rather, as to economic issues, only to announce the result which "more nearly complies with the applicable factors." Having been relieved by the Legislature of responsibility for fashioning the best award, he need take no real responsibility for the result. The chairman can, as did the chairman in the instant case,[60] disassociate himself from

---

[60] "It must be emphasized that under the mandate of the Legislature, this panel can do no more than accept the *last offer of one of the*

the result which he himself announced, by intimating that if he were not restrained by last best offer he would reach a different result, presumably lying between the last best offers.

It is the shift of responsibility from the chairman to the parties which advocates find attractive about final offer arbitration:

"Under a conventional procedure the award rarely resembles either party's position but is a compromise between the two. As a result, both parties may respond to constituent complaints that any dissatisfaction with the award should be directed at the arbitrator. In contrast, the final offer arbitrator selects one party's offer *in toto* after comparing it with the other party's offer, offering each side considerable opportunity to influence the outcome. This influence opportunity tends to increase each party's responsibility for the final outcome compared to conventional arbitration."[61]

It is unrealistic to argue that there is any political accountability when not even the chairman of the panel need take responsibility. Responsibility for the public policy implicit in the award has moved even further from the Legislature. Under the present system it falls somewhere between the parties who fashion the last offers and the chairman who chooses between them.

3

The most striking characteristic of last-best-offer

---

parties. The panel might wish that the parties had framed different offers or offers that were closer to each other. But we cannot mandate what the parties do."

[61] Feuille, Final Offer Arbitration (Chicago: International Personnel Management Ass'n, 1975), p 55.

Although Feuille was here referring to final offer arbitration by package the observation is pertinent to final offer arbitration by issue as well.

arbitration is the elimination of the most appropriate result as an option. It is excluded unless it coincides with one party's offer.[62]

Putting delegation issues aside, it is a question of some moment whether the Legislature can constitutionally deprive itself, or its delegate, of the authority to make the best public policy.

Could the Legislature appropriate $100 million for revenue sharing to be allocated between urban, suburban and rural communities on a last-best-offer system, the purpose being to encourage the competing governmental units to reconcile their differences?

Could the Legislature announce that it was hearing proposals for a new criminal code and that it planned to enact the last best proposal on each controversial issue, the purpose being again to encourage the contending forces to be "reasonable" and thereby achieve a consensus that would have broad public support?

We are inclined to the view that the Legislature could not constitutionally take such action because the legislative power is the power to make the best

---

[62] "One other criticism of final-offer-by-package arbitration *and* of final-offer arbitration by economic issue that runs completely contrary to the implications of the charge that arbitrators split the difference is that these systems prevent the arbitrator from splitting the difference when he should do so. If, in his judgment, the legislative criteria justify a wage increase of 8 percent, but the management is offering only 6 percent and the union is demanding 10 percent, then the legislative prohibition against his splitting the difference means that the final settlement, regardless of which he picks, does not meet the criteria for wage-setting enumerated in the statute to the same degree as the settlement he would have imposed had he been allowed to select a compromise position.

"Critics who believe that arbitrators split the difference and should be prevented from doing so should also recognize that, by implication at least, they are suggesting that one or the other of the extreme positions is more sound than a middle-ground position. Theoretically, it is doubtful that this can be substantiated." Stern, Rehmus, Loewenberg, Kasper & Dennis, Final-Offer Arbitration (Lexington, Mass: Lexington Books, 1975), p 185 (emphasis in original).

laws which can result from the legislative process. The Legislature cannot legislate itself out of business before the fact. It cannot provide for law by lottery, the result to be determined by how close the interested parties approach the resolution the Legislature would pick if it were making the decision. Nor can it authorize an officer or agency to decide upon public policy in this fashion.

It might be argued that in the examples the Legislature denies itself the ability to make the best possible law without effecting a corresponding benefit in so doing. Act 312, however, promotes effective collective bargaining by forcing both parties to present serious settlement offers lest the last offer of the other side be chosen, and thereby increases their incentive to reach their own agreement and the likelihood that they will succeed.

The Legislature is indeed authorized to encourage collective bargaining, but peaceful resolution of collective bargaining disputes is not mandated by the Constitution.[63] The constitutionally conferred authority to provide therefor is permissive rather than obligatory and does not override other constitutional precepts concerning the manner in which governmental power may be exercised and governmental decisions may be imposed.

Further, the efficacy of binding arbitration as a method of resolving collective bargaining disputes does not depend on the last-offer procedure. Conventional binding arbitration operated in this state for several years, and other jurisdictions provide for binding arbitration with the arbitrator free to fashion the award.[64] Even last-offer enthusiasts

---

[63] Const 1963, art 4, § 48.

[64] RI Gen Laws, §§ 28-9.1-1 *et seq.;* Wash Rev Code Ann, §§ 41.56.450 *et seq.;* Or Rev Stat, §§ 243.742 *et seq.;* Pa Stat Ann, tit 43, §§ 217.1 *et seq.* (police and fire fighters); Pa Stat Ann, tit 55, § 563.2 (port authority); NJ Stat Ann, 34:13A-16(c) allows the parties

argue that it is an improvement over conventional binding arbitration, not that it is an essential feature.[65]

## 4

The last-offer system yields results which are unconstitutionally arbitrary.

While it may be sound public policy to encourage the resolution of labor disputes before the arbitration stage, once that stage is reached, the Legislature cannot constitutionally penalize the party who, although proceeding in good faith, presented a final offer which in the chairman's judgment did not as nearly satisfy the § 9 criteria as did the opponent's. The chairman's inability to fashion the most appropriate award and the need to pick one party's proposal which, although fairer, is still likely to err in the prevailing party's favor, is apt to effect a costly penalty.

The need to accept a city's wage offer, because more reasonable than the union's, rather than award the most appropriate wage could mean a significant difference in an employee's standard of living. The need to accept a union's COLA proposal because more nearly in compliance with the applicable factors than the city's could cost the city millions of dollars. When the city loses, the penalty is on the taxpayer—more taxes or reduced services.

In the instant case the dollar difference in the cost of the union's and the city's last best offers on the issues of wages and COLA is substantial. The

to choose between several methods of arbitration only one of which is final offer arbitration. NJ Stat Ann, 40:37A-96 (county improvement authority); *Fire Fighters Union Local 1186 v Vallejo,* 12 Cal 3d 608; 116 Cal Rptr 507; 526 P2d 971 (1974).

[65] Feuille, fn 61 *supra;* Stern, fn 62 *supra.*

Lieutenants and Sergeants Association case and the Fire Fighters case (which on the principle of parity will be governed by the disposition of this case) contribute to that difference. Had the chairman been free to announce the result which he regarded most in accord with the factors delineated by the Legislature, rather than forced to choose the last best offer which more nearly accorded with such factors, the total cost of the award may well have been substantially less.

Unless one party's offer duplicates what would be the most appropriate award, the losing party will always incur a penalty. The size of the penalty is arbitrary, having no relation to the good- or bad-faith quality of the bargaining or the losing party's last offer. It is determined by the reasonableness of the winning party's last offer; the closer that offer is to the most appropriate award, the less the penalty, and the less reasonable, the greater the penalty.

Having entered the field of public employee dispute resolution to provide for binding resolution having the force of law, the Legislature cannot constitutionally provide for so arbitrary a solution and penalty. While peaceful resolution of public employee disputes is an important value, something less draconian is required.

Peaceful resolution of judicial controversies has, with clogged court calendars, become a social goal. We have moved from the pretrial conference to mediation to arbitration and still other alternatives are being considered, all designed to avoid a trial on the merits. If the parties cannot agree on a settlement the case goes to trial. A jury, like an arbitration panel, hears evidence and receives documents. Suppose the Legislature provided that plaintiffs and defendants in personal injury, prod-

uct liability and medical malpractice actions would
each make a last best offer of settlement and that
after the jury's verdict was announced the offer
nearest the jury's verdict would become the final
verdict. If the defendant's last offer is $100,000,
the plaintiff's $500,000, and the jury's verdict is
anything between $1 and $300,000, the plaintiff
would receive $100,000. If the jury's verdict is over
$300,000, even $750,000, the plaintiff would re-
ceive $500,000.[66]

Such a system could not survive constitutional
challenge. Government action, whether legislative
or adjudicative, cannot be arbitrary even when
there is an arguable rationale for the arbitrariness
—the promotion of private settlements by penaliz-
ing those who did not try hard enough to settle.

## C

The 1976 amendments to the process for select-
ing a chairman,[67] made following *Dearborn Fire*

[66] Indeed, it is arguable that such a system is more arbitrary in the
Act 312 context because the last best offer applies to the policy as
well as to the facts. An offer on wages has two components: a
judgment as to how wages are to be determined (policy) and an
assessment of the proper award under that policy (fact finding). At
least in the tort action situation the prevailing last best offer would
not determine what rule of law would be applied in the case (the line
drawing question), but only what side of the line the case falls on.

If the Act 312 chairman was not aware of the last best offer and
was required to state what his decision would be if he were not
restricted to choosing between last best offers, the arbitrariness of
requiring him to opt for an award other than what he regards to be
proper would be more apparent.

[67] As amended by 1976 PA 84, § 5 of the act, MCL 423.235; MSA
17.455(35), reads:

"(1) Within 7 days of a request from 1 or both parties [§ 4 dele-
gate(s)], the employment relations commission shall select from its
panel of arbitrators, as provided in subsection (2), 3 persons as
nominees for impartial arbitrator or chairman of the arbitration
panel. Within 5 days after the selection each party may peremptorily
strike the name of 1 of the nominees. Within 7 days after this 5-day
period, the commission shall designate 1 of the remaining nominees
as the impartial arbitrator or chairman of the arbitration panel.

*Fighters,* have not provided any significant measure of political accountability in the arbitral process.

The MERC was directed to establish and appoint a panel of arbitrators composed of "impartial, competent, and reputable citizens" of the United States and residents of Michigan, who "qualify by taking and subscribing the constitutional oath or affirmation of office", serve for indefinite terms, and are subject to removal by the commission without cause. Within seven days of a request from one or both parties for initiation of arbitration proceedings, the commission submits to both parties the names of three persons selected from its panel of arbitrators to be nominees for chairman of the arbitration panel. Each party is authorized to peremptorily strike one of the names within five days, and the commission then designates one of the remaining nominees as chairman of the arbitration panel.

Justice WILLIAMS finds "as a practical matter that the act as now amended sufficiently provides for public responsibility and accountability" because these modifications of the selection procedure "have greatly altered the atmosphere of accountability surrounding the service of arbitration panel chairpersons".[68] We conclude that, while the

"(2) The employment relations commission shall establish and appoint a panel of arbitrators, who shall be known as the Michigan employment relations commission panel of arbitrators. The commission shall appoint members for indefinite terms. Members shall be impartial, competent, and reputable citizens of the United States and residents of the state, and shall qualify by taking and subscribing the constitutional oath or affirmation of office. The commission may at any time appoint additional members to the panel of arbitrators, and may remove existing members without cause."

[68] This conclusion is, of course, consistent with Justice WILLIAMS' opinion in *Dearborn Fire Fighters,* where he found an arbitrator appointed by the chairman of the MERC to be publicly responsible and adequately accountable.

set of persons eligible to become the chairman of an arbitration panel may in theory have been narrowed and the likelihood that some arbitrators will chair a number of panels increased, the alterations in the chairman selection process do not supply the necessary accountability because it remains impossible to assign meaningful responsibility to any public official or authority for the manner in which a chairman exercises delegated power.

1

Constituting a continuing panel of arbitrators under the auspices of MERC does not localize continuing responsibility for the decisions of arbitration panels or establish a readily apparent link between the arbitrator and politically accountable elected officials. Arbitrators continue to be selected to determine the terms of contracts on a case-by-case basis, and their tenures as decision makers last only so long as the individual disputes for which they were selected remain unresolved by agreement or award.

The panel is large enough to allow assignments to be dispersed among a large number of persons.[69] Membership on the panel is no guarantee of nomination or selection, and as before, all members have "non-public" occupations, often as grievance arbitrators in the private sector. It is entirely conjectural whether the new method of selection motivates arbitrators to conduct themselves so as to enhance their chances of continued employment in the resolution of Act 312 disputes. It is equally likely that most members of the panel are fully

[69] As of January 8, 1980, a MERC "list of fact finders" contained the names of approximately 100 persons approved as Act 312 arbitrators.

occupied with other endeavors and are indifferent to whether they receive additional Act 312 appointments. Moreover, since the act places a premium on expeditious resolution, availability may be a key factor in determining which arbitrators are nominated and selected at any particular time.

It is also argued that the state residency and oath-taking requirements, as well as the indefinite term of membership on the panel of arbitrators—subject to removal without cause—promote accountability by encouraging arbitrators to act responsibly. The chairmen of Act 312 panels before and after the 1976 amendments were Michigan residents. Oath taking is more form than substance under the circumstance that the arbitrator must be "impartial, competent, and reputable". It is most unlikely that any arbitrator would be removed from the panel because of a particular decision. The decisional scheme of the act insures that few awards can objectively be labeled irresponsible, for evaluation of the evidence in light of the § 9 decisional criteria is largely a matter of individual judgment. Moreover, the last-offer system narrows the arbitrator's role in deciding economic issues to choosing between two alternatives, either of which will be a legitimate choice on most records.

2

In all events, Justice WILLIAMS' arguments misconceive the issue. Even if the chairman's sensitivity to the impact of his decisions is heightened by his awareness of personal consequences, that circumstance provides no safeguard against non-uniformity of policy and lack of political responsiveness.

A chairman may not even be aware of the policy

content of his decision. The public is even less likely to appreciate that policy decisions concerning its governance have been made when an Act 312 decision is announced. The public sees, rather, that a highly charged controversy with conflicting claims and factual allegations has been resolved one way or another. The arbitration decision seems more like a jury verdict than a declaration of policy subject to legislative oversight and rectification.

It is said that the revised selection system produces a "high order of political accountability" because all members of the panel of arbitrators have been approved and appointed by MERC, whose three members are, in turn, appointed by the Governor. It is implausible that public reaction to a decision made by one of some 100 or more panelists bearing the *imprimatur* of a three-member gubernatorially appointed commission will be directed to the Governor. Revision of the selection process has not altered the reality that the members of MERC and the Governor do not regard themselves, and are not generally regarded by the citizenry, as responsible or accountable for the decisions of the panel chairmen.[70] Indeed, as we observed in *Dearborn Fire Fighters:*

"Political intervention would be regarded as an unwarranted intrusion on the independence of the 'impar-

---

[70] One passage in a publication released by the Police Officers Association of Michigan may be read as an indication that the Governor's present involvement in the arbitration process is unappreciated even by those most interested in the subject. Responding to a City of Detroit proposal that the Governor's approval be required to initiate arbitration, the POAM states: *"Bringing the Governor into the process* would further politicize matters and would impose the additional delay of a formal hearing to allow him to make a decision." Police Officers Ass'n of Michigan, The Act 312 Experience: An Answer to Proposals for Amendment (February, 1980), p 14 (emphasis added).

tial' decision maker. It would be regarded as improper
for the chairman of the MERC or higher governmental
authority to attempt to influence the arbitrator/chair-
man."[71]

The commission performs its statutory duty by
empanelling "impartial" arbitrators. When an im-
partial arbitrator resolves the dispute, the people
of the state, if they look to the Governor or Legis-
lature at all, can hardly complain that a selection
process with a large element of unpredictability
did not yield a chairman who would have reached
a different result.

The connection between the chairmen and the
Governor or the Legislature is too attenuated to
provide any measure of political accountability for
the arbitrators' decisions.

## D

We expect independence and impartiality in a
judge or grievance arbitrator. But an Act 312
arbitrator does not decide grievances arising under
an already established agreement. Rather, acting
for the state, he decides and imposes (legislates)
the terms of the employment relationship. "What
is sound in the exercise of judicial power and the
quasi-judicial power of the grievance arbitrator,
when applied to interest arbitration in the *public*
sector, is not consonant with a core concept of a
representative democracy: the political power
which the people possess and confer on their
elected representatives is to be exercised by per-
sons responsible *(not independent)* and accountable
to the people through the normal processes of the
representative democracy."[72]

---

[71] *Dearborn Fire Fighters v Dearborn, supra,* p 261 (LEVIN, J.).
[72] *Id.,* pp 256-257.

The MERC panel of arbitrators is composed largely of persons with grievance arbitration experience. The Legislature is undoubtedly within its prerogative in creating a system which allocates to persons with that experience, belonging to that fraternity, and who are professionally committed to the collective bargaining concept, the power to resolve public policy concerning the terms and conditions of public employment. But the persons chosen to make those decisions for the state may not be isolated from the political process. They may exercise such state power only within a structure which elevates the public interest to predominance, requiring that those who act for the state identify and align themselves primarily with that interest to the exclusion of competing concerns, and which provides means by which the political process may effectively influence the policy-making process and change the policies decided upon and imposed by them as functionaries of state government.

It is expected that government officials, while in office, "will develop a quickening sense of their public responsibility transcending insular concerns and that they will eschew outside endeavors which may be or appear to be incompatible with their public responsibility".[73]

Chairmen, only temporarily in office, all have outside occupations. Most accept employment from labor unions and employers as grievance arbitrators. "That is not wholly compatible with development of the kind of solitary concern for the public interest which the citizenry properly expects of its public officials."[74]

An arbitrator whose primary professional expe-

[73] *Id.,* p 269.
[74] *Id.*

rience and skill has revolved around the identification and accommodation of the interests of two private parties cannot be expected to focus predominantly upon the public interest, subordinating the special interests of the parties, where his Act 312 service is occasional and his primary professional activity remains as before.

## E

We address additional arguments advanced in favor of the constitutionality of Act 312.

## 1

It is argued that the provision of the constitution authorizing the Legislature to "enact laws providing for the resolution of disputes concerning public employees"[75] constitutes a "vast" grant of authority to the Legislature to establish whatever mechanism it might deem appropriate for the resolution of public employee labor disputes. It is noted that at the 1961 Constitutional Convention a proposed amendment to delete the operative language of the forerunner of this provision, offered by a delegate who specifically stated his opposition to "laws to settle the disputes beyond the 2 parties interested, so that * * * the 2 parties have to listen to the third party for a solution",[76] was defeated. It is contended that, because it was the intent of the Convention to leave the choice of procedures to future Legislatures, the Legislature and not this Court is the appropriate body to determine whether the delegation of power to the chairmen of Act 312 panels is an appropriate

[75] Const 1963, art 4, § 48.
[76] 2 Official Record, Constitutional Convention 1961, p 2341.

allocation of authority in a representative democracy.

In our form of government, the power to determine whether acts of the Legislature comport with the principles enshrined by the people in a constitution is confided to the judicial branch. The record of the 1961 Constitutional Convention does not indicate that the delegates, even if they specifically intended to authorize compulsory interest arbitration, intended to approve any particular method of implementing such arbitration, including the appointment of ad hoc arbitrators on a dispute-by-dispute basis. Nor does the inclusion of art 4, § 48 in the Constitution indicate that the delegates or the people intended the grant of authority to be so expansive that measures for the resolution of public employee labor disputes could be adopted without regard to other constitutional precepts. It does not disparage the power granted the Legislature by Const 1963, art 4, § 48 to require that that power be exercised in accordance with other constitutional principles, explicit or implicit.

2

It is claimed that to declare Act 312 unconstitutional because the structure does not provide for political accountability would be inconsistent with the constitutional authorization of similar dispute settlement mechanisms in Const 1963, art 11, § 5, establishing and declaring the powers of the Civil Service Commission. It is said that the commission is more conspicuously lacking in political accountability than the Act 312 arbitrator and that this Court's decisions upholding the broad constitutional grant of authority to the commission require us to uphold the delegation of legislative power effected by Act 312.

Const 1963, art 11, § 5 establishes the Civil Service Commission, prescribes the number, method of appointment and tenure of its members, and enumerates its duties, powers and obligations. The entire framework is constitutional because embodied in the Constitution. In contrast, Const 1963, art 4, § 48, relied upon as the source of constitutional authorization for Act 312, simply permits the Legislature to "enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service". No particular framework for the resolution of such disputes is constitutionally approved, nor is it declared that the Legislature may exercise this power without regard to other constitutional principles.

Moreover, certain features of the constitutional charter for the Civil Service Commission endow that body with a measure of political accountability and subject its policy-making powers to limited legislative review.

The commission consists of four non-salaried persons, "not more than two of whom shall be members of the same political party, appointed by the governor for terms of eight years, no two of which shall expire in the same year".[77] It is asserted that, although the commissioners are appointed by the Governor, their extended tenure renders it unlikely that they will be responsible or responsive to him; indeed, the concept of a bi- or multi-partisan body whose members serve staggered and substantial terms is designed to insulate the commissioners from, not expose them to, political accountability.

It may be that few commission members are politically accountable in the sense that they are

––––––––––
[77] Const 1963, art 11, § 5.

motivated by the desire to enhance their prospects of reappointment for a second 8-year term (although such a situation is hardly inconceivable).

However, the commission's continuing responsibility for state personnel policy promotes consistency in the determination of that policy and encourages a commissioner's development of "a quickening sense of [his] public responsibility transcending insular concerns" and of "the kind of solitary concern for the public interest which the citizenry properly expects of its public officials".[78] The commission has also exercised its constitutional power to "make rules and regulations covering all personnel transactions" to promote uniform treatment of comparable individual cases.[79]

Finally, Const 1963, art 11, § 5 provides that "the legislature may, by a two-thirds vote of the members elected to and serving in each house, reject or reduce increases in rates of compensation authorized by the commission". Thus, where the fiscal integrity of the state is implicated, the Legislature is empowered to override the policy judgment implicit in a commission recommendation on rates of compensation if two-thirds of the Legislature disagree with that judgment. Even if the Legislature has never exercised this veto power, its inclusion in Const 1963, art 11, § 5 indicates that the provision contemplates legislative oversight and rectification of the commission's judgment on the budgetary component of personnel policy.

3

Finally, it is contended that a 1978 initiatory amendment to Const 1963, art 11, § 5 authorizing

---

[78] *Dearborn Fire Fighters v Dearborn, supra*, p 269 (Levin, J.).

[79] Const 1963, art 11, § 5.

collective bargaining for Michigan State Police troopers and sergeants and the submission of issues unresolved through collective bargaining "to binding arbitration for the resolution thereof" "the same as now provided by law for public police and fire departments" amounts to a ratification by Constitution of the Act 312 arbitration scheme.

Compulsory interest arbitration as presently provided by Act 312 poses fewer dangers in the case of the State Police than in the varied cases of municipal police and fire fighters. Because there is only one State Police force, there is no danger that different policies will simultaneously be applied in comparable situations. The arbitrator will be setting a state policy which has statewide implications and which will be funded by the state and not by local units of government.

More pertinently, the 1978 amendment approves the compulsory interest arbitration concept only for the State Police. The Legislature has enacted implementing legislation providing for compulsory interest arbitration of labor disputes concerning only the State Police.[80] Neither the constitutional amendment nor the enactment of this enabling legislation has any bearing on the constitutionality or administration of Act 312. Just as the Legislature is free to modify or repeal Act 312, the constitutionality of that act is to be decided without regard to this amendment which concerns only the State Police.

## F

Justice WILLIAMS states that "the majority of jurisdictions which have considered [the accountability question] have found accountability", and

---

[80] 1980 PA 17; MCL 423.271 et seq.; MSA 17.455(81) et seq.

that the courts which have ruled otherwise "have done so primarily on the basis of distinguishable constitutional provisions".[81] We read the cases differently.

In support of the first proposition he cites *Medford Fire Fighters Ass'n v Medford;*[82] *Richfield v Local No 1215, International Ass'n of Fire Fighters;*[83] *Arlington v Board of Conciliation & Arbitration*[84] and *Division 540, Amalgamated Transit Union v Mercer County Improvement Authority.*[85]

*Division 540* is inapposite. The statement in that opinion to the effect that compulsory arbitration schemes are an innovative way to avoid deadlocked labor disputes is not responsive to the accountability argument; clearly it is not a finding of accountability.[86]

As becomes clearer in our colleague's footnote,[87] the other courts did not find accountability; one court misconceived the argument, and the others found that accountability was not required.

The Oregon Court of Appeals did not find ac-

[81] Williams, J., *ante,* p 472.

[82] *Medford Fire Fighters Ass'n v Medford,* 40 Or App 519; 595 P2d 1268 (1979).

[83] *Richfield v Local No 1215, International Ass'n of Fire Fighters,* 276 NW2d 42 (Minn, 1979).

[84] *Arlington v Board of Conciliation & Arbitration,* 370 Mass 769; 352 NE2d 914 (1976).

[85] *Division 540, Amalgamated Transit Union v Mercer County Improvement Authority,* 76 NJ 245; 386 A2d 1290 (1978).

[86] Interestingly, in *Division 540, supra,* p 251 the New Jersey Supreme Court observed that:

"Nevertheless, in [providing an innovative solution to deadlock], there must be excluded from the arbitration process matters involving governmental policy determinations which involve an exercise of delegated police power."

The court offered no explanation, and none suggests itself to us, how it can be said that arbitration of this sort is not rife with the very sort of policy determinations that the court had said must be excluded.

[87] Williams, J., fn 53.

countability in *Medford Fire Fighters.* The court misconceived the accountability argument, seeing in it only a concern that the arbitrator's decision might be based on his private interests.[88]

The Massachusetts court did not find accountability in *Arlington.* Instead, it found that the town "fail[ed] to give this argument constitutional content".[89]

Only the Minnesota Supreme Court, in *Richfield,* said that there was accountability. It concluded that "accountability to the public is like delegation of power; both are a matter of degrees. Although the arbitrators are not directly accountable to the public for their decisions, various provisions ensure the competence and accountability of the arbitrators".[90] The court came to this conclusion in much the same way as does our colleague, referring to the standards in the act (specifically the requirement that the arbitrator consider the financial impact of his decision), the requirement that

---

[88] "[T]his case is not analogous to cases in which the Supreme Court held unconstitutional statutes which delegated price-setting powers to interested private parties." *Medford Fire Fighters Ass'n v Medford, supra,* p —.

Thus (mis)conceived, the argument was properly rejected. The concept of political accountability, however, assumes no private motivation on the chairman's part and rejects the idea that labeling the arbitrator a public officer assures that responsibility for policy judgments will rest with an accountable official or body. (For purposes of our argument, it can be assumed that the arbitrator is not motivated by a private interest. It is interesting, though, that our colleague finds that the arbitrators are accountable *because* of their self-interest.)

[89] *Arlington v Board of Conciliation & Arbitration, supra,* p 780.

As we have explained, the delegation doctrine flows from, *inter alia,* the constitutional sections which vest the legislative power in the Legislature, provide for separation of powers, and state that all political power is inherent in the people. The Massachusetts court recognized that there exists a non-delegation doctrine and that it has a constitutional basis. Citation of additional constitutional texts should be unnecessary, since the accountability argument is but a statement of what must be shown for the delegation doctrine to be satisfied.

[90] *Richfield v Local No 1215, supra,* p 47.

the arbitrators be qualified by experience, and the removal power of the Minnesota Public Employment Relations Board.[91]

Thus, the courts of only three states—Massachusetts, Minnesota and Maine[92]—have addressed and

---

[91] Significantly, the court seems to have recognized the political unresponsiveness of the process, for it went on to find "a pragmatic reason for the legislature's removal of the arbitrators from the immediate pressures of public opinion" because "the parties must feel confident that the panel will listen to their positions, weigh the evidence, consider the panel's statutory obligations, and come to a reasonable decision. The legislature may well have believed that exposing the arbitrators to more direct public input would influence the panels and undermine the effort to prevent work stoppages". *Richfield, supra,* p 47.

To the extent that the Minnesota court was expressing the same thought as that expressed in *Biddeford v Biddeford Teachers Ass'n,* 304 A2d 387 (Me, 1973), our response is the same. We note additionally that we would not require that the arbitrators be subject to the immediate pressures of public opinion; rather, we would require that there be some manner in which the policy decisions being made would become subject to political scrutiny and legislative modification.

[92] The Supreme Judicial Court of Maine, in *Biddeford,* also denied that accountability was required, rather than finding accountability.

Although dividing 3-to-3 on the question whether the standards in the act were sufficient, the Court, employing reasoning that has been called a "[virtual] admi[ssion] that it could not explain its rationale," *Amsterdam v Helsby,* 37 NY2d 19, 35; 371 NYS2d 404; 332 NE2d 290 (1975) (Fuchsberg, J., concurring), unanimously stated:

"We realize that in providing that the contract making process itself (as it affects working conditions and hours) is subject to binding arbitration, our Legislature has moved into an area forbidden by many courts. The Legislature must have concluded that the benefits which are sought by the statute can never be achieved if an impasse occurs at the very beginning of the relationship. This conclusion is not unreasonable." *Biddeford, supra,* p 398.

Apparently venturing a guess as to the basis of this "not unreasonable" conclusion, the court suggested that power was delegated to "ad hoc panels whose memberships are not to be controlled by governmental action" because the Legislature has "sought to avoid the disruptive feelings of resentment and bitterness which may result if the governmental employee may look only to the government for redress of his grievances". *Id.*

This analysis implicitly assumes that state and municipal governments are one. Because the adverse party is the municipality, not the state, it is difficult to see how a requirement that the arbitrator be accountable to the state legislature would engender the feared resent-

rejected the political accountability argument made in *Dearborn Fire Fighters,* and only one of those courts found accountability.

Courts in an equal number of states—Utah, Colorado and Connecticut—have found an unconstitutional absence of political accountability; these courts did not, as our colleague claims, do so on the basis of distinguishable constitutional provisions.[93]

The decision of the Utah Supreme Court in *Salt Lake City v International Ass'n of Fire Fighters*[94] is not distinguishable. Although, as our colleague observes, the Utah scheme lacked specified standards and safeguards of the sort which would be required by many courts, the court specifically stated that that was not dispositive. The basis of the court's decision was that the "complexities of budgeting and the selection of programs are duties elected officials owe to the electorate; these policy decisions cannot be delegated to a private ad hoc panel of arbitrators in violation of [Utah Const] art VI, § 1 [which provides that the legislative power is vested in a Senate and a House of Representatives]", and that "[t]he power conferred on the panel of arbitrators is not consonant with the concept of representative democracy". Even if the act had provided standards, this constitutional objection would not have been overcome.[95]

---

ment unless state and city are regarded as a single entity. The state and the city, however, are not one; virtually every challenge to public sector compulsory interest arbitration statutes enacted by state legislatures has been brought by a municipality.

[93] The decision of the South Dakota Supreme Court in *Sioux Falls v Sioux Falls Fire Fighters, Local 814,* 89 SD 455; 234 NW2d 35 (1975), is, indeed, based on a distinguishable constitutional provision.

[94] *Salt Lake City v International Ass'n of Fire Fighters,* 563 P2d 786, 789-790 (Utah, 1977).

[95] Nor would the failure of the statute to specify standards and safeguards necessarily be fatal when those traditional protections are all that is thought to be required. Courts will sometimes imply the

Although the decision of the Colorado Supreme Court in *Greeley Police Union v City Council of Greeley*[96] involved a city charter provision, not a state statute, the court struck down the provision because "[a] contrary holding, in our view, would seriously conflict with basic tenets of representative government". Placing specific reliance on the lead opinion in *Dearborn Fire Fighters,* the court reasoned:

"Fundamental among these tenets is the precept that officials engaged in governmental decision-making *(e.g.,* setting budgets, salaries and other terms and conditions of public employment) must be accountable to the citizens they represent. Binding arbitration removes these decisions from the aegis of elected representatives, placing them in the hands of an outside person who has no accountability to the public."

Nor is the opinion of the Connecticut Superior Court in *Berlin v Santaguida*[97] distinguishable. To be sure, the court's recognition that the standards in the act fell far short of those included in the acts of other states, including Michigan, provided one basis of decision. But the court, also relying on the lead opinion in *Dearborn Fire Fighters,* additionally held:

"The arbitration scheme in question, insulating the arbitration panel from the electorate and representatives of the electorate, contravenes [Conn Const] Article Second, Article Third, § 1 [providing that the legislative power is vested in the legislative branch] and the delegation doctrine set forth in *[State v Stoddard,* 126

necessary standards and safeguards to save a statute. See *Division 540, supra,* p 252.

[96] *Greeley Police Union v City Council of Greeley,* 191 Colo 419, 422; 553 P2d 790 (1976).

[97] *Town of Berlin v Santaguida,* 98 LRRM 3259, 3264 (Conn Superior Court, 1978).

Conn 623, 628; 13 A2d 586 (1940), articulating the traditional 'intelligible principle' formulation of the delegation doctrine]. In addition, the concept of politically insulated, compulsory arbitration panels is so inconsonant with the proper exercise of political power in our representative democracy as to violate Article First, § 2 of the State Constitution, which provides in part that '[a]ll political power is inherent in the people.' "

There is, thus, an even division of authority on the accountability question among courts which have addressed the issue.

We recognize that a majority of those jurisdictions which have considered the constitutionality of legislation mandating binding public sector arbitration have upheld such enactments,[98] but most did so without adverting to the issue of political accountability.

Two of these decisions rested upon distinguishable constitutional or statutory provisions.[99]

The decisions of the Wyoming and Rhode Island courts were discussed in *Dearborn Fire Fighters*.[100]

---

[98] See Anno: *Validity and construction of statutes or ordinances providing for the arbitration of labor disputes involving public employees,* 68 ALR3d 885.

[99] The Pennsylvania statute, as we said in *Dearborn Fire Fighters,* is supported by a unique constitutional provision for which there is no Michigan analogue. *Dearborn Fire Fighters v Dearborn, supra,* pp 249-250 (LEVIN, J.), referring to *Harney v Russo,* 435 Pa 183; 255 A2d 560 (1969).

The Nebraska statute, upheld in *School Dist of Seward Education Ass'n v School Dist,* 188 Neb 772; 199 NW2d 752 (1972), does not delegate authority to impartial arbitrators. Rather, the state's Court of Industrial Relations, a continuing body with state-wide jurisdiction, decides all post-impasse disputes under the statute.

[100] "The Supreme Court of Wyoming [in *State ex rel Fire Fighters Local No. 946 v Laramie,* 437 P2d 295 (Wyo, 1968)] avoided the real issue by refusing to characterize as a delegation of legislative power the arbitrator's power to decide 'wages, hours of service, and working conditions.'* .

"* The reasoning of the Wyoming Court has been described as

We are unpersuaded by the reasoning employed by the remaining courts comprising the majority which upheld their statutes ultimately by perfunctory application of a conventional standards and safeguards test.[101]

---

'superficial at best.' Smyser, *Public Employees and Public Employees Unions: Their Rights and Limitations in South Dakota,* 17 SD L Rev 65, 72 (1972)."

---

*Dearborn Fire Fighters v Dearborn, supra,* p 248 (LEVIN, J.).

"The Rhode Island Supreme Court [in *City of Warwick v Warwick Regular Firemen's Ass'n,* 106 RI 109; 256 A2d 206 (1969)] acknowledged that the arbitrator's 'power to fix the salaries of public employees [is] clearly a legislative function,' but analyzed a challenge to the constitutionality of the delegation in a manner which has been correctly criticized as 'wholly tautological.'

"In Rhode Island, as in Michigan, the arbitration panel consists of three members. Each party selects an 'arbitrator' and the arbitrators 'agree upon and select and name a third arbitrator' to serve as chairman of the panel. If the parties could not agree, the third arbitrator was selected by the Chief Justice of the Rhode Island Supreme Court.

"The Rhode Island Supreme Court said that the determinative question was whether decisional authority had been delegated to public officials or improperly to private persons. It reasoned that since the panel enjoys the legislative 'power to fix the salaries of public employees, * * * without control or supervision from any superior' and its term of service and duties are specified by statute, each member of the panel (including the union arbitrator and the public-employer arbitrator) is a 'public officer and that collectively the three constitute a public board or agency.' Such nominalistic reasoning both begs the question and reduces the analysis of the issue to a reason-free debate over labels. Such reasoning could countenance the syllogism that all enactments of the Legislature are constitutional because the Legislature cannot pass an unconstitutional law." *Dearborn Fire Fighters v Dearborn, supra,* pp 248-249 (LEVIN, J.).

[101] *Spokane v Spokane Police Guild,* 87 Wash 2d 457; 553 P2d 1316 (1976); *Division 540 v Mercer County Improvement Authority, supra; Medford Fire Fighters Ass'n v Medford, supra; Arlington v Board of Conciliation & Arbitration, supra; Amsterdam v Helsby, supra,* p 27; *Richfield v Local No 1215, supra.*

The opinions vary in minor respects in their statements of the rule and emphasis upon particular features of the statutory scheme. In essence, however, these courts found that there were sufficient standards (in the form of factors similar to those in Act 312, and typically including a direction to consider the public interest) and sufficient safeguards in the form of (often undescribed) procedural devices, such as a hearing with a record, an opportunity for judicial review and a requirement that there be competent record evidence to support the

## V

Justice WILLIAMS would affirm the chairman's award on the economic issues contested by the city because he finds the award supported by "competent, material and substantial evidence on the whole record". He states that this statutorily prescribed standard of review requires the order of the panel to be based upon evidence relating to all § 9 factors applicable to the case at hand, and that if an award finds the necessary support in the record, "we are mandated to uphold it—whatever we believe to be its wisdom or its folly".

We have previously indicated that the Legislature has indeed articulated a narrow scope of judicial review of Act 312 awards and that most awards will be adequately supported when viewed in the dim and deferential light in which judicial scrutiny must be conducted.

Nevertheless, we cannot properly approve the instant award because the critical factor in the chairman's decision to award COLA was the award rendered by another panel in the arbitration between the city and the Detroit Police Lieutenants and Sergeants Association (LSA). The validity of that award has not been finally determined because the LSA case is being held in abeyance pending resolution of this case.

The opinion of the chairman of the DPOA arbitration panel declared that COLA was "the central

---

award, all preventing excessive delegation and arbitrary and capricious action or abuse of discretion.

· We have elsewhere expressed our view that the validity of compulsory interest arbitration statutes cannot be measured by the same standards-and-safeguards test applied when a delegation to an ongoing administrative agency is challenged, that judicial review offers inadequate protection in this context and that it is not sufficient merely to prevent arbitrariness and capriciousness.

We have commented upon other arguments or statements made in these cases in fns 86, 88, 89, 91 and 92, *supra.*

issue in this dispute". The chairman emphasized
that, because prior agreements achieved through
collective bargaining evidenced a relationship be-
tween the provisions obtained by the LSA and
those won by the DPOA, and because members of
both bargaining units worked together to perform
police functions, acceptance of the DPOA's COLA
offer was virtually mandated by the award of an
identical COLA provision in the LSA arbitration.

In his item-by-item analysis of the § 9 criteria,
the chairman of the DPOA panel specifically relied
upon the LSA COLA award in discussing four
factors.[102]

---

[102] "(c) The interests and welfare of the public and the financial
ability of the unit of government to meet those costs.

"* * * The interest and welfare of the public, in the judgment of
the chairman, would include, of course, the quality of services deliv-
ered; a disposition which would place the members of the DPOA at a
disadvantage as compared with Lieutenants and Sergeants clearly
would not conduce to the interest and welfare of the public. It would
be so patently unfair as to imperil morale and effective performance
for the protection of the public."

"(d) Comparison of the wages, hours and conditions of employment
of the employees involved in the arbitration proceeding with the
wages, hours and conditions of employment of other employees per-
forming similar services and with other employees generally:

"(i) In public employment in comparable communities.

"(ii) In private employment in comparable communities.

"This is a central section on which the main reliance of the
chairman has been placed. The comparison which is most appropriate
is that of the Lieutenants and Sergeants as explained. * * *

"It should be pointed out, under (d), there are no other employees of
the city performing similar services except other police officers,
namely, Lieutenants and Sergeants rank. So far as other employees
generally in the city, the award is higher than that negotiated with
unions representing other employees. But these are separate bargain-
ing units entitled to different assessment, and not alone controlling in
disposition here. The more apt and more persuasive comparisons are
with other security personnel."

"(e) The average consumer prices for goods and services, commonly
known as the cost of living.

. "This has been central in the consideration of the chairman in
disposition, not only because of the traditional philosophical appeal of
COLA but principally too, because of the previous award of the
Lieutenants and Sergeants and the bargaining history between the
parties; (e) [along] with (d) are central to the conclusions reached."

In light of the "central" importance attached to the LSA award, the validity of the DPOA panel's reasoning in awarding the union's last best offer on COLA hinges upon the validity of the LSA panel's award on that issue. The DPOA award can be regarded as supported "by competent, material and substantial evidence on the whole record" only if the LSA award was properly arrived at.

The city appealed the LSA award to circuit court and, following affirmance at that level, to the Court of Appeals. The city's application for leave to appeal to this Court from the Court of Appeals decision affirming the award was not filed until November 8, 1979, the date on which we granted leave to appeal prior to decision of the Court of Appeals in the instant case. The city subsequently filed a motion to consolidate the cases on the ground that they related to the same subject and had in common controlling questions of law, but we took no action in the LSA case until four weeks after oral argument in the instant case, at which time we ordered the application for leave to appeal held in abeyance and denied the motion to consolidate as moot.

Speaking with the benefit of hindsight, it appears that we failed to appreciate the extent of the relationship between the two awards, at least on the central COLA issue.

The gist of the city's argument in the LSA case is that a panel is not empowered selectively to determine which of the § 9 criteria are "applicable" or to place greater weight upon one or more criteria upon which evidence has been received at

"(g) Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

"Central in disposition are changes that have occurred during the pendency of proceedings including the Lieutenants and Sergeants award * * *."

the expense of other criteria also addressed in the · record. My colleague's opinion implicitly rejects that argument by holding that the statute mandates consideration of whichever § 9 criteria are applicable but does not evince a legislative intention that each factor be accorded equal weight or deprive the panel of discretion to determine which applicable factors are more important in resolving a particular issue.

Other questions raised by the city in the LSA case, however, remain to be answered, including arguments that: the award is not supported by competent, material and substantial evidence on the whole record; the panel, although paying lip service to the § 9 criteria of lawful authority of the employer, financial ability of the city and wages of comparable employees, in reality disregarded applicable criteria upon which it had received evidence and thus reached its decision in a manner not authorized by the statute; the opinions and awards of the panel do not contain sufficient written findings of fact to satisfy the requirements of § 8 and of due process; and the Court of Appeals opinion upholding the panel's award improperly considered a fact outside the record: because the city's last offer on wages was related by a percentage formula to the compensation fixed for police officers in the DPOA case, the city's last offer on wages ultimately exceeded the union's last offer, which was accepted.

In his original opinion and award, rendered October 18, 1978, the LSA chairman's total discussion and presentation of his decision on COLA read:

"In the panel's opinion, employees under a three-year contract are entitled to a cost-of-living allowance. The

panel therefore adopts the Association proposal on cost of living."

The Wayne Circuit Court found this portion of the award insufficient to permit judicial review and remanded the award to the panel for supplemental findings, based upon the applicable § 9 factors and the record, on the issues of cost of living, wages and economic aspects of sick· leave. Two days later, the DPOA arbitration panel entered its award, recognizing the LSA remand order parenthetically in a footnote.

On January 24, 1979, the chairman of the LSA panel filed his supplemental opinion and award pursuant to the remand order. The city's brief in support of its application for leave to appeal in the LSA case argues that the "January 24, 1979 Supplemental Opinion and Award * * * is nothing more than a transparent after-the-fact attempt to justify [the] award." [p 21]. The city argues that the chairman's later effort disclaims reliance on comparative wage surveys acknowledged as relevant and influential in the original opinion and conceals rather than reveals the actual basis of the panel's award on economic issues.

The supplemental opinion discusses the wages and cost of living issues together in relation to the § 9 criteria. Close examination of the supplemental opinion, however, reveals little more than an inflated version of the bald conclusion originally stated: the certainty of inflation entitles employees to a cost-of-living allowance. In considering criterion (e) of § 9, the cost of living, the panel concluded:

"[A] cost of living allowance would be necessary to supplement the salary proposals of either of the parties in order to preserve the purchasing power of Lieuten-

ants and Sergeants during the life of this contract. The panel finds that maintaining the purchasing power of affected employees is a legitimate aim of the economic provisions of a labor contract. In any case, the city has failed to provide any testimony that would support the proposition that the purchasing power of Lieutenants and Sergeants should not be maintained.

"Since the city has offered no cost of living allowance, and has proposed salary increases that would significantly reduce the purchasing power of Lieutenants and Sergeants, the panel finds that the cost of living factor supports the Association's economic proposals."

The chairman treated the other applicable factors as follows:

(a) Although recognizing that constitutional, statutory and charter provisions precluded the city from raising taxes or realizing revenue beyond the figures stated in its exhibits and budget, the chairman declared:

"The question presented by this arbitration is what proportion of the total budget will be allotted for wages and benefits for Detroit Police Lieutenants and Sergeants. * * * The panel also recognizes that if city officials can limit the scope of an arbitration panel's authority simply by declaring budget limitations, there often would be no purpose for conducting arbitration proceedings."

(c) The chairman found that "the city did not claim an inability to pay but rather indicated that the present appropriation and budgeted amount for Lieutenants and Sergeants was insufficient to pay salaries, COLA and fringe benefits that were the subject of the union demands". While claiming to be cognizant of the interests and welfare of the public and the city's ability to pay, the panel declared that "the real issue" was whether a cost-of-living allowance approximately identical to that

contained in the prior contract should be continued, and that while "the city's financial position and legal authority is indeed a valid consideration * * * other criteria are more important, including cost of living".

(d) In considering the position of public employees in comparable communities, the panel exhaustively reviewed the data submitted by the parties on wages and other provisions in cities stipulated to be comparable, only to reject those figures as a basis for comparison because "no evidence [was] submitted as to what Sergeants and Lieutenants do in those 'comparable' communities". Instead, the panel declared that "the prior collective bargaining agreement * * * arrived at by mutual agreement and a meeting of the minds" was the most relevant comparison in determining adequate compensation for the services rendered by Detroit Police Lieutenants and Sergeants, and concluded a cost-of-living allowance was necessary to maintain that level of compensation.

(f) The chairman adverted to the overall compensation presently received by Lieutenants and Sergeants to emphasize that the previous agreement on wages and COLA had been negotiated and that the Association sought only to include identical provisions in the new contract.

The chairman found factors (b), (g), (h) and (d)(ii) —wages and conditions of those performing similar services in private employment and comparable communities—inapplicable.

The circuit court subsequently upheld the award and the Court of Appeals affirmed.

While we do not wish to be understood as intimating an opinion on the merits of a case not formally submitted for decision, we do not view the validity of the LSA arbitration award as a

foregoing conclusion. Surely the Court has the power to give some content to the statutory factors. Nor do we understand how the DPOA award can be upheld before judicial review of the LSA award is completed. To do so would imply that it is immaterial to the validity of the instant award whether another decision repeatedly identified as a "central" consideration in the chairman's reasoning is invalidated. Such an approach confirms the general lack of principled decision-making inherent in Act 312, the emptiness of the judicial review provided by the statute, and the paucity of safeguards attending the exercise of legislative-political power by Act 312 arbitrators.

COLEMAN, C.J., and KAVANAGH, J., concurred with LEVIN, J.

ADDENDUM

COLEMAN, C.J. The researcher will note that in *Dearborn Fire Fighters v Dearborn,* 394 Mich 229; 231 NW2d 226 (1975), I wrote to the opposite of the opinion I have now signed.[1] I must confess to a starry-eyed vision of how the 1969 legislative form of compulsory arbitration should operate—but it has not. More importantly, I am now convinced that it cannot operate constitutionally under the present statute.

[1] For those interested in quirks of fate, the history of the writing of *Dearborn Fire Fighters* parallels the rapid loss to our Court of 3 Justices, hence 4 opinions from 4 Justices, totalling an ultimate 2-1-1 split decision. It had been my intention to sign the opinion of another to the same end as my subsequent lone offering. There may have been at least a third vote, had not the writings taken so long (2 years) and intervening events so decimated our Court. It matters not at all to history and only possibly to the curious legal historian, but such was the state of the Supreme Court during the writing and deliverance of *Dearborn Fire Fighters.*